Julie E Maurer
David Christian Clukey
LEWIS BRISBOIS BISGAARD & SMITH LLP
2929 North Central Avenue, Suite 1700
Phoenix, AZ 85012
Telephone: 602.385.7879
Facsimile: 602.385.051
julie.maurer@lewisbrisbois.com
david.clukey@lewisbrisbois.com

Peter N. Kirsanow
Richard Hepp
BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP
200 Public Square, Suite 2300
Cleveland, Ohio 44114-2378
Telephone: 216.363.4500
Facsimile: 216.363.4588
pkirsanow@beneschlaw.com
rhepp@beneschlaw.com

*Attorneys for Defendant Arizona Logistics, LLC*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Secretary of Labor, United States Department of Labor<br><br>Plaintiff,<br><br>v.<br><br>Arizona Logistics, Inc., d/b/a Diligent Delivery Systems, an Arizona corporation; Parts Authority Arizona, LLC, an Arizona limited liability company, and Larry Browne, an individual<br><br>Defendants. | Case No. 2:16-cv-04499-DLR<br><br>**DEFENDANT ARIZONA LOGISTICS, INC.'S MOTION FOR SUMMARY JUDGMENT**<br><br>**(Oral Argument Requested)** |

Pursuant to Fed. R. Civ. P. 56.1, Defendant Arizona Logistics, Inc. d/b/a Diligent

Delivery Systems ("Diligent") hereby moves this Court for an order granting it summary

judgment on all claims asserted by Plaintiff Secretary of Labor, U.S. Department of Labor

("DOL") in its First Amended Complaint for Injunctive Relief and to Recover Amounts

Due Under the Fair Labor Standards Act (29 U.S.C. § 201 et seq.) ("Complaint").  The ground for this Motion is that no genuine issue of material fact exists precluding the entry of judgment in Diligent's favor as a matter of law.  This Motion is based upon the pleadings, supporting evidentiary citations in Diligent's Statement of Undisputed Material Facts, deposition testimony filed with the Court, and the below Memorandum of Points and Authorities in support.

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1
II.    FACTS .............................................................................................................. 3
       A.    Diligent's Business ............................................................................... 3
       B.    Diligent's Independent Contractor Relationship with Clients ............... 3
       C.    Diligent's Clients ................................................................................. 3
       D.    Parts Authority's Business ................................................................... 4
       E.    Diligent's Independent Contractor Relationship with IC Drivers ......... 4
       F.    IC Driver Compensation ...................................................................... 6
       G.    IC Drivers Onboarding ........................................................................ 6
       H.    IC Drivers Hire Helpers and Service Non-Diligent Clients................... 6
       I.     IC Drivers Provide Various Delivery Services...................................... 7
       J.     IC Drivers Control Their Delivery Services .......................................... 8
       K.    IC Drivers' Delivery Services Vary by Client ....................................... 8
       L.    Diligent's Independent Contractor Model ............................................ 10
       M.    DOL Fails to Execute Tolling Agreements ........................................... 11
III.   STANDARD OF REVIEW ................................................................................ 12
IV.    LAW AND ARGUMENT ................................................................................... 13
       A.    IC Drivers Are Independent Contractors Under FLSA ......................... 13
             1.    IC Drivers' control how their work is performed ....................... 14
             2.    IC Drivers have opportunities for profit and loss based on their
                   managerial skill ....................................................................... 15
             3.    IC Drivers invest in equipment and employ helpers.................. 16
             4.    IC Drivers do not possess special skills.................................... 17
             5.    IC Drivers do not have a permanent relationship ..................... 17
             6.    IC Drivers are not integral to Diligent's business.................... 17
       B.    The Testifying Witnesses Do Not Sufficiently Represent the IC
             Drivers................................................................................................. 19
       C.    The Two-Year Statute of Limitations Applies to DOL's Claims ......... 21
             1.    Diligent's reliance on case precedent, legal advice, and prior
                   decisions precludes a finding of willfulness ............................. 21
             2.    DOL is not entitled to equitable tolling .................................... 23
             3.    The tolling agreements are ineffective...................................... 25
       D.    Liquidated Damages Are Precluded Based On Diligent's Good Faith
             and Reasonable Belief IC Drivers Are Independent Contractors ......... 25
             1.    Diligent possesses a good-faith belief that IC Drivers are
                   properly classified as independent contractors ......................... 25
             2.    Reasonable grounds exist for Diligent's conclusion.................. 26
       E.    DOL Is Not Entitled to Injunctive Relief.............................................. 27
V.     CONCLUSION .................................................................................................. 27

# TABLE OF AUTHORITIES

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Andersen v. DIRECTV Inc.*,
No. CV-14-02307-PHX-SRB, 2017 U.S. Dist. LEXIS 215955 (D. Ariz. July
26, 2017) ...............................................................................................................16, 17, 22

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..........................................................................................................12

*Barba v. Lee*,
No. CV 09-1115-PHX-SRB, 2009 U.S. Dist. LEXIS 132415 (D. Ariz. Nov. 3,
2009) ..................................................................................................................................24

*Benshoff v. City of Virginia Beach*,
180 F.3d 136 (4th Cir. 1999) ............................................................................................13

*Bonner v. Mich. Logistics Inc.*,
250 F. Supp. 3d 388 (D. Ariz. 2017) ................................................................................24

*Bonnette v. California Health & Welfare Agency*,
704 F.2d 1465 (9th Cir. 1983) ............................................................................................1

*Bratt v. County of Los Angeles*,
912 F.2d 1066 (9th Cir. 1990) ....................................................................................25, 26

*Browning v. Ceva Freight, LLC*,
885 F. Supp. 2d 590 (E.D.N.Y. 2012) ..............................................................................15

*Cervantes v. Countrywide Home Loans, Inc.*,
656 F.3d 1034 (9th Cir. 2011) ..........................................................................................23

*Donovan v. Sureway Cleaners*,
656 F.2d 1368 (9th Cir. 1981) .....................................................................................1, 13

*Farrakhan v. Gregoire*,
590 F.3d 989 (9th Cir. 2010) ............................................................................................19

*Fugate v. Dolgencorp, LLC*,
No. 3:10-CV-344, 2012 U.S. Dist. LEXIS 151876 (N.D. Ind. Oct. 23, 2012)................22

*Herman v. Express Sixty-Minutes Delivery Serv.*,
161 F.3d 299 (5th Cir. 1998) ...........................................................................2, 11, 15, 22, 26

*Hultgren v. County of Lancaster*,
    913 F.2d 498 (8th Cir. 1990) ....................................................................................22

*Krupicki v. Eagle One, Inc.*,
    No. 4:12-cv-00150 KGB, 2014 U.S. Dist. LEXIS 46038 (E.D. Ark. April 3,
    2014) ..........................................................................................................................16

*Lee v. Venetian Casino Resort, LLC*,
    747 Fed. App'x 607 (9th Cir. 2019) ..........................................................................23

*Local 246 Util. Workers Union v. Southern Cal. Edison Co.*,
    83 F.3d 292 (9th Cir. 1996) ......................................................................................25

*Matsushita Elec. Indus. Co. v. Zenith Radio*,
    475 U.S. 574 (1986) ..................................................................................................13

*McLaughlin v. Richland Shoe Co.*,
    486 U.S. 128 (1988).............................................................................................21, 22

*Moba v. Total Transp. Servs.*,
    16 F. Supp. 3d 1257 (W.D. Wash. 2014)........................................13, 15, 16, 17, 18

*Nelson v. Waste Management of Alameda Cty., Inc.*,
    33 Fed. App'x 273 (9th Cir. 2002) .......................................................................21, 22

*Parrish v. Premier Directional Drilling, L.P.*,
    917 F.3d 369 (5th Cir. 2019) ....................................................................................14

*Prentice v. Fund for Pub. Interest Research, Inc.*,
    No. C-06-7776 SC, 2007 U.S. Dist. LEXIS 71122 (N.D. Cal. Sep. 18, 2007) ......................24

*Reich v. Southern Md. Hospital*,
    43 F.3d 949 (4th Cir.1995) .......................................................................................19

*Reich v. Southern New England Telecomm. Corp.*,
    121 F.3d 58 (2nd Cir. 1997)......................................................................................19

*Roslov v. DirecTV Inc.*,
    218 F. Supp. 3d 965 (E.D. Ark. 2016) ..........................................................15, 16, 17

*Secretary of Labor v. DeSisto*,
    929 F. 2d 789 (1st Cir. 1991).............................................................................2, 19, 20

*SEIU, Local 102 v. County of San Diego*,
    60 F.3d 1346 (9th Cir. 1995) ....................................................................................22

*Stoll v. Runyon*,
    165 F.3d 1238 (9th Cir. 1999) ..................................................................................23

*Terwilliger v. Home of Hope*,
    21 F. Supp. 2d 1305 (N.D. Okla. 1998) ................................................................22

*United States v. Spector*,
    55 F.3d 22 (1st Cir. 1995) ........................................................................................25

*Velu v. Velocity Exp., Inc.*,
    666 F. Supp. 2d 300 (E.D. N.Y. 2009) ...................................................................18

*Wallace v. Kato*,
    549 U.S. 384 (2007) .................................................................................................23

**Statutes**

29 U.S.C. § 203 ...............................................................1, 2, 11, 13, 18, 21, 22, 23, 24, 25, 26, 27

**Other Authorities**

29 C.F.R. §785.35 ...............................................................................................................21

29 C.F.R. § 791 ....................................................................................................................1

Fed. R. Civ. P. 56(a) ..........................................................................................................12

Fed. R. Civ. P. 56.1 ..............................................................................................................1

FLSA 2019-6 (April 29, 2019) ...........................................................................................18

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

DOL alleges in its Complaint that Diligent, Diligent's owner, Larry Browne, and Defendant Parts Authority Arizona, LLC ("PA"), as joint employers[1], have failed to pay overtime wages and minimum wage to a pool of drivers who delivered automotive and truck parts in Arizona, as required by the Fair Labor Standards Act ("FLSA").  The issue before this Court is whether DOL can meet its burden of proving that the drivers are "employees," as defined under the FLSA, when the record evidence categorically shows that the drivers are in business for themselves, which is the ultimate question.  DOL does not come close to carrying its burden.

Simply put, the drivers are independent contractors engaged to perform discrete delivery services for parts distributors and dealerships.  Diligent's role in this process is limited.  Diligent does not employ drivers or make deliveries on its own.  Rather, Diligent acts as a broker between the distributors and dealerships, on the one hand, and the drivers, on the other.  It identifies delivery opportunities for the drivers and processes their invoices for payment by the distributors and dealerships.  That is the sum and substance of Diligent involvement.  Drivers have sole control over whether and how to perform the delivery services.  Drivers can and frequently do hire subcontractors to perform the delivery services on their behalf.  And they can and do perform delivery services for Diligent's clients and other entities at the same time.  Based on the factors set forth in *Donovan v. Sureway Cleaners*, 656 F.2d 1368, 1370 (9th Cir. 1981), and the uncontroverted facts, there is no genuine dispute that the drivers are independent contractors and not subject to the FLSA.

---

[1] In the interest of brevity, Diligent hereby incorporates the Memoranda and Points of Authorities filed separately by Mr. Brown and PA, as if fully stated herein, as to why Defendants are not joint employers of the drivers.  Suffice it to say, DOL has failed to adduce any evidence that Defendants exercised the "considerable control" necessary to be found joint employers of the drivers, based on the factors set forth in *Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983), which were recently adopted by DOL in its March 16, 2020 interpretation of joint employer status under the FLSA, 29 C.F.R. § 791.

Further, DOL fails to produce sufficient evidence to establish not only that the drivers performed work for which they were improperly compensated but also the amount and extent of that work, "as a matter of just and reasonable inference." *Secretary of Labor v. DeSisto*, 929 F. 2d 789, 792 (1st Cir. 1991). DOL relies on the testimony of eight drivers to show that all 1,649 drivers were employees of and not properly compensated by Diligent. As the record evidence demonstrates, however, each driver's experience was so individualized and client specific that it cannot form a proper basis for how all drivers are treated. Moreover, the testifying drivers only provided delivery services for nine of Diligent's fifteen clients. There is absolutely no evidence regarding the remaining clients. Given these severe limitations, the testimonial evidence falls far short of being sufficiently representative of the non-testifying drivers.

Finally, DOL cannot adduce any evidence that Diligent willfully violated the FLSA and did not act in good faith by classifying the drivers as independent contractors. In fact, the opposite is true. Diligent sought the advice of counsel numerous times while developing and refining its independent contractor model. Its counsel based that advice on the Fifth Circuit's decision in *Herman v. Express Sixty-Minutes Delivery Serv.*, 161 F.3d 299 (5th Cir. 1998), which held that drivers substantially similar to the drivers here were independent contractors based on a full seventy-three years of controlling Supreme Court precedent, and numerous court and administrative law decisions upholding Diligent's classification of the drivers as independent contractors. Moreover, Diligent relied on the decisions of neutral arbitrators who have found that the drivers were independent contractors not subject to the FLSA as a matter of law. There can be no clearer evidence that Diligent sought to properly classify the drivers under the FLSA and did so in good faith. Thus, DOL would not be entitled to a three-year statute of limitations or liquidated damages were this Court to determine the drivers are employees, which they are not.

Based on the undisputed facts and supporting evidentiary citations in the Statement of Undisputed Material Facts ("DSUF") filed by Diligent, which is incorporated herein, Diligent respectfully submits that this Court should grant summary judgment in its favor

1  as to each of DOL's claims.

2  **II.    FACTS**

3  **A.    Diligent's Business**

4  Diligent is in the logistics business.  It acts as a broker between clients that have

5  products to be delivered in Arizona and independent contractors who offer delivery

6  services in Arizona ("IC Drivers").  Diligent does not employ delivery drivers or make

7  deliveries.  (DSUF, ¶ 1.)  Diligent employs a general manager and an operations manager

8  to solicit clients and identify IC Drivers.  (DSUF, ¶ 2.)

9  **B.    Diligent's Independent Contractor Relationship with Clients**

10  Diligent and its clients execute contracts, known as Master Client Services

11  Agreements and Client Services Agreements, that govern the scope of their engagement

12  and the engagement of IC Drivers ("Client Agreements").  Pursuant to the Client

13  Agreements, an independent contractor relationship exists between Diligent, the client, and

14  IC Drivers.  Specifically, the Client Agreements provide that "[a]ll services to be provided

15  by DILIGENT and by an [IC Driver] shall remain completely separate and independent

16  from each other.  Neither Client nor DILIGENT is in any way responsible for (i) providing

17  or maintaining any tools or vehicles that might be needed, or (ii) for any costs or expenses

18  that might be incurred by [IC Drivers] in connection with delivering parts for Client."

19  (DSUF, ¶ 3.)  In return for its brokerage service, Diligent charges its clients a monthly,

20  daily, or per-mile rate based on a formula that takes into consideration the number of IC

21  Drivers needed to perform delivery services, the frequency of deliveries, the estimated

22  miles to be driven, and the type of vehicle needed to complete the deliveries.  (DSUF, ¶ 4.)

23  **C.    Diligent's Clients**

24  Diligent has fifteen clients in Arizona, including AAPAK, Canyon State Bus Sales

25  ("Canyon"); Cummins Rocky Mountain, LLC ("Cummins"); Freightliner of Arizona

26  ("Freightliner"); NAPA; National Transmission Products, Inc. ("NatPro"); PA; Penske

27  Automotive Group, Inc. ("Penske"); Rush Tire Centers of Arizona, Inc. ("Rush"); SSF

28  Imported Auto Parts, LLC ("SSF"); TireHub; Watson Chevrolet ("Watson"); and

WorldPac. (DSUF, ¶ 5.)  Most, including Cummins, Freightliner, NAPA, NatPro, PA, Rush, SSF, and TireHub, sell automotive and truck parts to vehicle dealerships, repair shops, parts retailers, and the public.  Penske operates approximately twenty vehicle dealerships.  (DSUF, ¶ 6.)  Diligent's clients use IC Drivers to deliver parts, complete invoices, collect payment, and transport returned parts back to their store or warehouse. (DSUF, ¶ 7.)

### D.    Parts Authority's Business

PA sells auto parts, tools, equipment, and transmissions.  PA distributes these products from a warehouse to its stores and customers as needed.  (DSUF, ¶ 8.)  During the relevant time period, PA operated as many as twelve stores and one warehouse in Arizona.  (DSUF, ¶ 9.)  Like Cummins, NAPA, and Rush, PA used IC Drivers to supplement its own employee-driver workforce.  (DSUF, ¶ 10.)  Roughly one quarter of PA's sales in Arizona were delivered to local repair shops and other stores by IC Drivers. PA's remaining sales were either delivered by employee-drivers or common carriers, or picked up by walk-in customers.  (DSUF, ¶ 11.)

PA supplies most of its employee-drivers with PA-owned vehicles.  It reimburses other employee-drivers who use their own vehicles to make deliveries for gas, mileage, maintenance, and insurance. When not making deliveries, PA's employee-drivers stock shelves, pull parts, clean, and fill in as needed.  Unlike IC Drivers, PA's employee-drivers are required to return to the store after their last delivery to scan receipts and return their PA vehicle.  (DSUF, ¶ 12.)  Also unlike IC Drivers, PA's employee-drivers are subject to PA's employee policies and procedures.  (DSUF, ¶ 13.)

### E.    Diligent's Independent Contractor Relationship with IC Drivers

Diligent identifies IC Drivers through advertisements on Craigslist and referrals from other IC Drivers.  (DSUF, ¶ 14.)  Prior to a client engagement, a Diligent representative meets with IC Drivers and explains the independent contractor relationship between Diligent, its client, and IC Drivers.  (DSUF, ¶ 15.)  The Diligent representative also reviews the Owner Operator Agreement ("IC Agreement") that governs the

engagement.  (DSUF, ¶ 16.)

The IC Agreement provides that, during the term of their engagement, Diligent "may, from time to time, inform [the IC Driver] of a client-engagement opportunity" to provide delivery services and the IC Driver "shall have the right to decline or accept any such opportunity."  The IC Agreement further provides that the IC Driver "shall control and determine all matters related to the performance of an engagement," that Diligent does "not dictate the time of performance or the time or hours during which an opportunity is to be performed," and that the IC Driver has the right to terminate the IC Agreement on seven days' written notice.  (DSUF, ¶ 17.)

Under the IC Agreement, IC Drivers are solely responsible for supplying all tools and equipment necessary for completing the delivery services, including vehicles, trailers, cargo nets, tie downs, and cages.  IC Drivers are also responsible for all costs—automobile insurance, fuel, oil, and tires—associated with their assignments; applicable taxes; worker's compensation insurance; and reimbursing clients for lost or damaged products.  (DSUF, ¶ 18.)  For certain clients, such as Cummins, Freightliner, NAPA, Rush, and TireHub, this means IC Drivers are required to supply full-size pickup trucks and vans.  (DSUF, ¶ 19.)  While IC Drivers could be required by clients to wear a shirt and identification badge, Cummins, Freightliner, PA, and Rush do not require such shirts and others, including Penske and TireHub, do not enforce it.  (DSUF, ¶ 20.)  In no event are IC Drivers required to display signage on their vehicles.  (DSUF, ¶ 21.)

During the initial meeting, the Diligent representative also discusses which clients are in need of delivery services and their rates so that IC Drivers could decide whether to accept an opportunity, or not.  (DSUF, ¶ 22.)  IC Drivers choose the client, delivery schedule, and location where they want to provide delivery services.  They can also choose to provide delivery services for more than one client.  (DSUF, ¶ 23.)  IC Drivers understand they are independent contractors prior to executing the Owner Operator Agreement.  (DSUF, ¶ 24.)

1

### F.      IC Driver Compensation

Rates for IC Drivers are based on the client, the frequency of deliveries, the estimated number of miles to be driven, the type of vehicle needed, and the type of product being delivered.  (DSUF, ¶ 25.)  IC Drivers can renegotiate rates if they drive more miles than initially estimated.  (DSUF, ¶ 26.)  IC Drivers are paid for each day they provide delivery services, minus a $2 daily administrative fee Diligent charges to offset its overhead and expenses incurred by IC Drivers for lost or damaged parts, unreturned collections, and truck rentals.  (DSUF, ¶ 27.)

### G.      IC Drivers Onboarding

IC Drivers who execute an IC Agreement are required to provide a driver's license, vehicle information, Social Security card, motor vehicle record, proof of insurance, and a Form W-9.  (DSUF, ¶ 28.)  Diligent uses this information to create invoices for clients and settlement sheets for IC Drivers.  (DSUF, ¶ 29.)  Diligent's clients have no involvement in identifying or onboarding IC Drivers and are not provided copies of onboarding paperwork submitted by IC Drivers.  (DSUF, ¶ 30.)

### H.      IC Drivers Hire Helpers and Service Non-Diligent Clients

IC Drivers can elect to use subcontractors to provide delivery services for Diligent's clients.  (DSUF, ¶ 31.)  IC Drivers have sole control in choosing the subcontractors and are responsible for determining their compensation, scheduling their work, and providing them with tools and equipment, including vehicles, as necessary.  IC Drivers are also responsible for paying their subcontractors.  (DSUF, ¶ 32.)  Moreover, IC Drivers are permitted to provide delivery services for non-Diligent clients while engaged by Diligent.  (DSUF, ¶ 33.)

For example, IC Driver Eric Cutler engaged subcontractors on behalf of his company, Eric Cutler Enterprises, to perform delivery services for TireHub using fully insured vehicles he provided.  Cutler also tasked one subcontractor with scheduling the routes for all of his subcontractors, and used those subcontractors to complete deliveries for other entities while also servicing TireHub. (DSUF, ¶ 34.)  Similarly, IC Driver Russell

Brooks contracted four drivers to provide delivery services for PA.  Like Cutler, Brooks decided their schedules, determined their compensation, and provided any necessary training.  Brooks also delivered newspapers while providing delivery services for PA. (DSUF, ¶ 35.)  IC Drivers David Rivas, Kim Sanchez, and Randall Gohn also contracted with subcontractors to provide delivery services on alternate days or on a temporary basis. (DSUF, ¶¶ 36, 37, 38.)

## I.     IC Drivers Provide Various Delivery Services

Each of Diligent's clients has varying hours of operations, delivery service needs, and operational methods.  (DSUF, ¶ 39.)  As a result, clients utilize different types of delivery drivers to fulfill their needs: shuttle drivers to transport parts between a warehouse and stores on a set schedule; hot shot drivers to deliver parts on an as-needed basis; and returns drivers to pick up parts from customers.  (DSUF, ¶¶ 40, 41, 42, 43.)  Clients typically set timeslots for shuttle drivers and hot shot drivers to cover the needs of their individual stores and warehouses, while returns drivers pick up parts based on the customer's need.  (DSUF, ¶ 44.)

Clients do not schedule IC Drivers to work a specific timeslot and do not have preferences regarding how many IC Drivers are used to cover those timeslots.  (DSUF, ¶ 45.)  Instead, Diligent has contracted with a pool of 155 IC Drivers who have agreed either to provide delivery services for specific clients or to "fill in" as needed.  (DSUF, ¶ 46.)  IC Drivers who elect to provide services on a given day contact Diligent in the morning to determine if a client requires their delivery services that day.  Diligent then responds with an open engagement if one was available.  The engagement could be with the same client from the previous day, or with a different client, depending on the opportunities Diligent has identified.  (DSUF, ¶ 47.)  If an IC Driver chooses to provide delivery services for only part of a day, the IC Driver or Diligent can send a replacement driver to cover the rest of the client's timeslot.  (DSUF, ¶ 48.)

When IC Drivers arrive at a client, they pull manifests and invoices for parts to be delivered and load their vehicles with the parts that have been placed in designated loading

areas.  (DSUF, ¶ 49.)  After a delivery run is finished, they return to the client and load up for additional deliveries.  (DSUF, ¶ 50.)  IC Drivers take rest and meal breaks at their discretion and are not required to inform clients when they take a break.  (DSUF, ¶ 51.) Nor do they have to return to the client after completing their last delivery or at the end of their timeslot.  (DSUF, ¶ 52.)  Instead, they can return invoices and complete deliveries the following morning.  (DSUF, ¶ 53.)

### J.    IC Drivers Control Their Delivery Services

IC Drivers rely on their own judgment, skill, and initiative when delivering parts. IC Drivers choose whether to accept or decline a delivery without consequences.  If an IC Driver does decline, Diligent simply sends a replacement driver willing to make the delivery.  (DSUF, ¶ 54.)  IC Drivers also choose the most cost-effective route to complete deliveries without input from clients.  (DSUF, ¶ 55.)  Although Freightliner, PA, SSF, and TireHub provide electronic tablets to collect signatures for invoices and confirm delivery, the devices are not intended to monitor drivers.  (DSUF, ¶ 56.)  In fact, clients generally do not communicate with IC Drivers during their deliveries.  (DSUF, ¶ 57.)  If a problem arises, IC Drivers communicate with Diligent.  (DSUF, ¶ 58.)

IC Drivers also maximize their profits by purchasing vehicles that allow them to earn higher rates or optimize delivery services.  IC Driver Leonel Espinoza purchased a cargo van and IC Driver Robyn Gamino purchased a full-size pickup truck to qualify for higher-paying engagements.   Randall Gohn purchased higher-efficiency vehicles to increase his profits by reducing expenses.  (DSUF, ¶ 59.)

IC Drivers also have the ability to terminate their engagement to pursue new opportunities, which happened regularly.  Indeed, there was a "very high" turnover rate for IC Drivers, with many of them lasting between one run and a couple of months.  (DSUF, ¶ 60.)

### K.    IC Drivers' Delivery Services Vary by Client

In calculating its back-pay damages, DOL did not take into account the actual hours worked by IC Drivers or the individual needs of Diligent's clients.  Instead, DOL assumed

that all IC Drivers worked nine-and-a-half (9.5) hours on weekdays and eight hours on Saturdays. (DSUF, ¶ 61.) This was not the case:

- **Cummins** has two delivery runs a day, Monday through Friday. Gamino provided delivery services from 8:30 a.m. to 3:30 p.m. at Cummins' Mesa location and from 8:30 to 4:30 p.m. at Cummins' Avondale location. Gamino also took lunch and rest breaks at her discretion. (DSUF, ¶¶ 62, 63, 64.)

- **Freightliner** has deliveries throughout the day, Monday through Sunday. Gamino provided delivery services from 7 a.m. to 3:15 p.m., Monday through Friday. Gohn provided delivery services from 7 a.m. to 3 p.m. or from 4 p.m. to midnight, Monday through Friday. Gohn went home after his last delivery. Freightliner typically had weekend-only IC Drivers who drove from 8 a.m. to noon on Saturdays and Sundays. (DSUF, ¶¶ 65, 66, 67, 68, 69.)

- **NatPro** has four delivery runs a day, Monday through Friday. IC Driver Mark Richardson provided delivery services from 8 a.m. to 2:30 or 3 p.m. Richardson had discretion to take breaks, but "we get off work so early at NatPro. I really don't get an appetite." Gohn provided delivery services from 7:30 a.m. to 3 or 3:30 p.m. Gohn had discretion to take breaks, but he chose to complete his work and depart early. (DSUF, ¶¶ 70, 71, 72, 73, 74.)

- **NAPA** has four delivery runs a day, Monday through Friday. As a fill-in driver, Richardson provided delivery services from 8 a.m. to 3:30 or 4 p.m. Richardson had an hour break after the 10 a.m. run and could do what he wanted. He also went home after his last delivery. As a shuttle driver, Gohn provided delivery services from 8 a.m. to 3 p.m. Gohn also drove the Lake Havasu run from 11 a.m. to 5:30 p.m. Gohn had discretion to take a lunch break but chose to finish his work and go home. (DSUF, ¶¶ 75, 76, 77, 78, 79, 80, 81, 82.)

- **PA** has deliveries throughout the day, Monday through Saturday. For most locations, PA has delivery needs from 8 a.m. to 6 p.m., Monday through Friday, and seven hours on Saturday. IC Drivers providing delivery services do not need to be the same from one day to the next. As a fill-in driver, Richardson typically provided delivery services three days a week. (DSUF, ¶¶ 83, 84, 85, 86.)

Brooks initially provided delivery services as a shuttle driver from 8 a.m. to 5 p.m., or 9 a.m. to 6 p.m., Monday through Friday, and from 8 a.m. to 3 p.m. or 9 a.m. to 4 p.m. on Saturdays. In June 2013, Brooks started providing delivery services four days a week and hired a subcontractor,

Paul Laopahoe, for the other two days.  In late 2014, Brooks reduced his delivery services to one to two days a week and used subcontractors for the other days.  "Now, if my driver wanted to come in and work 8 to 12 and they wanted me to finish up the day, I'd go do that.  I'd do that a lot of times.  Somebody would work half the day, I'd work the other half." (DSUF, ¶¶ 87, 88, 89, 90.)

As a returns driver, Espinoza provided delivery services between six to seven hours a day, Monday through Friday, and three to four hours on Saturdays, which included his lunch breaks.  Espinoza took a lunch break every day for twenty to thirty minutes.  (DSUF, ¶¶ 91, 92.)

- **Penske** has three delivery runs a day, Monday through Friday.  Penske divides its territory into two locations, Penske North and Penske South, based on the location of the dealership.  IC Drivers for Penske North provide delivery services from 8 a.m. to 3:30 p.m.  IC Drivers for Penske South provide delivery services from 8 a.m. to 3 or 4 p.m.  IC Drivers had discretion to take lunch breaks if they chose.  Gohn provided delivery services for Penske North from 8 a.m. until the completion of his deliveries, which ranged from 1:30 to 5 p.m.  Gohn did not have to return after his last delivery of the day.  (DSUF, ¶¶ 93, 94, 95, 96.)

- **Rush** has three delivery runs a day, Monday through Friday.  As a fill-in driver, Gohn provided delivery services from 7 a.m. to 3 p.m. or 8:30 a.m. to 5:30 p.m.  IC Drivers had discretion to take lunch breaks.  If an IC Driver did not finish a delivery, the IC Driver took the parts home and delivered them the next day.  (DSUF, ¶¶ 97, 98, 99, 100.)

- **SSF** has deliveries throughout the day, Monday through Friday.  Gohn provided delivery services two to three times for SSF to get familiar with the business.  IC Drivers could go home after their last delivery.  (DSUF, ¶¶ 101, 102, 103.)

- **TireHub** has three delivery runs, Monday through Friday, and two runs on Saturday.  Cutler had subcontractors provide delivery services from 7 a.m. to 3 p.m. or 10 a.m. to 5 p.m., Monday through Friday, and 7 a.m. to 3 p.m., every other Saturday.  Cutler's subcontractors took lunch breaks at their discretion.  Cutler's subcontractors went home after their last delivery.  (DSUF, ¶¶ 104, 105, 106, 107.)

**L.    Diligent's Independent Contractor Model**

Diligent developed and refined its independent contractor model based on the advice of attorneys Maurice Bresenhan and Pascal Piazza of the law firm Zukowski, Bresenhan

& Piazza LLP.  (DSUF, ¶¶ 108.)  In counseling Diligent, Bresenhan relied on the Fifth Circuit's decision in *Herman v. Express Sixty-Minutes Delivery Serv.*, 161 F.3d 299 (5th Cir. 1998), which held that deliver drivers who performed services substantially similar to the IC Drivers were independent contractors.  (DSUF, ¶ 109.)  Bresenhan also relied on advice and guidance from DOL, a critique of Diligent's model from counsel hired by a potential investor, and a collection of court and administrative law decisions relating to Diligent's classification of IC Drivers as independent contractors.   (DSUF, ¶ 110.)  Bresenhan did not apply this analysis in a vacuum.  He informed his understanding of Diligent's operations in Arizona by speaking with Diligent's senior management between ten and twenty times, Diligent's general managers as many as ten times, and counsel for Diligent's clients regarding Diligent's operations.  He also spoke with IC Drivers.  (DSUF, ¶ 111.)  In 2013 or 2014, Diligent made "substantial revisions" to its IC Agreement as well as other agreements and documents related to the IC Agreement based on advice from Bresenhan and Piazza and the Littler Mendelson law firm.  (DSUF, ¶ 112.)  Diligent also sought to ensure compliance with the FLSA by having Bresenhan and professional trainers conduct intensive, several-day workshops with its managers.  (DSUF, ¶ 113.)  As a result, Diligent's independent contractor model has withstood scrutiny from several neutral arbitrators deciding claims brought by IC Drivers under the FLSA.   (DSUF, ¶ 114.)  Diligent relied on these decisions in determining that IC Drivers are independent contractors under the FLSA. (DSUF, ¶ 115.)

## M.    DOL Fails to Execute Tolling Agreements

DOL began investigating Diligent in April 2015.  (DSUF, ¶ 116.)  That month, DOL's lead investigator interviewed Diligent General Manager Bob Williams and Bresenhan regarding Diligent's corporate structure and its relationship with IC Drivers. The lead investigator and Bresenhan later engaged in numerous "significant" follow-up conversations, while Diligent also provided a list of 760 IC Drivers and offered to arrange interviews with IC Drivers.  (DSUF, ¶ 117.)

While the investigation progressed, DOL asked Diligent to enter into its standard

Statute of Limitations Tolling Agreement ("Tolling Agreement I").  (DSUF, ¶ 118.)  Tolling Agreement I provides: "In exchange for the Secretary's agreement to withhold immediate filing of legal proceedings under the Act to recover back wages and liquidated damages, . . . [and] to allow for the Secretary and the Firm [Diligent] to discuss and attempt to resolve this matter, … the Secretary and the Firm agree that the time period beginning on April 13, 2012 until and including April 14, 2016 . . . will not be included in computing the running of any statute of limitations."  Tolling Agreement I also provides, "This Agreement shall be effective when it is signed by representatives of the Secretary and the Firm."  (DSUF, ¶ 119.)  Although Diligent signed Tolling Agreement I on December 23, 2015, DOL's representative did not.  (DSUF, ¶ 120.)

Several months later, without signing Tolling Agreement I, DOL asked Diligent to enter into a second agreement ("Tolling Agreement II"), which sought to extend the tolling period from "April 13, 2012 until and including April 14, 2017."  Like the first, Tolling Agreement II also provides, "This Agreement shall be effective when it is signed by representatives of the Secretary and the Firm."  (DSUF, ¶ 121.)  Diligent executed Tolling Agreement II on March 30, 2016.  DOL never did.   Instead, its lead investigator placed unsigned Tolling Agreement II in her case file with unsigned Tolling Agreement I.  (DSUF, ¶ 122.)

On August 1, 2016, Bresenhan notified DOL that Diligent had withdrawn its consent to both tolling agreements based on DOL's failure to sign and return either of them.  DOL did not object. (DSUF, ¶ 123.)  Two months later, in October 2016, DOL broadened its investigation to include PA.  This time, DOL did not ask Diligent or PA to sign a tolling agreement.  (DSUF, ¶ 124.)

## III.   STANDARD OF REVIEW

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party on a particular issue, there is no genuine dispute for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

Diligent respectfully submits that in light of these standards and based on the undisputed material facts contained in the record evidence, the Court should grant summary judgment in Diligent's favor on each of DOL's claims.

## IV.   LAW AND ARGUMENT

### A.   IC Drivers Are Independent Contractors Under FLSA

The FLSA does not apply to independent contractors, only employees.  *Moba v. Total Transp. Servs.*, 16 F. Supp. 3d 1257, 1263 (W.D. Wash. 2014).  Under the FLSA, an "employee" means "any individual employed by an employer."  29 U.S.C. § 203(e)(1).  The Ninth Circuit has identified several factors to consider when determining whether a worker is an independent contractor or an employee:

> 1) The degree of the alleged employer's right to control the manner in which the work is to be performed; 2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; 3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; 4) whether the service rendered requires a special skill; 5) the degree of permanence of the working relationship; 6) whether the service rendered is an integral part of the alleged employer's business.

*Donovan v. Sureway Cleaners*, 656 F.2d 1368, 1370 (9th Cir. 1981).  "Neither the presence nor the absence of any individual factor is determinative."  *Id*.  Rather, the determination depends on the totality of the circumstances and whether, "as a matter of economic reality," the individuals are "dependent upon the business to which they render service."  *Id*.  The plaintiff bears the ultimate burden of proving that the workers were employees covered under the FLSA.  *Benshoff v. City of Virginia Beach*, 180 F.3d 136, 140 (4th Cir. 1999).

Based on the *Donovan* factors and the uncontroverted facts, there is no genuine dispute that IC Drivers were independent contractors in business for themselves and not subject to the FLSA.  Thus, Diligent is entitled to summary judgment.

1

### 1.   <u>IC Drivers' control how their work is performed</u>

"Control is only significant when it shows an individual exerts such a control over a meaningful part of the business that [the individual] stands as a separate economic entity." *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369 (5th Cir. 2019) (*quoting Usery v. Pilgrim Equip. Co., Inc.*, 527 F.2d 1308, 1312–13 (5th Cir. 1976)).  Here, the IC Agreement provides that IC Drivers had sole control over providing delivery services for Diligent's clients.  IC Drivers had "the right to decline or accept any" client engagement offered by Diligent.  IC Drivers had the right to "control and determine all matters related to the performance of an engagement," including "the time of performance or the time or hours during which an opportunity is to be performed."  IC Drivers also had the right to provide services for non-Diligent clients during their engagement with Diligent.  This fact is sufficient, in and of itself, to show that IC Drivers stood as separate economic entities.  When coupled with the undisputed facts evincing the IC Drivers' control of their day-to-day operations, this conclusion becomes inescapable.

IC Drivers chose the client, the delivery schedule, and the location where they wanted to provide delivery services.  On days they sought to provide delivery services, they contacted Diligent to confirm that a client required their services and that they intended to provide delivery services that day.

Further, IC Drivers controlled the manner in which they provided such delivery services.  Brooks, Cutler, Espinoza, Gamino, Gohn, and Richardson each testified they chose the most cost-effective route to complete deliveries without input from clients.  They also testified they chose whether and when to take rest and meal breaks.  Some, like Gamino, elected to take lunch breaks.  Others, like Richardson and Gohn, preferred to complete their deliveries and go home.  Moreover, IC Drivers had sole control over hiring subcontractors to provide delivery services and were responsible for determining their compensation, scheduling their work, and providing them with tools and equipment, including vehicles.  Cutler, Brooks, Rivas, Sanchez, and Gohn all contracted with subcontractors to provide services.  Finally, IC Drivers were able to and did provide

delivery services for non-Diligent clients.  Cutler and Brooks testified that they delivered products for Diligent's clients and others at the same time.

When presented with similar facts, courts in the Ninth Circuit and elsewhere have found this factor weighs in favor of independent contractor status.  In *Moba v. Total Transp. Servs.*, 16 F. Supp. 3d at 1264, the court found that drivers sufficiently controlled the manner in which they performed delivery services based not only on the terms of the independent contractor agreement but also on the discretion drivers had to accept shipments, deliver the shipments, delegate work to their own employees, and work for other carriers in addition to the defendant logistics company.  *See also*, *Roslov v. DirecTV Inc.*, 218 F. Supp. 3d 965, 974 (E.D. Ark. 2016) (installation standards and uniform requirements do not "negate the reality that [the alleged employee] was still operating as a 'separate economic entity'" where a technician could take days off; decide not to take additional orders at the end of the day without recourse; and complete some work orders in any order if he was double-booked"); *Herman v. Express Sixty-Minutes Delivery Serv.*, 161 F.3d 299, 303 (5th Cir. 1998) (finding control factor weighed in favor independent contractor status where drivers could set their own schedules, reject deliveries, and work for other courier delivery systems, noting that although drivers were required to attend an orientation session and be on call, "these facts do not outweigh the other facts indicating a lack of control and independent contractor status"); *Browning v. Ceva Freight, LLC*, 885 F. Supp. 2d 590, 608 (E.D.N.Y. 2012) (finding that defendant's control over its branding via car decals and uniforms was "not so great as to weigh in favor of finding the Plaintiffs to be employees as opposed to independent contractors").  In the present case, the control factor weights determinatively in favor of independent contractor status.

## 2.    IC Drivers have opportunities for profit and loss based on their managerial skill

IC Drivers were compensated based on the number of days they provided delivery services.  They could increase their profit by choosing to purchase certain vehicles required to perform higher-paying delivery services, as Espinoza and Gamino did.  Or they could

increase their profit by purchasing more fuel-efficient vehicles, like Cutler did.  Finally, and dispositive here, IC Drivers could and did rely on their managerial skill to increase their profit by hiring subcontractors to provide additional delivery services.  Thus, an IC Driver's opportunity for profit and loss was based "'largely on his or her skill, initiative, ability to cut costs, and understanding of the courier business[,]' suggesting independent contractor status." *Moba*, 16 F. Supp. 3d at 1264 (*quoting Herman*, 161 F.3d at 305); *see also, Krupicki v. Eagle One, Inc.*, No. 4:12-cv-00150 KGB, 2014 U.S. Dist. LEXIS 46038 at * 19 (E.D. Ark. April 3, 2014) (factor supports independent contractor status where drivers increased profits by hiring as many as seven subcontractors, purchasing vans to take on additional delivery routes, and determining subcontractor compensation); *Roslov*, 218 F. Supp. 3d. at 977 (plaintiff was in control of his profits and losses when he could take on additional work orders and hire other technicians to help him complete work orders to supplement his own income).  This factor weighs heavily in favor of independent contractor status.

### 3. IC Drivers invest in equipment and employ helpers

When analyzing this factor, the question is not how much each party invested in their individual businesses but rather how much each invested in the tools and equipment used by the workers to perform their services.  *Andersen v. DIRECTV Inc.*, No. CV-14-02307-PHX-SRB, 2017 U.S. Dist. LEXIS 215955 at *9 (D. Ariz. July 26, 2017)(*citing Torres-Lopez v. May*, 111 F.3d 633, 643-44 (9th Cir. 1997)).  Applying that framework, *Andersen* found that although the defendant had invested $35 million to upgrade a system, the factor nevertheless weighed in favor of independent contractor status where there was no evidence the defendant invested in equipment necessary for the plaintiff's daily tasks.  *Id.*, at *10.

Here, IC Drivers were solely responsible for providing all tools and equipment necessary to perform the delivery services, including full-size pickup trucks and vans, trailers, cargo nets, tie downs, cages, and cellphones.  They also had sole discretion to hire subcontractors to provide delivery services and determine their compensation.  Diligent

was responsible for none of this.  Diligent did not own any vehicles.  Diligent did not rent any warehouse space.  Indeed, there is no evidence that Diligent made any investment in the equipment IC Drivers used to perform their delivery services.  This factor weighs heavily in favor of independent contractor status.

### 4.      IC Drivers do not possess special skills

Diligent did not require IC Drivers to possess any particular education, training, or special license.  IC Drivers were required, however, to exercise their own judgment of reading maps and selecting the most efficient routes. This factor weighs marginally in favor of employment status.

### 5.      IC Drivers do not have a permanent relationship

Under the IC Agreement, IC Drivers had the right to terminate their engagement at any time by providing seven days' written notice.  They also had the right to accept or decline "a client-engagement opportunity" and to work for others in addition to Diligent's clients.  Finally, IC Drivers had a "very high" turnover rate with many of them lasting between one run and a couple of months.  Courts in this District and elsewhere have concluded such impermanence demonstrates an independent contractor relationship.  *See, Andersen*, 2017 U.S. Dist. LEXIS 215955 at * 13 ("There is no genuine issue of material fact that Plaintiffs could and did terminate their employment when they pleased or that they could work for another employer albeit on their own time);  *Moba*, 16 F. Supp. 3d at 1265 (factor favors independent contractor status where agreement could be terminated on one days' notice, nothing "obligate[d] Lessee to offer any minimum number of shipments, or obligate[s] Lessor to accept any minimum number of shipments," and drivers could contract with others).  This factor weighs heavily in favor of independent contractor status.

### 6.      IC Drivers are not integral to Diligent's business

The fact that a business engages independent contractors is not indicative of an employment relationship. *Roslov*, 218 F. Supp. 3d at 975. Just recently, DOL's Wage and Hour Division determined that the "primary purpose" of a virtual marketplace company that connects service providers to consumers to provide various services, including

deliveries, was "not to provide services to end-market consumers, but to provide a referral system that connects service providers with consumers." U.S. Department of Labor Wage and Hour Division Advisory Opinion FLSA 2019-6 (April 29, 2019), at 10 ("DOL 2019 Letter") (*citing Werner v. Bell Family Med. Ctr., Inc.*, 529 Fed. App'x 541, 545 (6th Cir. 2013)). As a result, DOL found "the service providers are not an integral part of your client's referral service; they are consumers of that service from your client and negotiate with your client over the terms and conditions of using that service. Accordingly, they are not operationally integrated into your client's business." *Id.*

For precisely the same reason, IC Drivers are not integral to Diligent's business. Diligent acts as a broker between its clients and IC Drivers, and its business operations effectively terminate when it connects a client with an IC Driver. Diligent does not provide delivery services itself. Thus, IC Drivers are not an integral part of Diligent's business. They are consumers of Diligent's business. This factor weighs heavily in favor of independent contractor status.

Accordingly, five of the six factors of the economic realities test weigh heavily in favor of finding IC Drivers are independent contractors. More importantly, the undisputed facts categorically show that IC Drivers are in business for themselves, which is the ultimate factor in this case. *Moba*, 16 F. Supp. 3d at 1265 (*citing Velu v. Velocity Exp., Inc.*, 666 F. Supp. 300, 307 (E.D. N.Y. 2009)). As *Velu* stressed in finding drivers were independent contractors:

> In this case, if either party were to terminate the Agreement today, Plaintiff could go out the next day with the same van, clothes, equipment, computer, printer, and other supplies, and immediately work for another shipping company. Accordingly, the Court finds that Plaintiff is in business for himself and is an independent contractor for purposes of the FLSA.

*Velu*, 666 F. Supp. 2d at 307.

Here, IC Drivers were correctly classified as independent contractors. They were in business for themselves and could, and did, provide delivery services for non-Diligent clients at any time. Therefore, based on the totality of the circumstances, IC Drivers were independent contractors and the FLSA does not apply as a matter of law.

### B.    The Testifying Witnesses Do Not Sufficiently Represent the IC Drivers

DOL seeks to show that 1,649 IC Drivers were employees of and not properly compensated by Diligent based on the testimony of *eight* IC Drivers.  As the record evidence demonstrates, however, each IC Driver's experience was so individualized and client specific that it cannot form a proper basis for how all IC Drivers were treated.  Finding otherwise would permit DOL to eviscerate any defense Diligent could make based on discrepancies between the IC Drivers.  Moreover, the testifying IC Drivers only provided delivery services for nine of Diligent's fifteen clients.  There is no evidence regarding the remaining clients.  Given these severe limitations, the testimonial evidence falls far short of being sufficiently representative of the non-testifying IC Drivers.

To carry its burden, DOL must produce sufficient evidence to establish not only that the workers, in fact, performed work for which they were improperly compensated but also the amount and extent of that work, "as a matter of just and reasonable inference." *Secretary of Labor v. DeSisto*, 929 F. 2d 789, 792 (1st Cir. 1991) (*quoting Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946)).  "Where the employees fall into several job categories, . . . at a minimum, the testimony of a representative employee from, or a person with first-hand knowledge of, each of the categories is essential to support a back pay award." *DeSisto*, 929 F. 2d at 793; *see, also*, *Reich v. Southern New England Telecomm. Corp.*, 121 F.3d 58, 67 (2nd Cir. 1997) (39 employees, representing five job categories, insufficiently representative of 1,500 claimants); *Reich v. Southern Md. Hospital*, 43 F.3d 949, 951 (4th Cir.1995) (54 employees insufficiently representative of 3,368 employees).  A defendant need only point out the absence of evidence to prevail at summary judgment.  *Farrakhan v. Gregoire*, 590 F.3d 989, 1003 (9th Cir. 2010) (*citing Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (*en banc*)).

Here, DOL has failed to show that the testifying IC Drivers sufficiently represent all 1,649 IC Drivers it claims were employees of Diligent.  There are four types of IC Drivers: shuttle drivers, hot-shot drivers, returns drivers, and fill-in drivers.  The shuttle drivers—Brooks, Cutler, Gamino, Gohn, and Richardson—all testified that they provided

services for eight or fewer hours a day, including the breaks they took at their discretion, and they could go home after their last delivery.  Indeed, several testified they provided services for significantly fewer than eight hours.  Gohn drove the Lake Havasu run for a year at NAPA from 11 a.m. to 5:30 p.m., Monday through Friday.  Brooks provided delivery services at PA from 9 a.m. to 6 p.m., four days a week, and his subcontractor provided delivery services the other two days.  Brooks later reduced his delivery services even further to one or two days a week, and used subcontractors for the other days.  Espinoza, the only returns driver, testified he provided services between six and seven hours a day during the week, and three to four hours on Saturdays.  These times included his daily lunch breaks of up to thirty minutes.  And Richardson, the fill-in driver, testified that he provided delivery services to PA three days a week.  In no way does this testimony show that all 1,649 IC Drivers were employees of Diligent and that they worked more than forty hours a week.

Further, the testifying IC Drivers only provided services to Cummins, Freightliner, NatPro, NAPA, PA, Penske, Rush. SSF, and TireHub.  Given the individualized and client-specific nature of the delivery services, DOL cannot rely on their testimony to show similar circumstances existed with Diligent's other clients.  Thus, for this additional reason, summary judgment is appropriate against DOL's claims regarding IC Drivers who provided services for AAPAK, Canyon, Watson, WorldPac and other unidentified Diligent clients.

Finally, the testimonial evidence does not support DOL's back-pay wage calculations.  DOL assumed that all IC Drivers who worked on a weekday did so for nine-and-a-half hours with no breaks and those who worked on a Saturday did so for eight hours with no breaks.  Based on the testimonial evidence, DOL's calculations have no basis in fact and certainly cannot be relied on to show the amount and extent of the delivery services provided by the IC Drivers "as a matter of just and reasonable inference."  *DeSisto*, 929 F. 2d at 792.  Many IC Drivers did take lunch breaks and many went home after the last delivery of the day without returning to the client's location.  This time cannot be used to

1    calculate back-pay wages.  29 C.F.R. §785.35 ("An employee who travels from home

2    before his regular workday and returns to his home at the end of the workday is engaged

3    in ordinary home to work travel which is a normal incident of employment.  This is true

4    whether he works at a fixed location or at different job sites. Normal travel from home to

5    work is not worktime.")  Accordingly, Diligent is entitled to summary judgment as a matter

6    of law.

7         ## C.    The Two-Year Statute of Limitations Applies to DOL's Claims

8         FLSA claims are ordinarily subject to a two-year statute of limitations from the date

9    a cause of action is filed unless a plaintiff can show a "willful violation," in which case the

10   limitations period is three years.  *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133,

11   135 (1988).  A three-year statute of limitations is an exception, and a party claiming the

12   exception carries the burden to show the violation was, in fact, willful.  *Nelson v. Waste*

13   *Management of Alameda Cty., Inc.*, 33 Fed. App'x 273, 274 (9th Cir. 2002).  Here, DOL

14   filed its initial Complaint on December 21, 2016.  Thus, DOL's wage claims are applicable

15   only to the period after December 21, 2014.

16        As argued more fully below, no evidence exists to find that a three-year statute of

17   limitations is warranted.  Diligent did not willfully violate the FLSA.  Further, DOL is not

18   entitled to equitable tolling as nothing prevented IC Drivers from asserting an FLSA claim

19   on their own behalf.  Finally, DOL is barred from relying on the tolling agreements Diligent

20   signed and later withdrew, because DOL never executed them, as required under the plain

21   language of the agreements to make them binding.  Thus, the two-year statute of limitations

22   applies and any claims that accrued prior to December 21, 2014, are time barred.

23        ### 1.    Diligent's reliance on case precedent, legal advice, and prior
24            decisions precludes a finding of willfulness

25        DOL alleges that Diligent willfully violated the FLSA and that the three-year statute

26   of limitations applies.  To show willfulness, DOL must prove that Diligent knew or showed

27   reckless disregard as to whether its conduct was prohibited by the FLSA.  *McLaughlin*, 486

28   U.S. at 133.  "Mere negligence" is not willfulness, and a "good-faith but incorrect

assumption" that conduct complies with the FLSA does not trigger the three-year limitations period. *Id.* In fact, an employer does not act willfully so long as it is not reckless, even if the employer is unreasonable in determining its FLSA obligations. *Id.* at 135 n. 13.

It is well-settled that an employer does not act willfully where it seeks legal or expert advice in its attempt to comply with the FLSA. *SEIU, Local 102 v. County of San Diego*, 60 F.3d 1346, 1355-1356 (9th Cir. 1995) (rejecting claim of willfulness where defendant "relied on substantial legal authority when it decided not to compensate for standing time as well as consulting experts and the DOL in an attempt to comply with the law"); *Hultgren v. County of Lancaster*, 913 F.2d 498, 506-510 (8th Cir. 1990) (uncertainty about the application of the FLSA and consultation with counsel shed light on whether the employer had an honest intention to comply); *Terwilliger v. Home of Hope,* 21 F. Supp. 2d 1305, 1306-07 (N.D. Okla. 1998) (reliance on internal dialogue, discussion with attorney, and statements made by person at industry conference found sufficient to evidence a lack of willfulness). Furthermore, the mere filing of lawsuits cannot be deemed sufficient to put an employer on notice that its policy is violative of the FLSA. *Andersen*, 2017 U.S. Dist. LEXIS 215955 at *9 (*citing Fugate v. Dolgencorp, LLC*, No. 3:10-CV-344, 2012 U.S. Dist. LEXIS 151876, at * 20 (N.D. Ind. Oct. 23, 2012)). Even if the employer's reliance was ultimately incorrect, "that misclassification would be a result of negligence, at most." *Fugate*, 2012 U.S. Dist. LEXIS 151876, at * 20. There must be actual evidence that the employer affirmatively knew it was violating the FLSA or that it was acting with "reckless disregard" of the FLSA. *Nelson*, 33 Fed. App'x at 274.

DOL has not shown that Diligent knew it was violating the FLSA or that it was acting with reckless disregard. Indeed, the evidence adduced demonstrates just the opposite: Diligent sought both legal and expert advice to ensure that its independent contractor model in Arizona complied with the FLSA. In counseling Diligent, Bresenhan relied on the Fifth Circuit's decision in *Herman v. Express Sixty-Minutes Delivery Serv.*, which held that drivers who performed services substantially similar to the IC Drivers were

1  independent contractors based on their treatment and seventy-three years of controlling
2  Supreme Court precedent.  Bresenhan also relied on DOL guidance and a collection of
3  court and administrative law decisions upholding Diligent's classification of IC Drivers as
4  independent contractors.  Moreover, Diligent made "substantial revisions" to its IC
5  Agreement in 2013 or 2014 based on input from Bresenhan and Piazza and the Littler
6  Mendelson law firm.  Nor did Bresenhan provide advice in a vacuum.  He spoke with
7  Diligent's senior management, Diligent's general manager, Diligent's clients, and IC
8  Drivers to fully understand Diligent's operations in Arizona.  Finally, Diligent relied on
9  the decisions of neutral arbitrators who found that IC Drivers were independent contractors
10  not subject to the FLSA as a matter of law.

11      Thus, it cannot be gainsaid that Diligent sought to properly classify IC Drivers under
12  the FLSA.  The record evidence plainly shows that Diligent sought and relied on legal
13  advice in its attempt to comply with the FLSA.  Nonetheless, even if Diligent's analysis
14  and conclusion were ultimately incorrect, which it is not, its decision could only be the
15  result of negligence, not recklessness, as a matter of law.  That is wholly insufficient to
16  find willfulness and the proper limitations period is two years.

17          **2.      DOL is not entitled to equitable tolling**

18      "Equitable tolling is a rare remedy to be applied in unusual circumstances, not as a
19  cure-all for an entirely common state of affairs."  *Wallace v. Kato*, 549 U.S. 384, 396
20  (2007).  Indeed, the Ninth Circuit has instructed that equitable tolling is available only in
21  "extreme cases" and should be "applied sparingly."  *Lee v. Venetian Casino Resort, LLC*,
22  747 Fed. App'x 607, 608 (9th Cir. 2019).  There are three principal situations when
23  equitable tolling may be appropriate: (1) when the plaintiff is prevented from asserting a
24  claim by wrongful conduct on the part of the defendant; (2) when extraordinary
25  circumstances beyond a plaintiff's control made it impossible to file a claim on time; and
26  (3) when a party is unable to obtain vital information bearing on the existence of the claim.
27  *See, e.g.*, *Stoll v. Runyon*, 165 F.3d 1238, 1242 (9th Cir. 1999); *Cervantes v. Countrywide
28  Home Loans, Inc.*, 656 F.3d 1034, 1045 (9th Cir. 2011).  At all times, the plaintiff bears

1     the burden of showing that equitable tolling is warranted.

2           DOL contends the statute of limitations should be tolled, presumably as of April

3     2012, because Defendants sought to confuse IC Drivers regarding their status under the

4     FLSA by maintaining "an employment structure with each entity serving the interests of

5     and/or acting as an agent for the other" and by discouraging, punishing, and coercing them

6     from exercising their rights under the FLSA.  (Complaint, ¶¶ 18-20.)

7           Simply put, DOL is wrong.  Classifying IC Drivers as independent contractors

8     instead of employees cannot form the basis for such extraordinary relief.  "To grant

9     equitable tolling in such circumstances would void the statute of limitations entirely, as

10    *any* FLSA plaintiff would qualify."  *Prentice v. Fund for Pub. Interest Research, Inc.*, No.

11    C-06-7776 SC, 2007 U.S. Dist. LEXIS 71122, at *8 (N.D. Cal. Sep. 18, 2007) (emphasis

12    added).  Nor has DOL adduced any extraordinary circumstance that made it impossible for

13    it or an IC Driver to file a claim on time.  In *Barba v. Lee*, No. CV 09-1115-PHX-SRB,

14    2009 U.S. Dist. LEXIS 132415, at *92 (D. Ariz. Nov. 3, 2009), the court rejected a request

15    for equitable tolling based on alleged "psychological manipulation, coercive persuasion,

16    thought reform and undue influence," because even if such evidence did exist the plaintiffs

17    were nonetheless aware of what they were paid each time they got a check.  *Id.*, at *93-94.

18    More to the point, DOL cannot show that IC Drivers were prevented from filing a lawsuit.

19    Indeed, IC Drivers have actually pursued FLSA claims against Diligent, *see*, *Bonner v.*

20    *Mich. Logistics Inc.*, 250 F. Supp. 3d 388 (D. Ariz. 2017), showing that they could have

21    pursued a claim at any point but chose not to.

22          Finally, DOL has presented no evidence that Defendants prevented it from obtaining

23    information on IC Drivers.  In fact, DOL's lead investigator spoke with Williams and

24    Bresenhan on April 22, 2015, regarding Diligent's corporate structure and its relationship

25    with IC Drivers, and she and Bresenhan had numerous "significant" follow-up

26    conversations after that.  Diligent also provided DOL a list of 760 IC Drivers and tried to

27    arrange interviews with IC Drivers.  Accordingly, for all these reasons, DOL has failed to

28    show that any extraordinary circumstances exist entitling it to equitable tolling.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 3.   <u>The tolling agreements are ineffective</u>

In *United States v. Spector*, 55 F.3d 22, 24 (1st Cir. 1995), the First Circuit invalidated a tolling agreement that expressly provided that it only became effective "upon execution" by all parties after the government failed to sign it.  As *Spector* noted, "[W]here the parties themselves have chosen to set forth the terms in writing, it makes sense to hold them to those terms, absent good reason to do otherwise."  *Id.* at 26 n.4.  To the extent DOL seeks to enforce Tolling Agreement I or II, it is barred from doing so for the exact same reason.  DOL never signed either agreement, even though each provided that it would become effective only after it was "signed by representatives of the Secretary and the Firm."  Moreover, Diligent affirmatively withdrew its consent to both agreements based on DOL's inaction.  Therefore, Tolling Agreements I and II are inoperative.

### D.   **Liquidated Damages Are Precluded Based On Diligent's Good Faith and Reasonable Belief IC Drivers Are Independent Contractors**

Liquidated damages are not automatic.  *Local 246 Util. Workers Union v. Southern Cal. Edison Co.*, 83 F.3d 292, 297 (9th Cir. 1996).  If an employer demonstrates that the failure to pay appropriate wages was in good faith and that the employer had reasonable grounds for believing the failure was not an FLSA violation, the court has discretion to deny an award of liquidated damages.  *Id.*

### 1.   <u>Diligent possesses a good-faith belief that IC Drivers are properly classified as independent contractors</u>

To satisfy the subjective good-faith component, an employer must show that it had an honest intention to ascertain what the FLSA requires and to act in accordance with it. *Bratt v. County of Los Angeles*, 912 F.2d 1066, 1071-72 (9th Cir. 1990).  "An employer's willingness to state and defend a ground suggests a colorable foundation, and openness facilitates challenges by the employees. Double damages are designed in part to compensate for concealed violations, which may escape scrutiny."  *Id.*, at 1072 (*quoting Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 312 (7th Cir. 1986)).

In *Bratt*, the Ninth Circuit affirmed the denial of liquidated damages, even though

the defendant was ultimately incorrect, because the defendant relied on reasonable advice that was informed by an objective study of the job classifications to determine compliance with the FLSA:

> While the Employees present arguments that the County did not do as good a job as it could have done, they fail to show that the County had anything other than an honest intention to comply with the Act.  The person assigned to make the coverage decisions arguably was adequately qualified, and his decisions whether to make more extensive studies of individual jobs and corresponding data involved practical considerations on how best to complete the required evaluations in a timely fashion.

*Bratt*, 912 F.2d at 1072.

Here, Diligent relied on the advice of attorneys Bresenhan and Piazza and the Littler Mendelson law firm to develop and refine its model.  This advice was based on multiple conversations with Diligent's senior management, counsel for Diligent's clients regarding Diligent's operations, and IC Drivers.  Furthermore, Diligent put safeguards in place to ensure compliance with the independent contractor model, including intensive training with its managers.  Moreover, Diligent has routinely defended its model against claims to the contrary.  There can be no clearer evidence that Diligent held an honest intent to comply with the FLSA.

## 2. Reasonable grounds exist for Diligent's conclusion

Determining the reasonableness of an employer's belief involves applying the proper interpretation of the FLSA and supporting regulations to the uncontested facts.  *Bratt*, 912 F.2d at 1072.  In *Bratt*, the Ninth Circuit held that the defendant's interpretation was not unreasonable where the regulations did not specifically address its employees' classification and their duties could reasonably be construed as analogous to those cited in the regulations.  *Id.*

Here, ample ground exists to support the reasonableness of Diligent's belief that its independent contractor model complies with the FLSA.  As Bresenhan testified, Diligent developed its model based on the Fifth Circuit's decision in *Herman v. Express Sixty-Minutes Delivery Serv.*, which relied on binding Supreme Court precedent.  Diligent also relied on a collection of court and administrative law decisions upholding Diligent's

classification of the drivers as independent contractors as well as decisions from neutral arbitrators who held the IC Drivers are independent contractors under the FLSA. The reasonableness of Diligent's decision is further cemented given the unsettled guidance regarding independent contractor status after DOL withdrew the Wage and Hour Administrators interpretative memorandum in 2017, and the fact that the 2019 DOL Letter found that delivery service providers like the IC Drivers are independent contractors. Under these circumstances, it cannot be said that Diligent does not have a reasonable legal basis to classify IC Drivers as independent contractors. It clearly does have such basis, even if its decision is ultimately incorrect.

**E.     DOL Is Not Entitled to Injunctive Relief**

DOL seeks an order permanently enjoining and restraining Diligent from prospectively violating the FLSA. As argued more fully above, the IC Drivers are independent contractors in business for themselves. Thus, they are not subject to the FLSA's payment scheme, and Diligent is lawfully permitted to continue to compensate them pursuant to the terms of the IC Agreements that Diligent and the IC Drivers negotiated. Accordingly, the injunctive relief sought by DOL would be wholly inappropriate here.

**V.     CONCLUSION**

For the foregoing reasons, Diligent respectfully requests that this Court dismiss the Complaint in its entirety and for such other further relief that this Court finds just.

Dated:  July 8, 2020

Respectfully submitted,

Peter N. Kirsanow (OH 0034196)
Richard Hepp (OH 0090448)
**BENESCH, FRIEDLANDER,
COPLAN & ARONOFF LLP**
200 Public Square, Suite 2300
Cleveland, Ohio 44114-2378
Telephone:  216.363.4500
Facsimile:  216.363.4588
Email:  pkirsanow@beneschlaw.com
         rhepp@beneschlaw.com


 s/Julie E. Mauerer
Julie E. Maurer
David Christian Clukey
**LEWIS BRISBOIS BISGAARD &
SMITH LLP**
Phoenix Plaza Tower II
2929 North Central Avenue
Suite 1700
Phoenix, Arizona 85012-2761
602-385-7832 Telephone
Julie.Maurer@lewisbrisbois.com

*Attorneys for Defendant Arizona
Logistics, Inc. d/b/a Diligent Delivery
Systems*

1

## <u>CERTIFICATE OF SERVICE</u>

2
3
4
5

     This is to certify that the foregoing *Defendant Arizona Logistics, Inc.'s Motion for Summary Judgment and Memorandum of Points and Authorities* was electronically filed on July 8, 2020, with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following parties:

6
7
8
9
10
11

            Boris Orlov
            Hailey Rose McAllister
            Paige Bree Pulley
            **OFFICE OF THE SOLICITOR**
            **U.S. DEPARTMENT OF LABOR**
            350 S. Figueroa St., Suite 370
            Los Angeles, California 90071-1202
            Email: orlov.boris@dol.gov
                    mcallister.hailey@dol.gov
                    pulley.paige.b@dol.gov

12

            *Attorneys for Plaintiff Secretary of Labor*

13
14
15

            Sharon P. Stiller
            **ABRAMS FENSTERMAN FENSTERMAN EISMAN**
            **FORMATO FERRERA & WOLF LLP**
            160 Linden Oaks, Ste. E
            Rochester, NY 14625
            Email: sstiller@abramslaw.com

16
17
18

            Michelle R. Matheson
            **MATHESON & MATHESON, PLC**
            15300 North 90th Street, Suite 550
            Scottsdale, Arizona 85260
            Email: mmatheson@mathesonlegal.com

19

            *Attorneys for Defendant Parts Authority Arizona LLC*

20
21
22
23
24

            Christopher Michael Mason
            John J. Egbert
            Kevin H. George
            **JENNINGS STROUSS & SALMON, PLC**
            One E. Washington St., Suite 1900
            Phoenix, AZ 85004
            Email: johnegbert@jsslaw.com
                    cmason@jsslaw.com
                    kmas7656@gmail.com
            *Attorneys for Defendant Larry Browne*

25
26
27

                           */s/ Julie E. Maurer*
                           *One of the Attorneys for Defendant Arizona Logistics, Inc.*

28

13425509