Janet M. Herold
Regional Solicitor
Andrew J. Schultz (CSBN 237231)
Counsel
Boris Orlov (CSBN 223532)
Senior Trial Attorney
Hailey McAllister (CSBN 326785)
Paige Pulley (CSBN 312596)
Eduard R. Meleshinsky (CSBN 300547)
Trial Attorneys
Office of the Solicitor
United States Department of Labor
350 S. Figueroa St., Suite 370
Los Angeles, California 90071-1202
Telephone: (213) 894-0201
Facsimile:  (213) 894-2064
Email: orlov.boris@dol.gov

*Attorneys for Plaintiff Secretary of Labor*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Eugene Scalia, Secretary of Labor, United States Department of Labor, | Case No. 2:16-cv-04499-DLR |
| Plaintiff, | |
| v. | **PLAINTIFF SECRETARY OF LABOR'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| Arizona Logistics, Inc., d/b/a Diligent Delivery Systems, an Arizona corporation; Larry Browne, an individual; Parts Authority Arizona, LLC, an Arizona limited liability company. | **ORAL ARGUMENT REQUESTED** |
| Defendants. | |

1    Pursuant to Fed. R. Civ. P. 56, Plaintiff United States Secretary of Labor

2    ("Secretary"), hereby moves for partial summary judgment against Defendants Arizona

3    Logistics, Inc., d/b/a Diligent Delivery Systems, its owner Larry Browne, and Parts

4    Authority Arizona, LLC, for violations of the Fair Labor Standards Act ("FLSA").  The

5    undisputed material facts establish as a matter of law that: (1) Defendant Diligent is an

6    employer; (2) Defendant Parts Authority is a joint employer; (3) Defendant Browne is

7    liable as an individual employer; (4) Defendants violated the Fair Labor Standards Act

8    (FLSA) minimum wage, overtime, and recordkeeping requirements and continue to do

9    so; (5) Defendants' violations of the FLSA are willful; and (6) Defendants cannot show

10    that they acted in good faith under 29 U.S.C. § 260.

11    The Secretary reserves all remaining claims alleged in the First Amended

12    Complaint for trial.

13

14                                    Respectfully submitted,

15    Dated: July 8, 2020             JANET M.  HEROLD

16                                    Regional Solicitor
                                      ANDREW J. SCHULTZ

17                                    Counsel
                                      PAIGE B. PULLEY

18                                    EDUARD MELESHINSKY

19                                    HAILEY MCALLISTER
                                      Trial Attorneys

20

21                                    /s/ Boris Orlov
                                      BORIS ORLOV

22                                    Senior Trial Attorney

23

24

25

26

27

28

1

Janet M. Herold
Regional Solicitor
Andrew J. Schultz (CSBN 237231)
Counsel for Wage and Hour
Boris Orlov (CSBN 223532)
Senior Trial Attorney
Hailey McAllister (CSBN 326785)
Paige B. Pulley (CSBN 312596)
Eduard Meleshinsky (CSBN 300547)
Trial Attorneys
Office of the Solicitor
United States Department of Labor
350 S. Figueroa St., Suite 370
Los Angeles, California 90071-1202
Telephone: (213) 894-0201
Facsimile:  (213) 894-2064
Email: orlov.boris@dol.gov

*Attorneys for Plaintiff Secretary of Labor*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Eugene Scalia, Secretary of Labor, United States Department of Labor, | Case No. 2:16-cv-04499-DLR |
| Plaintiff, | |
| v. | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF SECRETARY OF LABOR'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| Arizona Logistics, Inc., d/b/a Diligent Delivery Systems, an Arizona corporation; Larry Browne, an individual; Parts Authority Arizona, LLC, an Arizona limited liability company. | |
| Defendants. | **ORAL ARGUMENT REQUESTED** |

# TABLE OF AUTHORITIES

**Federal Cases**

*Acosta v. Senvoy, LLC*,
  2018 WL 3722210 (D. Or. July 31, 2018) ...................................................7

*Alexander v. FedEx Ground Package Sys., Inc.*,
  765 F.3d 981 (9th Cir. 2014) ..........................................................11, 17, 18

*Alvarez v. IBP, Inc.*,
  339 F.3d 894 (9th Cir. 2003) ....................................................26, 27, 29, 30

*Bonnette v. Cal. Health and Welfare Agency*,
  704 F.2d 1465 (9th Cir. 1983) ...............................................................*passim*

*Boucher v. Shaw*,
  572 F.3d 1087 (9th Cir. 2009) ............................................................22

*Burton v. DRAS Partners, LLC*,
  2019 WL 5550579 (N.D. Ill. Oct. 27, 2019) ...........................................20

*Caliber One Indem. Co. v. Wade Cook Fin. Corp.*,
  491 F.3d 1079 (9th Cir. 2007) .............................................................5

*Campos v. Zopounidis*,
  2011 WL 2971298 (D. Conn. July 20, 2011) .........................................11

*Carrillo v. Schneider Logistics Trans-Loading & Distribution, Inc.*,
  2014 WL 183956 (C.D. Cal. Jan. 14, 2014) ...........................................14

*Chao v. A-One Med. Servs., Inc.*,
  346 F.3d 908 (9th Cir. 2003) .............................................................29

*Chao v. Hotel Oasis, Inc.*,
  493 F.3d 26 (1st Cir. 2007) ..............................................................22

*Chao v. Me & Lou's Rest.*,
  2008 WL 4832880 (D. Idaho Nov. 5, 2008) ...........................................24

*Collinge v. IntelliQuick Delivery, Inc.*,
  2015 WL 1299369 (D. Ariz. Mar.  23, 2015) ............................4, 7, 17, 18

*Collinge v. IntelliQuick Delivery, Inc.*,
  JWS, 2018 WL 1088811 (D. Ariz. Jan. 9, 2018) .........................15, 17, 22

*Donovan v. Sureway Cleaners*,
  656 F.2d 1368 (9th Cir. 1981) .........................................................5, 12

i

*Falk v. Brennan*,
  414 U.S. 190 (1973) ................................................................14

*Flores v. City of San Gabriel*,
  824 F.3d 890 (9th Cir. 2016) ........................................26, 27

*Flores v. Velocity Express, LLC*,
  250 F. Supp. 3d 468 (N.D. Cal. 2017) ...............................*passim*

*Gillard v. Good Earth Power AZ LLC*,
  2019 WL 1280946 (D. Ariz. Mar. 19, 2019) ........................14

*Haro v. City of Los Angeles*,
  745 F.3d 1249 (9th Cir. 2014) ........................................29, 30

*Harris v. Skokie Maid & Cleaning Serv., Ltd.*,
  2013 WL 3506149 (N.D. Ill. July 11, 2013) ........................10

*Hughes v. Family Life Care, Inc.*,
  117 F. Supp. 3d 1365 (N.D. Fla. 2015) ..............................10, 13

*Keller v. Miri Microsystems LLC*,
  781 F.3d 799 (6th Cir. 2015) ..........................................12

*Lambert v. Ackerley*,
  180 F.3d 997 (9th Cir. 1999) ..........................................22

*Lovo v. Express Courier Int'l, Inc.*,
  2019 WL 387367 (N.D. Tex. Jan. 30, 2019) ........................16, 17

*McLaughlin v. Richland Shoe Co.*,
  486 U.S. 128 (1988) ......................................................26

*Nationwide Mut. Ins. Co. v. Darden*,
  503 U.S. 318 (1992) ........................................................5

*Perez v. Lantern Light Corp.*,
  2015 WL 3451268 (W.D. Wash. May 29, 2015) ....................15, 19

*Perez v. Oak Grove Cinemas, Inc.*,
  68 F. Supp. 3d 1234 (D. Or. 2014) ....................................5, 10

*Perez v. Super Maid, LLC*,
  55 F. Supp. 3d 1065 (N.D. Ill. 2014) ................................10

*Perez v. TBG Logistics LLC*,
  2016 WL 10919966 (D. Ariz. Dec. 16, 2016) ......................27

*Pizzarelli v. Cadillac Lounge, L.L.C.*,
  2018 WL 2971114 (D.R.I. Apr. 13, 2018) ..........................13

*Powers v. Emcon Assocs., Inc.*,
   2017 WL 4075766 (D. Colo. Sept. 14, 2017) ................................................................ 13

*Real v. Driscoll Strawberry Assocs., Inc.*,
   603 F.2d 748 (9th Cir. 1979) ....................................................................................... 6, 22

*Ruiz v. Affinity Logistics Corp.*,
   754 F.3d 1093 (9th Cir. 2014) ........................................................................................ 11

*Rutherford Food Corp. v. McComb*,
   331 U.S. 722 (1947) .................................................................................................. 14, 30

*Scalia v. Empl'r Sols. Staffing Grp.*, LLC,
   951 F.3d 1097 (9th Cir. 2020) ................................................................................... 27, 29

*Scantland v. Jeffry Knight, Inc.*,
   721 F.3d 1308 (11th Cir. 2013) ........................................................................... 5, 11, 13

*Sec'y of Labor v. Lauritzen*,
   835 F.2d 1529 (7th Cir. 1987) ........................................................................................ 12

*Slayman v. FedEx Ground Package Sys., Inc.*,
   765 F.3d 1033 (9th Cir. 2014) ................................................................................. passim

*Snead v. EOG Resources, Inc.*,
   2018 WL 1151137 (W.D. Tex. Feb. 16, 2018) ............................................................... 28

*Solis v. Velocity Exp., Inc.*,
   2010 WL 2990293 (D. Or. July 26, 2010) ...................................................................... 22

*Solis v. Velocity Exp., Inc.*,
   2010 WL 3259917 (D. Or. Aug. 12, 2010) ............................................................... 16, 17

*Swinney v. AMcomm Telecommunc'ns, Inc.*,
   30 F. Supp. 3d 629 (E.D. Mich. 2014) ........................................................................... 13

*Torres-Lopez v. May*,
   111 F.3d 633 (9th Cir. 1997) ...................................................................................... 5, 22

*Usery v. Pilgrim Equip. Co.*,
   527 F.2d 1308 (5th Cir. 1976) ........................................................................................ 12

*Wirtz v. Miss. Publishers Corp.*,
   364 F.2d 603 (5th Cir. 1966) .......................................................................................... 24

*Zhou v. Wang's Rest.*,
   2007 WL 134441 (N.D. Cal. Jan. 16, 2007) .................................................................. 25

1

**<u>Federal Statutes</u>**

2

29 U.S.C. § 203 .................................................................................................. 5

3

29 U.S.C. § 206 ................................................................................................ 25

4

29 U.S.C. § 207 ................................................................................................ 25

5

29 U.S.C. § 211 ......................................................................................... 24, 15

6

29 U.S.C. § 255 ................................................................................................ 26

7

29 U.S.C. § 260 ................................................................................................ 31

8

9

**<u>Federal Regulations</u>**

10

29 C.F.R. § 516.2(a) ........................................................................................ 21

11

29 C.F.R. § 578.3 ........................................................................................ 26, 27

12

29 C.F.R. § 778.112 ......................................................................................... 25

13

29 C.F.R. § 791.2 ................................................................................... 14, 15, 21

14

15

**<u>Federal Register</u>**

16

Joint Employer Status Under the Fair Labor Standards Act,
   85 Fed. Reg. 2820 (Jan. 16, 2020) ............................................................... 14

17

18

19

20

21

22

23

24

25

26

27

28

iv

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................1

II.     FACTUAL BACKGROUND ............................................................1

III.    ARGUMENT ......................................................................................4

      A.     Drivers' Employee Status Under the FLSA Is a Question of Law
           Appropriate for Resolution by Summary Adjudication......................4

           1.    Drivers are Diligent's Employees under the FLSA.................6

                  a.    Diligent Controls the Manner in Which Drivers Perform
                        Their Work. .......................................................................6

                  b.    Drivers Have No Opportunity for Profit or Loss By
                        Exercise of Managerial Skill or Otherwise. ..................9

                  c.    The Investment Factor Weighs in Favor of Employee
                        Status. ..............................................................................10

                  d.    Making Deliveries Does Not Require a Special Skill..11

                  e.    Drivers' Minimum One-Year Term, Plus a Non-
                        Compete Restriction, Establish a Sufficiently Permanent
                        Working Relationship with Diligent. ...........................12

                  f.    Delivery Drivers are Integral to Diligent's Business as a
                        Delivery Company. .......................................................13

            2.    Parts Authority is Liable as Drivers' Joint Employer. ...........13

                  a.    Parts Authority Exercises the Authority to Fire Drivers.
                        ..................................................................................15

                  b.    Parts Authority Supervises and Controls Drivers' Work
                      Schedules and Conditions of Employment to a
                      Substantial Degree.........................................................15

                  c.    Parts Authority Determines Drivers' Rate and Method
                      of Payment......................................................................19

                  d.    Parts Authority Maintained Portions of Drivers'
                      Records............................................................................21

B.   By Controlling the Terms and Conditions of Drivers' Employment, Browne is Liable as an Employer. .......................................................22

C.   Defendants Have Violated the FLSA's Minimum Wage, Overtime, and Recordkeeping Requirements. ...................................................24

D.   There is No Genuine Dispute that Defendants' Violations Were Willful. ..........................................................................................25

E.   Defendants Cannot Show that They Acted in Good Faith. ...............29

IV.   **CONCLUSION** ...........................................................................**30**

## I.   <u>INTRODUCTION</u>

For years, Defendant Arizona Logistics, Inc. ("Diligent"), Defendant Parts Authority Arizona, LLC ("PA"), and Defendant Larry Browne ("Browne") paid their delivery drivers ("Drivers") an average rate of $0.44 per hour in violation of the FLSA minimum wage and overtime provisions.  They accomplished this by unlawfully claiming their employee drivers were independent contractors in order to maximize their own profits, shift delivery vehicle costs, and gain a competitive advantage over law-abiding businesses.  Despite the label Diligent provides to its Drivers, they are not entrepreneurs running their own businesses: they depend on Defendants to pay them set wages; they serve Diligent's clients, not their own; they rely on Defendants to provide them deliveries each workday; and they are subject to written and verbal rules and commands issued by both Diligent and PA.  Diligent and PA each control how Drivers must look and act when making deliveries, and each keep Drivers on a tight schedule, even going so far as to reprimand Drivers for taking unscheduled bathroom breaks.  Diligent and PA determine Driver pay, how many hours Drivers work each week, which hours they work each day and where, the specific routes Drivers drive, and the order in which Drivers make their deliveries.  Diligent further requires Drivers to sign a non-competition agreement that prevents them from offering their delivery services directly to any Diligent client or becoming employees of those clients.  Defendants Diligent and PA together control and supervise every aspect of Drivers' work.  The overwhelming undisputed facts establish, as a matter of law, that Defendants are employers of Drivers under the FLSA.

## II.   <u>FACTUAL BACKGROUND</u>

Diligent is one of twenty entities operating as part of a national delivery service known as Diligent Delivery Systems ("Diligent National").  Pls. Separate Statement of Undisputed Facts (*hereinafter* "SUF") 1.  Diligent is a "delivery business," and its Drivers deliver auto parts for its clients.  SUF 9-10.  Diligent is a self-proclaimed client-driven company that earned a reputation for "crack[ing]" Drivers' "heads" to ensure a high level of client service.  SUF 12, 43-46. Diligent contracts directly with clients, who depend on

Drivers performing fast and timely deliveries that are essential to their clients' respective businesses.  SUF 9, 26, 119-121.  It contracts with approximately 18 clients in Arizona, of which PA is the largest.  SUF 3.[1]  During the relevant period, Diligent had 1,649 Drivers making deliveries, of which 964 drove for PA.  SUF 118.[2]

Larry Browne, the sole owner and CEO of the Diligent entities, hires and fires Diligent employees, and also determines the pay of Drivers.  SUF 94, 99-100, 101-103. Browne admits he is personally involved in negotiating Diligent's contracts concerning Drivers' work.  SUF 104-112, 113-116.  Browne also admits it was his decision over 20 years ago to require Drivers to execute contracts that described them as "independent contractors," and Browne directed Diligent to treat and pay Drivers as independent contractors, rather than as employees, for payroll and tax purposes.  SUF 95-97.

Before hiring, Diligent requires that each Driver sign a package of form documents, which Diligent and/or its counsel drafted.  SUF 18-25.  These onboarding documents repeatedly characterize Drivers as independent contractors.  *Id*.  The "Operator Proposal" drafted by Diligent counsel, for example, is written from the alleged point of view of the Driver using "I" statements and purportedly offering business services to Diligent.  SUF 18-19.  The contract includes a non-competition agreement that prevents Drivers from offering their delivery services to any Diligent client or becoming employees of those clients.  SUF 18, 25, 74-78.  Diligent enforced this provision by penalties and threats of lawsuits.  SUF 25, 74-75.  The contract states that each Driver is an "owner

---

[1] PA accounts for 50 percent of all Driver workdays.  SUF 3.  Penske Auto Group, Freightliner, TWW/TireHub, NAPA, SSF Auto Parts, and Watson Chevrolet account for approximately 40 percent of Diligent Driver workdays, with smaller clients accounting for the remaining 10 percent.  *Id*.  Client operations varied slightly in hours and delivery methods but were the same in how clients and Diligent interacted with and controlled the Drivers. *E.g.*, SUF 51, 110-111 (some Diligent clients required Drivers use particular communication equipment while others did not).  Diligent's Drivers include all 1,649 individuals listed on Exhibit A to the Amended Complaint. SUF 118.  PA, as one of Diligent's largest clients, includes a large subset of, but not all, of those Drivers.  *Id*.  Specifically, 964 Drivers listed on Exhibit A worked for Parts Authority for some period of time.  *Id*.
[2] PA changed the classification of Drivers to employee status in 2018, after the Secretary brought this action. SUF 152.

operator[s]" and "not an employee."  SUF 20.  The onboarding documents include a one-year contract that renews automatically each year.  SUF 15.

Diligent pays Drivers preset pay rates with no chance for negotiation.  SUF 26-28, 30.  Diligent further prohibits Drivers from negotiating their set pay rate with clients, such as PA.  SUF 26-28, 30-31.  Rather, PA negotiated the preset monthly contract rate directly with Diligent.  SUF 139.  This negotiated monthly rate is calculated based on the hours and daily miles for a particular PA delivery route.  SUF 140.  For the majority of PA routes, PA requires Drivers to work six days per week, driving 150 miles per day, for a total of 54.5 hours each week.  SUF 125, 127, 141-143.  PA paid Diligent a flat monthly rate for Drivers performing these standard routes, and Diligent kept 20% of that monthly rate for each Driver as Browne-mandated Diligent profit.  SUF 114, 141.

After hire, Diligent requires its Drivers to provide dedicated and exclusive services to Diligent and the client(s) to whom Diligent assigns Drivers.  SUF 17.  Diligent prohibits Drivers from earning money in other capacities while working for its clients, such as driving for rideshare companies like Lyft or Uber, or even selling lunches out of the car during the workday.  SUF 17, 40, 161.  Diligent reprimanded Drivers who engaged in these activities.  SUF 40.

Diligent requires Drivers to work specific work schedules daily.  SUF 32.  Drivers must send a daily morning text message between 6:00 a.m. and 6:30 a.m. to Diligent to check-in for work.  SUF 38.  When Drivers need time off during specific hours in a work-day or need a specific day off work, Drivers must request that time off from Diligent.  SUF 32-33.  In response to such requests, Diligent managers have directed Drivers, for example: to come to work sick; to miss a family funeral; and to finish a shift when a Driver discovered his sister attempted suicide.  *Id*.

After checking in with Diligent each morning, PA Drivers must arrive at their as-signed PA store by their shift schedule, which is generally between 7:00 a.m. and 8:30 a.m.  SUF 126.  If Drivers are late for any reason, they risk a PA dispatcher sending them home without work.  SUF 167.  PA requires its Drivers to complete deliveries in the

precise manner and in the exact order it dictates to Drivers.  SUF 156-158, 160.  PA requires that a Driver working six days per week must work 54.5 hours at an average of 9.5 hours a day and 7 hours on Saturdays.  SUF 127-128, 185.  Diligent and PA each impose strict attendance requirements and penalize Drivers with Diligent's $35 "failure to provide service fee" for not completing work, among a variety of other penalties.  SUF 34 ($35 failure to provide service fee imposed on at least 868 occasions from 2012 to 2019), 69-70, 73-74.

Neither PA nor Diligent ever paid Drivers an increased pay rate for hours worked beyond 40 in a workweek or paid them any mileage reimbursement to cover Drivers' fuel or car maintenance costs.  SUF 139.  Separate and apart from Drivers, PA directly-employed delivery drivers, to whom PA paid an overtime premium for hours beyond 40 in a workweek as well as covering the fuel and other costs of a fleet of PA delivery vehicles or otherwise providing PA's directly-employed drivers with a mileage reimbursement to cover the their fuel and vehicle costs.  SUF 151, 179.

Drivers repeatedly notified Diligent about FLSA minimum wage and overtime violations.  Drivers told Diligent's operations manager that they were making less than minimum wage (SUF 188); were losing money driving for Diligent (SUF 189); were paying out of pocket to work (*id.*); could not afford gas (SUF 190); and had to borrow money in order to continue working (*id.*).[3]

## III.   ARGUMENT

### A.   Drivers' Employee Status Under the FLSA Is a Question of Law Appropriate for Resolution by Summary Adjudication.

"Whether an individual is an employee or an independent contractor for purposes of the FLSA is a question of law."  *Collinge v. IntelliQuick Delivery, Inc.*, No.  2:12-cv-00824 JWS, 2015 WL 1299369, at *2 (D. Ariz. Mar.  23, 2015) (citing *inter alia Bonnette v. Cal. Health and Welfare Agency*, 704 F.2d 1465, 1469 (9th Cir. 1983)).

---

[3] Each Defendant is covered by the requirements of the FLSA.  SUF 189-192.

4

"Summary judgment is appropriate where, as here, the undisputed evidence supports only one reasonable inference." *Caliber One Indem. Co. v. Wade Cook Fin. Corp.*, 491 F.3d 1079, 1085 (9th Cir. 2007).

<u>The FLSA's Definition of Employee</u>

The FLSA defines an employee as "any individual employed by an employer," 29 U.S.C. § 203(e)(1), and employ as including "to suffer or permit to work," *id.* at § 203(g). *See Torres-Lopez v. May*, 111 F.3d 633, 638 (9th Cir. 1997); *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992) ("[T]he FLSA . . . defines the verb 'employ' expansively to mean 'suffer or permit to work.' This . . . definition, whose striking breadth we have previously noted, stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles.") (citation omitted).

To determine whether individuals are employees, courts look at the economic realities of the circumstances to determine whether "individuals are dependent upon the business to which they render service." *Donovan v. Sureway Cleaners*, 656 F.2d 1368, 1370 (9th Cir. 1981) (citation omitted); *see also Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1312 (11th Cir. 2013) (noting courts focus "on whether an individual is 'in business for [] [themselves]' or is 'dependent upon finding employment in the business of others'"). In conducting this analysis, courts must consider the totality of the circumstances between the individual and the employer, evaluating "the circumstances of the whole activity." *Sureway*, 656 F.2d at 1370.

The Ninth Circuit has identified factors to help measure "the degree of dependence by the individual on the entity," which is at the heart of the economic reality analysis. *Perez v. Oak Grove Cinemas, Inc.*, 68 F. Supp. 3d 1234, 1242 (D. Or. 2014). This "list is not exhaustive" and no single factor is dispositive. *Sureway*, 656 F.2d at 1370. These relevant factors include:

> a) the degree of the alleged employer's right to control the manner in which the work is to be performed;

b) the alleged employee's opportunity for profit or loss depending upon his managerial skill;

c) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers;

d) whether the service rendered requires a special skill;

e) the degree of permanence of the working relationship; and

f) whether the service rendered is an integral part of the alleged employer's business.

*Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748, 754 (9th Cir. 1979).

    1.    <u>Drivers are Diligent's Employees under the FLSA.</u>

        *a.*    *Diligent Controls the Manner in Which Drivers Perform Their Work.*

Here, Diligent not only has the right to exercise substantial control over how Drivers perform their work but actually exercises that control.[4]  First, Diligent maintains detailed written policies outlining how Drivers must perform their work.  Diligent's "code of conduct" states that each Driver "will abide by" Diligent's requirements, wear uniforms, be "clean and well groomed," and carry specific brands of phones to "facilitate customer communications" which "may also include GPS tracking and delivery route monitoring."  SUF 41-42, 108.  Diligent's code of conduct further gives Drivers directions on how to account for, load, and complete deliveries, and advises that Drivers are seen as their "Customer Service Ambassadors to all."  *Id.*

Second, Diligent exercises substantial control over Drivers' work schedules.  As Diligent's former operations manager testified, Diligent enforces the work hours dictated by each Diligent client, ensuring that Drivers "had no say-so" regarding their scheduled work hours.  SUF 36-37.  A Driver's only option is: "work or no work."  SUF 37.  To enforce client schedules, Diligent requires that Drivers check in via text message with a Diligent supervisor each morning before their scheduled start time to confirm they are working that day.  SUF 38, 49-50.  Depending on the client, Diligent requires Drivers to

---

[4] The Ninth Circuit has made plain that the inquiry into control includes the right to control.  *See Real*, 603 F.2d at 754.

work between 7 and 9.5 hours per day with no scheduled break.  SUF 125, 133.  As a Diligent dispatcher testified, he tells Drivers "I need to know where you're at, at all times."  SUF 52.  Diligent requires Drivers for some clients to use tablets with GPS that track their daily movements.  SUF 51, 110, 158.  Diligent also expects Drivers to take deliveries late in the day that push them past their scheduled end time.  SUF 39, 134.  If a Diligent client complains that Drivers are refusing late deliveries, Diligent managers will "fix" the situation and compel Drivers to take the delivery.  SUF 39.

Diligent communicates and enforces clients' requirements regarding the performance of deliveries, including via joint Diligent/client in-person meetings.  SUF 14, 41, 43, 47-48, 53-54, 129, 155, 162.  Diligent requires Drivers to be available to perform work for Diligent customers at all scheduled times and Drivers may not use slow periods to perform any other work, such as driving for rideshare companies like Lyft or Uber.  SUF 40, 138.  If Drivers have personal emergencies that arise prior to or during a scheduled shift, they risk termination of work or losing a route if they cannot complete their shift.  SUF 32-33, 69-70.

Diligent also controls Drivers by shifting costs and imposing penalties to pressure Drivers to comply with client schedule demands.  Diligent imposes a $35 "failure to provide service" fee when a Driver does not work on a scheduled day for "whatever reason."  SUF 34.  Diligent requires Drivers to provide seven days' notice before terminating their contracts, even "if a family member is dying."  SUF 67.  Diligent imposes a $75 penalty on Drivers who fail to provide seven-day notice.  SUF 70; *see Collinge*, 2015 WL 1299369, at *3 (discussing delivery company's use of "financial penalties" to induce delivery drivers' compliance with standard operating procedures weighed in favor of employee status); *Acosta v. Senvoy, LLC*, No. 3:16-CV-2293-PK, 2018 WL 3722210, at *7 (D. Or. July 31, 2018) (same).  Diligent also shifts administrative costs by charging Drivers a $2 daily fee, which Diligent executive leadership acknowledges is a "made-up number."  SUF 71-72.

7

1   Third, Diligent controls how Drivers perform the work through Diligent's training,

2   monitoring, and enforcement of work rules with disciplinary action, which includes ter-

3   mination.  Diligent trains Drivers by assigning them to shadow another Driver on the job.

4   SUF 58.  Diligent also imposes uniform, hygiene, and cleanliness requirements on Driv-

5   ers, which the Ninth Circuit has expressly held "clearly constitute[s] control[.]"  *Slayman*

6   *v. FedEx Ground Package Sys., Inc.*, 765 F.3d 1033, 1042-1043 (9th Cir. 2014); SUF 23,

7   42, 48, 67, 108, 161-162.  Diligent requires Drivers to wear a Diligent polo shirt (the cost

8   of which is deducted from their pay) and prohibits various types of clothing, such as flip-

9   flops and short shorts.  SUF 23, 56.  Diligent requires Drivers to be "presentable" and

10  "decent" when interacting with Diligent clients because Drivers are "more customer ser-

11  vice than the company itself because [clients] are seeing you."  SUF 57.  If a client com-

12  plains about a Driver, Diligent will attempt to move that Driver to a different location;

13  however, if the client no longer wants to use the Driver, Diligent will terminate that

14  Driver's contract.  SUF 66.  Diligent may also unilaterally terminate a Driver for being

15  unprofessional with clients, being late, or for simply "not following procedures the cus-

16  tomer has in place."  SUF 65.  By way of example, Diligent cited "Reason for Termination

17  of Operator Agreement" as follows:

18  Remarks:  *Tried to ask why he doesn't wear*

19  *his shirts and he got very Loud*

20  *& defensive that he is his own Boss.*

21  Diligent Authorized Signature:  *John Creamvella*   Date:  *9/23/15*

22  SUF 67.

23      Diligent has the right to control Drivers' work and ultimately does so through a

24  variety of enforced strict rules and hands-on supervision, as evidenced by approximately

25  75,554 text messages Diligent exchanged with Drivers between August 18, 2016 and

26

27

28

8

December 16, 2017.[5]   Indeed, consistent with this daily oversight and supervision, Diligent's former operations manager testified that he believes Drivers were more like employees than independent contractors.  SUF 35.

> **b.**   *Drivers Have No Opportunity for Profit or Loss By Exercise of Managerial Skill or Otherwise.*

Drivers lack the opportunity for profit or loss depending on their managerial skill. Diligent negotiates Drivers' most important work terms—the fee charged to clients, Drivers' work schedules, and the miles associated with Drivers' routes—directly with its clients long before Diligent hires a Driver.  *See* SUF 26; *see also Slayman*, 765 F.3d at 1043 (finding employment relationship when employers, as opposed to workers, negotiate directly with customers); *Flores v. Velocity Express, LLC*, 250 F. Supp. 3d 468, 472 (N.D. Cal. 2017).  Diligent's contracts with clients dictate Drivers' pay rate: once Diligent's client fee is negotiated, Diligent simply reduces the contract rate to pay itself its targeted 20% profit margin and sets Driver pay to align with that figure.  SUF 26-28, 114, 116.

Thus, as Diligent's former operations manager admitted, Driver negotiations on pay rate "didn't happen."  SUF 27.  The "negotiation" simply consists of a Driver accepting Diligent's set pay rate or "don't sign the contract."  *Id.*  Diligent's operations managers each admit that they lack authority to change Driver pay.  SUF 29.  Because Diligent predetermines pay rates and miles with its clients, Drivers are unable to increase their profits by requesting a raise.  SUF 26-31.  Indeed, Diligent has terminated Drivers for asking for pay raises when their pay did not cover mileage costs.  SUF 31.

Diligent's prohibition of Drivers making other deliveries or working for ride share companies like Uber and Lyft during down time on their scheduled shifts ensures that Drivers have zero control over their profits and losses.  *Oak Grove Cinemas, Inc.*, 68 F.

---

[5] The sheer volume of the texts between Diligent management and Drivers speaks to Diligent's extensive control over the Drivers' work performance.  SUF 33, 49.  Yet, of course, these texts do not capture all the additional control Diligent and its clients exerted over Drivers in person and by phone.

Supp. 3d at 1243 (noting under the profit and loss prong "none of the employees worked for a non-[Defendant] entity during the time they worked for the [Defendant]" weighing in favor of employee status).  In short, Diligent "cannot have it both ways: that is, [they] cannot claim that [their] [workers] are independent contractors, who would traditionally be free to use their skills wherever they please, and simultaneously prevent them from working for other" potential employers.  *Harris v. Skokie Maid & Cleaning Serv., Ltd.*, 2013 WL 3506149, at *9 (N.D. Ill. July 11, 2013); *see also Perez v. Super Maid, LLC*, 55 F. Supp. 3d 1065, 1078 (N.D. Ill. 2014) (same).[6]

> c.   The Investment Factor Weighs in Favor of Employee Status.

The third *Driscoll* factor seeks to illuminate the economic dependence of Drivers on Diligent as a matter of economic reality by focusing on the relative investments[7] made by Drivers and Diligent and Drivers' ability to hire helpers.  Here, again, this third factor sharply underscores Drivers' strong economic dependence on Diligent, underlying their employee status.

First, as to relative investment, any investment made by Drivers—which is simply the provision of their personal vehicle and advancing the costs of fuel—pales in comparison to that of Diligent, a nationwide delivery enterprise of 20 entities with revenue reaching approximately $227 million in 2018.  SUF 1-2.[8]  Second, as to Drivers' ability to contract their own helpers to perform work, Diligent's heavy-handed control over all aspects of Drivers' work terms and performance also renders any claimed

---

[6] Additionally, Drivers are bound to a non-compete clause that prohibits them from independently contracting with PA or other client competitors, stifling any potential profits Drivers might make through a self-negotiated contract.  *See Hughes v. Family Life Care, Inc.*, 117 F. Supp. 3d 1365, 1371-72 (N.D. Fla. 2015) (finding employer's non-compete and anti-solicitation contract clauses "constrained" employee's "capacity to realize profit," which "points toward employee status" under the FLSA).

[7] Dkt. 99 (8/8/2018 Order) (finding that the relevant investment made by the Drivers and Diligent is considered as part of the third *Driscoll* factor).

[8] Diligent maintains its corporate headquarters in Houston where it employs a large staff to oversee client and payroll operations for its various entities.  SUF 7-8.

authority with respect to helpers illusory:[9] here, potential Driver helpers must complete a Diligent subcontract and are subject to approval by both Diligent and the Diligent client for which the Driver (and helper) is working.  SUF 60-63; *Sureway*, 765 F.3d at 1045-46 ("[C]hoice of helper was subject to the approval of the employer.") (internal citations and quotations omitted); *see Flores*, 250 F. Supp. 3d at 489 ("[A] worker's ability to hire helpers is 'illusory' for purposes of the FLSA if helpers are also subject to the control of the alleged employer.") (quoting *Scantland*, 721 F.3d at 1317).  Diligent further admits that it can, and does, terminate Drivers' helpers (SUF 63), further underlining that Drivers and any helpers recruited are economically dependent on, and employees of, Diligent.

### d. Making Deliveries Does Not Require a Special Skill.

The Ninth Circuit has held that delivery drivers do not need special skills to perform their work.  *See Alexander v. FedEx Ground Package Sys., Inc.*, 765 F.3d 981, 995 (9th Cir. 2014); *Ruiz v. Affinity Logistics Corp.*, 754 F.3d 1093, 1104 (9th Cir. 2014); *see also Flores*, 250 F. Supp. 3d at 490; *Campos v. Zopounidis*, No. 3:09-CV-1138 VLB, 2011 WL 2971298, at *7 (D. Conn. July 20, 2011) ("[T]he possession of a driver's license and the ability to drive an automobile is properly characterized as a 'routine life skill' that other courts have found to be indicative of employment status rather than independent contractor status.").

Like all the delivery drivers repeatedly considered by courts in this circuit, Diligent's Drivers need no special skills beyond a driver's license to work as Drivers ("it's not rocket science," as multiple Diligent and PA managers testified during this litigation.). SUF 11, 59, 175, 182-183.  Indeed, Diligent's former operations manager explained that he never turned down a prospective Driver for lack of experience because they could "always train them."  SUF 59.

---

[9] The record here is clear that although Diligent's contract technically permits Drivers to hire helpers, few actually do so (SUF 64).

1
2

>    e.   *Drivers' Minimum One-Year Term, Plus a Non-Compete*
>         *Restriction, Establish a Sufficiently Permanent Working*
>         *Relationship with Diligent.*

3   The relative permanence of Drivers' work arrangement also weighs in favor of

4   employee status.  Drivers work indefinitely for Diligent, starting with a one-year contract

5   that automatically renews for another year unless either party gives notice.  SUF 15; *see*

6   *also Sureway*, 656 F.2d at 1372 (noting that "true independent contractors have a fixed

7   employment period"); *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1314 (5th Cir. 1976)

8   (finding permanence where contract "is for a 1 year duration and is routinely renewed").

9   In fact, Diligent attempted to deter Drivers from leaving by imposing a $75 penalty on

10  Drivers who quit within the first 90 days, in addition to numerous other penalties it

11  imposed on departing Drivers.  SUF 70, 103.

12  In addition, PA Drivers' work schedules average 9.5 hours per day Monday

13  through Friday and 7 hours on Saturday with no official lunch break, which effectively

14  prevents them from working other jobs.  SUF 125, 127-128, 133; *see, e.g.*, *Slayman*, 765

15  F.3d at 1047 (working "9.5 to 11 hours per day" demonstrated permanence); *Keller v.*

16  *Miri Microsystems LLC*, 781 F.3d 799, 807 (6th Cir. 2015) (recognizing "short, exclusive

17  relationships between the worker and the company may be indicative of an employee-

18  employer relationship" where an employer's required working hours effectively prohibit

19  the worker from performing other work) (citing *Sec'y of Labor v. Lauritzen*, 835 F.2d

20  1529, 1537 (7th Cir. 1987)); *Sureway*, 656 F.2d at 1372 (noting that independent

21  contractors generally work for other employers).  Diligent and PA also require Drivers to

22  work late if a delivery order comes in shortly before their scheduled end time, which

23  prevents Drivers from trying to secure work on their own behalf (separately from

24  Diligent) at the end of their long shifts.  SUF 39.

25  Not only do the work schedules Diligent sets prevent Drivers from working for

26  others, Diligent's contract explicitly prohibits Drivers from engaging in specific classes

27  of delivery or driving work.  Diligent requires Drivers to sign a non-competition

28  agreement that prevents them from offering their delivery services to any Diligent client,

or becoming employees of those clients (to prevent Drivers from "stealing a spot").  SUF 74, 76-78.  Diligent may assess a $500 penalty on a Driver for violating the agreement.  SUF 74.  Diligent also penalizes its clients if they employ or directly contract with Drivers, charging clients a $1,500 "opportunity fee" per Driver.  SUF 75.  Thus, by imposing penalties on both Drivers and clients, Diligent ensures that Drivers can only make deliveries through Diligent and prevents them from securing FLSA-compliant employment with Diligent clients.   SUF 17; *see, e.g.*, *Swinney v. AMcomm Telecommunc'ns, Inc.*, 30 F. Supp. 3d 629, 634 (E.D. Mich. 2014) (noting "independent contractor agreement contains a non-compete agreement, which in and of itself weighs in favor of viewing Plaintiffs as employees"); *Powers v. Emcon Assocs., Inc.*, No. 14-CV-03006-KMT, 2017 WL 4075766, at *6 (D. Colo. Sept. 14, 2017) (recognizing a non-compete clause is indicia of employee status under the FLSA); *Pizzarelli v. Cadillac Lounge, L.L.C.*, No. CV 15-254 WES, 2018 WL 2971114, at *4 (D.R.I. Apr. 13, 2018) (same); *Hughes*, 117 F. Supp. 3d at 1371-72 (same).  Simply put, Defendants expect Drivers to provide full-time, dedicated and exclusive services.  *Id*.

> f.   *Delivery Drivers are Integral to Diligent's Business as a Delivery Company.*

Finally, Drivers are integral to Diligent's business.  Diligent's sole owner, Larry Browne, describes his business as "a national delivery service" which "mov[es] in and out of a lot of states."  SUF 1.  As former Diligent operations manager John Caccavella candidly admitted, "[i]t's a delivery business.  Without drivers, [Diligent] might as well shut the doors."  SUF 10; *see Flores*, 250 F. Supp. 3d at 492 (quoting *Scantland*, 721 F.3d at 1319) ("If the workers play an integral role in the alleged employer's business, this 'shows that the arrangement follows more closely that of an employer-employee relationship than an independent contractor dynamic.'").

2.   Parts Authority is Liable as Drivers' Joint Employer.

The Department of Labor and the Supreme Court have long recognized that an employee can have two or more employers who are jointly and severally liable for the

wages due the employee under the Act.  *See* 29 C.F.R. § 791.2; *Falk v. Brennan*, 414 U.S. 190, 195 (1973) (holding maintenance workers were employees of both building owner and property management company); *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 727-29 (1947) (concluding slaughterhouse workers were employees of both subcontractor and plant operator); *see also Gillard v. Good Earth Power AZ LLC*, No. CV-17-01368-PHX-DLR, 2019 WL 1280946, at *8 (D. Ariz. Mar. 19, 2019) (Rayes, J.) (citing *Bonnette,* 704 F.2d at 1469).

In *Bonnette*, the Ninth Circuit applied the following four factors to determine joint employment status: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records."  704 F.2d at 1470.

The Department of Labor recently adopted the four-factor test derived from *Bonnette*, with slight modifications, as the basis for its updated joint employment regulation.  *See* Joint Employer Status Under the Fair Labor Standards Act, 85 Fed. Reg. 2820 (Jan. 16, 2020) (promulgating a revised 29 C.F.R. Part 791) (the "Rule").  The Rule assesses whether the alleged employer (1) hires or fires the employees; (2) supervises and controls their work schedules or conditions of employment to a substantial degree; (3) determines the rate and method of payment; and (4) maintains employment records.  *See* 29 C.F.R. § 791.2(a)(1).  The Rule, consistent with *Bonnette*, affirms that no single factor is dispositive to the joint employer inquiry,[10] the ultimate outcome depends on all the facts of a particular case, and a putative joint employer's "ability, power, or reserved right to act in relation to the employee may be relevant for determining joint employer status . . . ." 29 C.F.R. § 791.2(a)(3)(i)).  The Rule also affirms the longstanding principle that joint employer status may be proven where the putative joint employer indirectly

---

[10] *See, e.g.*, *Carrillo v. Schneider Logistics Trans-Loading & Distribution, Inc.*, No. 2:11-CV-8557-CAS, 2014 WL 183956, at *6 (C.D. Cal. Jan. 14, 2014) (denying client employer's motion for summary judgment based on first three *Bonnette* factors).

exercises control over workers.  *See* 29 C.F.R. §§ 791.2(a)(3) & 791.2(g)(5) (restaurant is joint employer of cleaning company's workers because company "agreed without question" to hire and fire workers on "several occasions" upon the restaurant's request).

Here, the first three factors weigh in favor of finding that PA's direct and indirect operational control over Drivers' work constitutes joint employment.  The fourth factor has no application here because no Defendant maintains complete employment records in violation of 29 U.S.C. § 211.  *See Collinge v. IntelliQuick Delivery, Inc.*, JWS, 2018 WL 1088811, at *13 (D. Ariz. Jan. 9, 2018); SUF 187.

> a.    *Parts Authority Exercises the Authority to Fire Drivers.*

PA directly and indirectly exercised termination authority over Drivers by either 1) complaining about job performance issues to Diligent, resulting in Drivers' termination or payment of a penalty, or 2) directly sending Drivers home without consulting Diligent. SUF 164.  Importantly, Diligent would agree "without question" to PA's requests to replace Drivers for failing to adhere to its directions.  *See* 29 C.F.R. § 791.2(g)(5)(ii).  For example, PA and Diligent discussed PA's dissatisfaction with a Driver together in the store, after which the Diligent operations manager "let him go."  SUF 170.

Further, an "evaluation of a company's power over the employment relationship must take into account its control over the purse strings, '[r]egardless of whether [it is] viewed as having had the power to hire and fire.'"  *Perez v. Lantern Light Corp.*, No. C12-01406 RSM, 2015 WL 3451268, at *5 (W.D. Wash. May 29, 2015) (quoting *Bonnette*, 704 F.2d at 1470).  Here, as described in the next section, PA is by far Diligent's largest client, and it wielded its significant market power by banning individual Drivers who failed to comply with its procedures.

> b.    *Parts Authority Supervises and Controls Drivers' Work Schedules and Conditions of Employment to a Substantial Degree.*

>> i.    Parts Authority Exercises Control Over Drivers' Working Conditions.

As Diligent's largest client, PA can and does exercise control over Drivers'

working conditions delivering auto parts to PA customers.  SUF 3-4, 117.  Half of PA's revenue derives from delivery of auto parts.  SUF 118.  Its advantage relative to competitors is its ability to get parts to customers faster than competitors by: 1) stocking a large inventory such that parts are readily available; and 2) delivering these parts quickly to customers.  SUF 119-120.

To achieve quick deliveries, PA maintains strict controls over Drivers and how they perform deliveries.  PA requires Drivers to take every delivery assigned to them (SUF 39, 159) and to perform each delivery in compliance with highly specific procedures.  SUF 152-157.  For example, PA requires that Drivers make deliveries "in the order the dispatcher gave them," "go directly to the first stop," prohibits any personal stops without letting the dispatcher know, forbids Drivers from transporting passengers or pets, and provides detailed directions for handling various customer scenarios.  SUF 153-158, 161, 163; *see Lovo v. Express Courier Int'l, Inc.*, No. 4:16-CV-853-Y, 2019 WL 387367, at *6 (N.D. Tex. Jan. 30, 2019) (concluding delivery drivers were employees where delivery company controlled routes, even if some drivers disobeyed).

PA further specifies the manner in which Drivers are to track deliveries and customer payments, including how to complete and turn in invoices for deliveries during every day of work.  SUF 157-158; *see Solis v. Velocity Exp. Inc.*, 2010 WL 3259917, at *5 (D. Or. Aug. 12, 2010) (denying delivery company's motion for summary judgment in part because the company required drivers to "submit specific route forms and check-in with the company daily").  PA requires Drivers to keep a clean personal and vehicle appearance, answer their phone whenever PA calls, refrain from playing loud music, take all calls outside, rather than inside a PA facility, and act as both PA's "representatives" and its "eyes and ears."  SUF 153, 162.  In addition to written directions, PA personnel tell new Drivers how to "properly do the job" in person and oversee new Driver training. SUF 156, 159.  Courts have found each of these actions weigh in favor of employee status. *See Lovo*, 2019 WL 387367, at *6 (noting delivery company's expectation that drivers answer calls during deliveries weighed in favor of employee status); *Alexander*, 765 F.3d

16

at 989 (noting appearance requirements weighed in favor of drivers' employee status); *Solis*, 2010 WL 3259917, at *5 (determining "daily calls" between delivery drivers and delivery company's dispatchers weighed in favor of denying delivery company's motion for summary judgment on employee status issue); *Collinge*, 2015 WL 1299369, at *3 (finding written uniform procedures that "regulate what the drivers are required to do, within which 'time frame' they must do it, what they are required to wear, and which equipment they must use" weigh in favor of employee status).

PA enforces its procedures both directly and via Diligent's operations team.  First, PA can act unilaterally with respect to Drivers, even if Diligent supervisors disagree with its decision.  SUF 167.  Drivers who fail to comply with PA's procedures risk PA sending them home for the day.  SUF 167, 169, 171; *Lovo*, 2019 WL 387367, at *5 (observing delivery company "tak[ing]" away drivers' routes for "[r]epeated infractions" such as appearing "late" for work or not wearing the correct uniform is indicia of employer/employee relationship).  Second, Diligent, on behalf of PA, directed Drivers to perform their delivery duties according to the specific terms of the "[P]arts [A]uthority agreement."  SUF 155, 162.  When Drivers failed to follow PA's directions, PA complained to Diligent, which in turn reprimanded Drivers.  SUF 164-165, 170.  For example, upon PA complaints, Diligent's operations manager reprimanded Drivers for carrying passengers (including family members) and for having "messy" cars.  SUF 48, 164-165; *Collinge*, 2018 WL 1088811, at *16 (finding evidence of direct control over delivery drivers' working conditions where supervisor of delivery drivers "confronted driver about his vehicle's dirty windows").

The extraordinary amount of control PA exhibits over Drivers' working conditions weighs heavily in favor of finding PA liable as a joint employer.

ii.     Parts Authority Sets Drivers' Schedules.

PA exercises complete control over PA Drivers' schedules.  PA expects Drivers to work 54.5 hours per week (9.5 hours on weekdays and 7 hours on Saturdays).  SUF 127, 128, 185; *see Alexander*, 765 F.3d at 993 (stating regular schedule supports employee

17

status).  PA admits that it instructs Drivers on which items to deliver, where to deliver them, and in what order.  SUF 157; *see Collinge*, 2015 WL 1299369, at *4 (holding delivery company which "controls the time that . . . Drivers must start their work . . . [and] gives them a manifest that informs them of their deliveries, which vary from day-to-day, and the time by which the time-sensitive deliveries must be completed" is an employer of drivers under FLSA); *Flores*, 250 F. Supp. 3d at 484 (finding delivery company was employer in part because it designed delivery drivers' routes). *Cf. Slayman*, 765 F.3d at 1043-1044 (finding employment relationship where employer told drivers which packages to deliver and where, despite the fact that it did not require a specific delivery order).

  PA's control of Drivers' schedules extends beyond setting a general schedule:  PA also dictates the timing of lunch breaks, slow periods, and issues strict prohibitions on Drivers' movements while waiting for packages to deliver.  SUF 133, 136-138.  In particular, PA does not allow Drivers to have a designated lunch break but instead instructs Drivers to eat on the road if able.  SUF 125, 133.  If a Driver requests a lunch break on a busy day, a PA dispatcher will ask the Driver to first complete the delivery and will note the Driver's request on a report submitted to the Driver's supervisor or notify Diligent.  SUF 133.  If a Driver's schedule ends at 6:00 p.m., PA may still assign the Driver a delivery at 5:57 and require the Driver to take the delivery.  SUF 134-135.  PA does not allow Drivers to go home early if they are not busy or to perform work for others during their PA-scheduled work hours.  SUF 136-137, 161.  Similarly, if Drivers are finished with their work before their scheduled end time, PA prohibits Drivers from leaving the premises for any reason, including to get lunch or run personal errands.  SUF 138.  When PA was dissatisfied with Drivers' performance—such as when Drivers failed to promptly respond to PA dispatchers' announcement that a package is ready for delivery—PA sent those Drivers home, ending that employee's workday.  SUF 171.

  In addition to controlling Drivers' start and stop times, PA also has unfettered control over Drivers' routes, intermingling Drivers' schedules with the schedules of PA's

employee-drivers, who it directly employed to deliver the same auto parts.  SUF 130, 132, 177, 185.  Indeed, PA makes no distinction between its two categories of drivers—its directly-employed drivers and the drivers jointly employed with Diligent—in assigning deliveries via its white-board system.  *See* SUF 130, 132, 177; *Flores*, 250 F. Supp. 3d at 482 (noting delivery company's "dispatchers['] discretion to unilaterally assign pick-ups" weighed in favor of employer/employee relationship).  PA holds Drivers accountable to the same job performance standards as its directly-employed drivers.  SUF 173, 176.  Further, PA shifted work away from its directly-employed drivers to the Drivers it employed with Diligent because PA's contract with Diligent did not require it to pay a higher overtime rate for the hours PA assigned Drivers to work weekly beyond 40.  SUF 139, 138.

c.    *Parts Authority Determines Drivers' Rate and Method of Payment.*

In *Bonnette*, the Ninth Circuit held that state welfare agencies, which failed to authorize sufficient funds to pay "chore workers the minimum wage for the hours worked," were joint employers because "their control over the purse strings was substantial."  *See* 704 F.2d at 1468.  The *Bonnette* purse string principle is instructive here because PA directly controls and sets Drivers' pay rate, hours worked, and miles driven—all three variables of Driver compensation.  *Id.* at 1468, 1470.  By setting Drivers' pay rate and hours, PA set[11] Drivers' hourly rate of pay *below* the federal minimum wage, sharply underlining PA's liability for the violations of the FLSA suffered upon these Drivers.  Specifically, PA set a monthly payment rate that, in combination with the hours and miles PA required of Drivers, guaranteed that Drivers' pay could not exceed $4.04 per hour even before accounting for *any* Diligent profit on the contract.  SUF 147-150.  In doing

---

[11] Direct control over employees' rate of pay is not required to satisfy the third *Bonnette* factor.  The court in *Perez v. Lantern Light Corporation* held a satellite television provider liable as a joint employer because it effectively set pay rates for cable installers hired by its subcontractor by way of the rates the satellite television provider agreed to pay to the subcontractor.  2015 WL 3451268, at *9.

so, PA ensured that Drivers were paid below the FLSA required minimum and overtime wage.  For example, the typical rate PA sets is $119.23 per actual day worked.  SUF 148. Drivers are required to bear the costs of operating a personal vehicle to make the deliveries,[12] roughly $82.50 per day,[13] resulting in PA setting Driver pay rates as follows:

| PA Driver Pay | Monthly | Daily | Weekly | Hourly |
|---|---|---|---|---|
| Before Diligent Fees | $955.00 | $36.73 | $220.38 | $4.04 |
| Diligent Profit | -$800.00 | -$30.77 | -$184.62 | -$3.38 |
| Diligent Admin Fee | -$52.00 | -$2.00 | -$12.00 | -$0.22 |
| **Actual Driver Pay** | **$103.00** | **$3.96** | **$23.77** | **$0.44** |

Thus, PA sets Drivers' maximum pay of $4.04 per hour ($3.21 below the $7.25 mandated FLSA minimum wage).  Once Diligent's profit rate is taken into account—and PA cannot credibly deny that it was aware that Diligent was taking a cut of the monthly Driver rate paid—the Driver's pay is just $0.44 per hour.  SUF 147-150.  Drivers are unable to obtain pay above the $4.04 hourly rate set by PA because Diligent "cannot pay more than [it] can bill the customer."  SUF 26-28.  Further, because PA's contract with Diligent provides that PA will pay the same daily rate regardless of the number of hours worked or the number of parts delivered, Drivers' pay does not increase even if they drive more hours in a day.  SUF 139.

---

[12] SUF 149.  PA is well aware of the costs Drivers must bear to perform the delivers as PA supplies almost all of its directly-employed drivers with company vehicles and covers all expenses for these vehicles, including fuel.  SUF 151, 179.  For the few PA employee-drivers that drive their own cars, PA provides reimbursement for vehicle expenses.  SUF 179.

[13] Here, PA's designed routes averaged 150 daily miles.  SUF 142.  Multiplying this daily average mileage by the IRS mileage reimbursement rate provides the daily cost Drivers pay to provide the car and fuel required to make the deliveries commanded by PA.  *See Burton v. DRAS Partners, LLC*, No. 2019-CV-02949, 2019 WL 5550579, at **2-4 (N.D. Ill. Oct. 27, 2019) (IRS mileage rate is an appropriate method to determine minimum wage violations under FLSA kickback theory where employer failed to maintain detailed records of employees' expenses (collecting cases); Wage & Hour Div., Dep't of Labor, Field Operations Handbook at 30c15 *available at* https://www.dol.gov/agencies/whd/field-operations-handbook/Chapter-30#B30b15 (last visited June 18, 2020). The IRS mileage reimbursement rate for business travel varied slightly during the liability period from $0.535 per mile to $0.58 per mile.  For the calculations herein, the Secretary applies $0.55 per mile (*i.e.*, $0.55 * 150 = $82.50).  SUF 149.

Not only does PA set the overall pay rate, PA approves modifications to Drivers' rate of pay. For example, PA President, Eric Schwartz, approved a request from Diligent's General Manager, Bob Williams, to change a Driver's pay rate to that of a shuttle driver. SUF 145. Similarly, a PA dispatcher loaned gas money to Drivers because they could not otherwise complete their deliveries. *See* SUF 146.

Finally, PA prohibited Drivers from earning extra pay through even non-driving work activities. PA, for instance, asked that Diligent reprimand a Driver who sold burritos out of his car while delivering for PA. SUF 167. Such action not only limits the opportunity for Drivers to earn above the rate PA sets, it also demonstrates the high level of control PA maintains and exerts over Drivers' rates of pay during the hours they perform work for the exclusive benefit of PA.

<i>d.</i>     <i>Parts Authority Maintained Portions of Drivers' Records.</i>

The FLSA requires employers to maintain certain records related to their employees. 29 C.F.R. § 516.2(a) (specifying twelve categories); *see also* 29 C.F.R. § 791.2(a)(2) ("employment records" includes "payroll records, that reflect, relate to, or otherwise record information pertaining to the hiring or firing, supervision and control of the work schedules or conditions of employment, or determining the rate and method of payment of the employee"). PA maintained partial employment records for Drivers, including a schedule comingling Diligent Drivers and PA employee-drivers. SUF 185. PA also maintained records of some Drivers' routes and some of their deliveries (SUF No. 186), but neither Diligent nor PA kept a complete set of Drivers' FLSA-mandated employment records. SUF 187. Accordingly, this factor has no application here, as it is neutral. *See Collinge*, 2018 WL 1088811, at *13 (holding that fourth *Bonnette* factor "is neutral" because no employer "ke[pt] any formal employment records").[14]

---

[14] In addition to the four factors identified above, the Ninth Circuit considers some additional factors when determining joint employment under the FLSA. *See*, *e.g.*, *Torres-Lopez*, 111 F.3d at 640. The following additional factors also show that PA is an em-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**B.     By Controlling the Terms and Conditions of Drivers' Employment, Browne is Liable as an Employer.**

Because Browne, Diligent's President and CEO, is the admitted architect of Diligent and the practices that resulted in FLSA violations, he is personally liable for violating Drivers' FLSA rights.  The Ninth Circuit is clear that "[w]here an individual exercises 'control over the nature and structure of the employment relationship,' or 'economic control' over the relationship, that individual is an employer within the meaning of the [FLSA], and is subject to liability."  *Lambert v. Ackerley*, 180 F.3d 997, 1012 (9th Cir. 1999) (*quoting Bonnette,* 704 F.2d at 1470).  Courts impose joint and several liability on individuals who are "instrumental in 'causing' the corporation to violate the FLSA."  *Solis v. Velocity Exp., Inc.*, 2010 WL 2990293, at *5 (D. Or. July 26, 2010) (*quoting Chao v. Hotel Oasis, Inc.*, 493 F.3d 26, 34 (1st Cir. 2007)); *accord Boucher v. Shaw*, 572 F.3d 1087, 1091 (9th Cir. 2009) (citing *Hotel Oasis* approvingly). Factors to consider include whether the individual has: (1) "significant ownership interest with operational control of significant aspects of the corporation's day-to-day functions;" (2) "the power to hire and fire employees;" and (3) "the power to determine salaries." *Lambert*, 180 F.3d at 1012 (internal marks omitted).

Here, Browne is Diligent's sole owner and controls significant aspects of Diligent's day-to-day operations, has the power to hire and fire employees, and the power to determine salaries, such that he is properly considered Drivers' employer.  Browne made the decision to improperly characterize Drivers as "independent contractors."  SUF

_____

ployer: (1) Drivers have no ability to increase profits or decrease losses through managerial skills because PA controls Drivers' hours, miles, routes, and ability to conduct other business;  (2) Drivers' investment in the maintenance of their vehicles is minimal compared to PA's investment in the facilities, personnel, advertising, and other state-wide and national infrastructure to stock and distribute auto parts; (3) driving requires no special skills, particularly in light of PA's detailed directions; (4) a significant number of Drivers worked for PA for over a year according to a fixed weekly schedule; and (5) Drivers perform work integral to PA's business as demonstrated by Drivers performing near-identical duties to the drivers PA directly employed and half of PA's revenue depending on its delivery of auto parts to its customers for which PA hires Drivers.  *Real*, 603 F.2d at 754.

22

5-6, 94-96.  Browne continues to exercise his power over the classification of employees and, in response to this litigation, Browne exercised his power by directing Diligent to reclassify a certain number of Drivers from independent contractors to employees.  SUF 96-98.  Browne not only oversees Diligent's finances generally, but he is personally involved in negotiating Diligent's contracts with clients.  SUF 100, 104-105, 107, 110-111.  In fact, Browne signed one of the contracts between Diligent and its largest client, PA.  SUF 107.  The contract that Browne negotiated with PA (SUF 107) contains the Diligent "code of conduct" discussed above outlining rules and restrictions that Diligent places on Drivers.  SUF 108.  The contracts Browne negotiated include explicit details regarding how Drivers are to perform work and which restrictions could be placed on Drivers.  SUF 105, 108, 110-111.

Browne admits that he was involved in setting prices, Diligent's gross profit margin, and Driver pay for a contract with another key Arizona client, SSF.  SUF 104, 106.  The SSF contract contains explicit details for Drivers, including the number of runs, stops, and miles Drivers must complete per day, as well as the rates that Diligent charges SSF for specific Phoenix-area Driver routes.  SUF 105.  Browne was involved in approving the purchase of tablets that Diligent provides Drivers for another client, TWW, and signed an addendum to the TWW contract regarding iPad use by Drivers, through which they must download delivery routes prior to commencing deliveries and follow specific steps in the delivery process.  SUF 110-111.  Browne is intimately involved in Diligent's costs given his central leadership role.  SUF 94 ("we all report to Larry."); SUF 101 ("I'm the freaking CEO.  I have to be [concerned about costs].  It's money out of the company."); SUF 109 ("[T]hese [proposed discounts to client PA] are big numbers, so why wouldn't, as a CEO, [I] get involved in something like this?"); *see also Bonnette*, 704 F.2d at 1470 (finding defendant was employer, and explaining that "[r]egardless of whether [defendants] are viewed as having had the power to hire and fire, their power over the employment relationship by virtue of their control over the purse strings was substantial").  Browne hired and fired a number of Diligent employees, including directly

interviewing and hiring Diligent's general manager and firing the previous Diligent general manager in response to an EEOC lawsuit.  SUF 99.  Browne indirectly sets Driver pay as it is derived from Diligent client rates and Diligent's desired profit margin, both factors within Browne's authority and control.  SUF 28, 113-114, 116.

Tellingly, Browne is even involved in operational minutiae at the level of ordering an extra $11.63 be deducted from a Driver each pay cycle for alleged damage caused, *directly* causing an FLSA minimum wage violation.  SUF 101-102.  Browne also directly impacted Driver pay by directing Diligent to assess Drivers' various penalties and fees, including the $2 administrative fee, the $35 failure-to-provide-service fee, and the $75 fee for quitting within 90 days of hire.  SUF 103.

Browne is the driving force behind Diligent's violations of Drivers' FLSA rights. He is thus an employer and bears individual liability for those violations.

### C.  Defendants Have Violated the FLSA's Minimum Wage, Overtime, and Recordkeeping Requirements.

The FLSA requires that employers maintain accurate contemporaneous records of the total daily and weekly hours worked by employees.  29 U.S.C §§ 211(c); § 215(a)(5) (deeming failure to maintain adequate records unlawful under FLSA).  This requirement is "fundamental" to achieving the FLSA's remedial goals because "[f]ailure to keep accurate records can obscure a multitude of minimum wage and overtime violations." *Wirtz v. Miss. Publishers Corp.*, 364 F.2d 603, 607 (5th Cir. 1966).  First, Defendants admit that they have not kept complete records of the hours worked by Drivers.  SUF 185. These admissions establish that Defendants violated the FLSA's recordkeeping requirements.  *Chao v. Me & Lou's Rest.*, 2008 WL 4832880, at *3 (D. Idaho Nov. 5, 2008) (granting partial summary judgment on recordkeeping violations based on defendant admissions).

Second, Defendants have violated the FLSA's requirement to pay a $7.25 minimum wage.  29 U.S.C. § 206.  As detailed above, Defendants paid Drivers, on average, only $0.44 for each of the typically 54.5 hours worked.  *See* Section III.A(2)(c) *supra*.

24

Thus, Defendants caused a $6.81 minimum wage violation for each hour worked.  Defendants even further diminished this already substandard wage through the myriad penalties Diligent levied against Drivers.  Further, in the event that a Driver drove more than 150 miles per day, the vehicle expenses the Driver advanced to Defendants exceeded Driver pay, resulting in a negative pay rate.  For example, Leo Andrews, a PA shuttle Driver, drove 310 daily miles incurring $170.50 per day in vehicle expenses while being paid only $110.50, thus losing $60 a day.  SUF 195.

Finally, Defendants have violated the FLSA's overtime requirement to pay a one-half premium for every hour over 40 worked per week.  29 U.S.C. § 207.  Diligent's own documents show that Drivers are paid a flat monthly rate "regardless of the number of hours worked."  SUF 20, 139, 187; *see* 29 C.F.R. § 778.112; *Zhou v. Wang's Rest.*, 2007 WL 134441, at *6 (N.D. Cal. Jan. 16, 2007) (noting that "flat rate semi-monthly payments are inherently irreconcilable with the requirements of the FLSA" because they "essentially conflate the overtime requirements into the minimum wage requirements, because an employer could disregard overtime requirements altogether so long as a reverse-engineered hourly wage never dipped below minimum wage").  The undisputed facts establish that Drivers on average worked 9.5 hours per day Monday through Friday and 7 hours on Saturday, thus establishing that Drivers worked over 40 hours per week and were not paid any overtime premium.  SUF 125, 139.[15]

**D.   There is No Genuine Dispute that Defendants' Violations Were Willful.**

Defendants' willful violations of the FLSA render them liable for back wages from at least December 2013 through the present.  *See* 29 U.S.C. § 255(a) (liability for willful FLSA violations extends to three years prior to the filing of the Secretary's

---

[15] As an example, three specific workweeks for three Drivers illustrate Defendants' minimum wage and overtime violations.  Drivers Andre Mestas, Jr., Henry Williams and Leo Andrews, worked at PA. Undisputed records maintained by Diligent and Parts Authority show the hours worked and miles driven by these Drivers. These undisputed records show FLSA minimum wage and overtime violations in each of the three workweeks.  SUF 193-195.

25

complaint); *see generally* Compl. (Dkt. 1) (filed Dec. 21, 2016).  A violation is willful if the employer "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA]."  *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988).  Evidence that an employer "attempt[ed] to evade compliance" with the FLSA obviously establishes a willful violation.  *Alvarez v. IBP, Inc.*, 339 F.3d 894, 908-09 (9th Cir. 2003).  Even an employer who does not consciously attempt to evade the FLSA acts willfully if it was on notice of its obligations under the FLSA but took no affirmative action to assure compliance with them or disregarded the very possibility that it was violating the statute.  *See Flores v. City of San Gabriel*, 824 F.3d 890, 906 (9th Cir. 2016); 29 C.F.R. § 578.3.  An employer acts in "reckless disregard" of the FLSA "if the employer should have inquired further into whether its conduct was in compliance with the Act, and failed to make adequate further inquiry."  29 C.F.R. § 578.3(c)(3).  Indeed, conduct is willful "where an employer disregarded the very 'possibility' that it was violating the statute."  *City of San Gabriel*, 824 F.3d at 906 (citation omitted).

Defendants each acted willfully to violate the FLSA.  PA failed to take any action or make any reasonable inquiry about its compliance with the FLSA despite obvious, repeated signs it was violating the law.  PA knew that the actual pay rates Drivers received were subminimum wage because PA bore all the vehicle and fuel expenses for its directly-employed drivers to perform precisely the same work PA assigned Drivers to perform.[16] SUF 147-151, 173-174, 176-179.   Despite this knowledge, PA failed to take any reasonable action regarding the Drivers' clear and obvious subminimum pay rates until two years after the Secretary brought this action, at which point PA changed the classification of Drivers to employees with overtime and mileage reimbursement.  SUF 151-152, 180.  As even a basic inquiry would have revealed that Drivers were improperly classified, PA's failure to make such a simple inquiry over the course of a decade

---

[16] PA's knowledge that Drivers are properly employees under the FLSA is further evidenced by its attempts to hire Diligent-provided Drivers directly as their own employees to preform deliveries in the same manner.  SUF 181.

1  unquestionably amounts to willfulness.  *See* 29 C.F.R. § 578.3(c)(3) (conduct is reckless

2  where employer should have but "failed to make adequate further inquiry"); *see Alvarez*,

3  339 F.3d at 909 (finding willfulness when defendant "was on notice of its FLSA

4  requirements, yet took no affirmative action to assure compliance with them"); *see also*

5  *City of San Gabriel*, 824 F.3d at 906 (affirming finding of willfulness where defendant

6  could point to "no evidence of affirmative action taken" to ensure compliance with the

7  FLSA).

8      PA cannot credibly shift blame for violations to Diligent.  As established above,

9  PA directly caused the FLSA violations at issue here by setting pay rates, mileage

10  expectations, and hour requirements that resulted in a maximum pay rate of $4.04 per

11  hour even before Diligent took its profits.  SUF 147-150.  Further, PA willfully attempted

12  to evade its responsibility through an indemnity provision specifically for FLSA

13  violations in its contract with Diligent.  SUF 109.  However, it is well established that an

14  employer cannot simply contract away its independent responsibility to comply with the

15  law.  *See, e.g.*, *Perez v. TBG Logistics LLC*, No.  CV-16-02916-PHX-ROS, 2016 WL

16  10919966, at *3 (D. Ariz. Dec. 16, 2016), *aff'd sub nom. Scalia v. Empl'r Sols. Staffing

17  Grp.*, LLC, 951 F.3d 1097 (9th Cir. 2020) (denying contractual indemnity claim because

18  to hold otherwise "would have the practical effect of allowing it to offset FLSA liability

19  and thereby weaken its incentive to comply with the FLSA").  Therefore, it is clear that

20  PA was on notice that the independent contractor arrangement violated the FLSA but

21  attempted to insulate itself from anticipated liability through an indemnity provision

22  instead of changing employee status.

23      Diligent's willfulness is well evidenced by the aggressive steps it took to create a

24  fictitious paper trail purporting to show Drivers were independent contractors when

25  readily available countervailing facts demonstrated Drivers were employees.  Even a

26  cursory review of Diligent's Driver documentation packet make it apparent that it does

27  not accurately represent Drivers' work for Diligent, as it states, among other things, that:

28      • Drivers can negotiate pay and other terms with Diligent (although Diligent

27

admits the Drivers cannot);

- Drivers will not receive any training or instruction from Diligent (although Diligent admits it provides training);
- Drivers have no set work hours (although Diligent admits it enforces strict schedules); and
- Drivers may perform work for other clients during their work hours (although Diligent repeatedly punished Drivers for doing so). *See* Section III.A(1) *supra*.

As detailed above, none of these contractual representations are true, as Diligent squarely admitted in the course of discovery here.[17]  Moreover, Diligent's COO had no role in creating the independent contractor agreement (SUF 83), nor did Diligent's local managers. *Id*.  These individuals, aside from Drivers themselves, are in the best position to know the way Diligent's business model actually operates.[18]  Tellingly, counsel admits that his goal in drafting Diligent's independent contractor documents was to "put something together that wouldn't get us in trouble."[19]  SUF 88.[20]

Diligent's willful FLSA violations are well reflected in Drivers' communications directly with Diligent.  For example, Drivers told Diligent's operations manager: that they were losing money and paying to work (SUF 189); that they needed to borrow money in order to continue working (SUF 190); that their pay was less than a minimum wage job (SUF 188); and that they were unable to make any money—expressly highlighting the exploitive nature of the job.  SUF 189.  Instead of addressing these complaints, Diligent

---

[17] While Diligent attempts to muddle the record with false labels and semantics (*e.g.*, it does not provide training, but "ride-alongs," and a "negotiation" is Drivers selecting pre-set pay rates), this does not change the Drivers' realities that run directly counter to Diligent's contractual representations.

[18] Diligent's counsel who drafted the documents lacked knowledge of Diligent's Arizona Driver model, such as incorrectly believing that: Drivers are not required to check in with Diligent before starting work; Drivers are able to negotiate their pay rates; Diligent does not impose a failure to provide service fee; PA does not have set hours for Drivers; and Diligent does not enforce client rules on Drivers.  SUF 90.

[19] Diligent's Driver documentation clearly attempts to protect it from liability, even going so far as to mirror the Ninth Circuit's economic reality factors to claim that Drivers are not an "integral part" of Diligent's logistics business.  SUF 21.

[20] Significantly, Diligent and PA included an indemnity provision in their contract, clearly anticipating the illegality of the independent contractor arrangement and attempting to divide between themselves the liability associated with it.  SUF 109; *Snead v. EOG Resources, Inc.*, 2018 WL 1151137 at *3 (W.D. Tex. Feb. 16, 2018).

28

maintained limitations on Driver's ability to escape the underpaying job by imposing noncompetition and termination penalties on Drivers and charging fees to clients that wanted to hire Drivers.  SUF 70, 74-75, 103.

**E.    Defendants Cannot Show that They Acted in Good Faith.**

As the Ninth Circuit has explained, "the employer has the 'difficult' burden of proving both subjective 'good faith' and objectively 'reasonable grounds' for believing that it was not violating the FLSA."  *Haro v. City of Los Angeles*, 745 F.3d 1249, 1259 (9th Cir. 2014) (quoting *Alvarez,* 339 F.3d at 909-10, *aff'd*, 546 U.S. 21 (2005)).  A finding of willfulness as shown in Section D is inconsistent with good faith.  *Empl'r Sols. Staffing Grp.*, *LLC*, 951 F.3d at 1102 (quoting *Chao v. A-One Med. Servs., Inc.*, 346 F.3d 908, 920 (9th Cir. 2003).

Diligent has no good faith defense.  Diligent and Diligent National have not obtained any opinion letters on employee status.  The law firm Morgan Lewis, in assessing Driver status for a potential third-party transaction, opined that drivers of a predecessor entity were employees in 2000.  SUF 79-81.  Diligent produced 2004 opinion letters from its long-term counsel that also drafted Diligent's onboarding documents, which concluded that DSI (a predecessor to Diligent) drivers are likely independent contractors.  SUF 86, 89.  Yet, any reliance on these letters is misplaced as the opinions themselves state they are based on the assumption that "DSI does nothing in the way of exercising control over the [Independent Contractors] that is inconsistent with the terms of the contract."  SUF 89.  These letters also carve out an express exception acknowledging that "the conduct of the parties can be used to show that the contract is a sham and that one party exercises so much control over the other so as to make the relationship that of employer/employee[.]"  *Id.*  This is precisely what occurred here.  Tellingly, when confronted with text messages from Diligent managers instructing sick Drivers to take medicine and show up to work, even Diligent's counsel admitted that Diligent exercised control over Drivers inconsistent with the understanding of DSI's "independent contractor" relationships that had informed his legal opinion.  SUF 90-92.

Further, PA cannot meet its "difficult" burden that it had subjective good faith and objectively reasonable grounds for believing it was not violating the FLSA given that it set pay at a maximum hourly rate of $4.04 per hour (Section III.A(2)(c)).  *Alvarez,* 339 F.3d at 910.  PA was well aware of the legal requirements of the FLSA because it directly employed delivery drivers to perform precisely the same work as Drivers.  SUF 173-174, 176-79; *see Haro*, 745 F.3d at 1259; *Rutherford Food*, 331 U.S. at 729.  While PA, for example, took steps to comply with the FLSA for its directly-employed drivers by providing them with a company car to make deliveries and paying them overtime and providing lunch breaks, it failed to take any "affirmative steps to ensure compliance with the FLSA" as to the Drivers employed through Diligent until 2018.  SUF 151-152; *see Flores*, 250 F. Supp. 3d at 496.  Instead, clearly anticipating the illegality of the independent contractor arrangement, PA attempted to shift the liability for these violations via the indemnity provision in its contract with Diligent.  PA's decision to classify its Drivers jointly employed with Diligent as employees subsequent to the filing of this lawsuit is further evidence that PA failed to affirmatively take reasonable steps to ensure compliance with the FLSA earlier.  SUF 98, 152.

## IV.   **CONCLUSION**

For the foregoing reasons, the Court should grant the Secretary's Motion for Partial Summary Judgment and adjudicate as a matter of law that: (1) Defendant Diligent is an employer; (2) Parts Authority is a joint employer; (3) Defendant Browne is liable as an individual employer; (4) Defendants violated the FLSA's minimum wage, overtime, and recordkeeping requirements and continue to do so; (5) Defendants' violations of the FLSA are willful; and (6) Defendants cannot show that they acted in good faith under 29 U.S.C. § 260.

Respectfully submitted,

Dated: July 8, 2020

/s/ *Boris Orlov*
BORIS ORLOV
Senior Trial Attorney

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JANET M.  HEROLD
Regional Solicitor
ANDREW J. SCHULTZ
Counsel
PAIGE B. PULLEY
EDUARD R. MELESHINSKY
HAILEY MCALLISTER
Trial Attorneys

U.S. Department of Labor