Janet M. Herold
Regional Solicitor
Andrew J. Schultz (CSBN 237231)
Counsel for Wage and Hour
Boris Orlov (CSBN 223532)
Senior Trial Attorney
Hailey McAllister (CSBN 326785)
Paige B. Pulley (CSBN 312596)
Eduard Meleshinsky (CSBN 300547)
Trial Attorneys
Office of the Solicitor
United States Department of Labor
350 S. Figueroa St., Suite 370
Los Angeles, California 90071-1202
Telephone: (213) 894-0201
Facsimile:  (213) 894-2064
Email: orlov.boris@dol.gov

*Attorneys for Plaintiff Secretary of Labor*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Eugene Scalia, Secretary of Labor, United States Department of Labor,<br><br>Plaintiff,<br><br>v.<br><br>Arizona Logistics, Inc., d/b/a Diligent Delivery Systems, an Arizona corporation; Larry Browne, an individual; Parts Authority Arizona, LLC, an Arizona limited liability company.<br><br>Defendants. | Case No. 2:16-cv-04499-DLR<br><br>**PLAINTIFF SECRETARY OF LABOR'S OPPOSITION TO DEFENDANT ARIZONA LOGISTICS, INC.'S MOTION FOR SUMMARY JUDGMENT**<br><br>**ORAL ARGUMENT REQUESTED** |

1

## <u>TABLE OF AUTHORITIES</u>

2

**Federal Cases**

3

*Acosta v. Senvoy, LLC,*

4

    2018 WL 3722210 (D. Or. July 31, 2018) ...................................................................9

5

*Alexander v. FedEx Ground Package Sys., Inc.,*

6

    765 F.3d 981 (9th Cir. 2014)........................................................................................15

7

*Alvarez v. IBP, Inc.,*

8

    339 F.3d 894 (9th Cir. 2003)............................................................................19, 20, 23

9

*Baker v. D.A.R.A. II, Inc.,*

10

    No. CV-06-2887-PHX-LOA, 2008 WL 191995 (D. Ariz. Jan. 22, 2008) ................23

11

*Browning v. Ceva Freight,*

12

    885 F. Supp. 2d 590 (E.D.N.Y 2012) ........................................................................10

13

*Campos v. Zopounidis,*

14

    No. 3:09-CV-1138 VLB, 2011 WL 2971298 (D. Conn. July 20, 2011) ...................15

15

*Chao v. A-One Med. Servs., Inc.,*

16

    346 F.3d 908 (9th Cir. 2003)......................................................................................23

17

*Collinge v. IntelliQuick Delivery, Inc.,*

18

    No. 2:12-CV-00824 JWS, 2015 WL 1299369 (D. Ariz. Mar. 23, 2015) ............12, 13

19

*Collinge v. IntelliQuick Delivery, Inc.,*

20

    No. 2:12-CV-00824 JWS, 2018 WL 1088811 (D. Ariz. Jan. 9, 2018)......................21

21

*Donavan v. Sureway Cleaners,*

22

    656 F.2d 1368 (9th Cir. 1981)......................................................................................4

23

*Donovan v. Crisostomo,*

24

    689 F.2d 869 (9th Cir. 1982)......................................................................................28

25

*Donovan v. Univ. of Texas at El Paso,*

26

    643 F.2d 1201 (5th Cir. 1981)....................................................................................18

27

*Empl'r Sols.  Staffing Grp., LLC,*

28

i

951 F.3d 1097 (9th Cir. 2003).................................................................23

*Flores v. City of San Gabriel*,

824 F.3d 890 (9th Cir. 2016)..................................................................19

*Flores v. Velocity Express, LLC*,

250 F. Supp. 3d 468 (N.D. Cal. 2017) ...............................................passim

*Gen. Tel. Co. of the Nw. v. Equal Employment Opportunity Comm'n*,

446 U.S. 318 (1980) ............................................................................18

*Haro v. City of Los Angeles*,

745 F.3d 1249 (9th Cir. 2014).................................................................23

*Harris v. Bruister*,

2013 WL 6805155 (S.D. Miss. Dec. 20, 2013) ...................................24, 26

*Herman v. RSR Sec. Servs. Ltd.*,

172 F.3d 132 (2d Cir. 1999)...................................................................23

*Herman v. Express Sixty-Minutes Delivery Serv.*,

161 F.3d 299 (5th Cir. 1998)...............................................8, 9, 13, 16

*Hughes v. Family Life Care, Inc.*,

117 F. Supp. 3d 1365 (N.D. Fla. 2015)..............................................12, 16

*Kasten v. Saint-Gobain Perf. Plastics Corp.*,

563 U.S. 1 (2011) ..............................................................................28

*McLaughlin v. Richland Shoe Co.*,

486 U.S.  128 (1988) ...........................................................................19

*Moba v. Total Transp.*,

16 F. Supp. 3d 1257 (W.D. Wash. 2014) ................................................10

*Moreno v. United States*,

88 Fed. Cl. 266 (2009) ........................................................................19

*Nellis v. G.R. Herberger Revocable Tr.*,

360 F. Supp. 2d 1033 (D. Ariz. 2005)......................................................23

*North Carolina v. Butler,*
    441 U.S. 369 (1979) ................................................................................ 26

*Overnight Motor Transp. Co. v. Missel,*
    316 U.S. 572 (1942) ................................................................................ 23

*Pizzarelli v. Cadillac Lounge, LLC,*
    No. CV 15-254 WES, 2018 WL 2971114 (D.R.I. Apr. 13, 2018) ............ 16

*Powers v. Emcon Assocs., Inc.,*
    No. 14-CV-03006-KMT, 2017 WL 4075766 (D. Colo. Sept. 14, 2017).... 16

*Real v. Driscoll Strawberry Assocs., Inc.,*
    603 F.2d 748 (9th Cir.1979).............................................................. 2, 3, 4

*Roslov v. DirecTV Inc.,*
    218 F. Supp. 3d 965 (E.D. Ark. 2016) .................................................... 9

*Ruiz v. Affinity Logistics Corp.,*
    754 F.3d 1093 (9th Cir. 2014)................................................................ 15

*Rutherford Food Corp. v. McComb,*
    331 U.S. 722 (1947) .................................................................................. 4

*Scantland v. Jeffrey Knight, Inc.,*
    721 F.3d 1308 (11th Cir. 2013)............................................................... 14

*Slayman v. FedEx Ground Package Sys., Inc.,*
    765 F.3d 1033 (9th Cir. 2014)......................................................... 10, 14

*Stoll v. Runyon,*
    165 F.3d 1238 (9th Cir. 1999)................................................................ 28

*Swinney v. AMcomm Telecommunc'ns, Inc.,*
    30 F. Supp. 3d 629 (E.D. Mich. 2014) ................................................... 16

*Taylor v. Sturgell,*
    553 U.S. 880 (2008) ................................................................................ 18

*Trans World Airlines, Inc. v. Thurston,*
    469 U.S. 111 (1985) ................................................................................ 23

*United States v. Caldwell*,

    859 F.2d 805 (9th Cir. 1988) ........................................................................26

*United States v. Doyle*,

    348 F.2d 715 (2d Cir. 1965) ........................................................................26

*United States v. Spector*,

    55 F.3d 22 (1st Cir. 1995) .....................................................................25, 26

*Yu G. Ke v. Saigon Grill, Inc.*,

    595 F. Supp. 2d 240 (S.D.N.Y. 2008) .......................................................28

**Federal Statutes**

29 U.S.C. § 215 .................................................................................................29

29 U.S.C. § 216 .................................................................................................23

29 U.S.C. § 217 .................................................................................................29

**Federal Rules**

Federal Rule of Civil Procedure 23 ............................................................21, 22

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................1

II.     FACTS ....................................................................................................2

III.    ARGUMENT ..........................................................................................2

      A.      Drivers Are Employees Based on the Undisputed Material Facts. ....2

            1.      Contrary to Diligent's assertions, Drivers do not control how they perform their work. ............................................................4

            2.      Diligent's argument that its Drivers have opportunity for profit or loss based on managerial skill is meritless........................10

            3.      The investment factor weighs in favor of employee status. ...13

            4.      Diligent concedes that driving is not a special skill, as courts have repeatedly held. ............................................................15

            5.      Diligent's permanency argument is meritless. .......................15

            6.      Diligent is a delivery business and Drivers provide its core service. ...................................................................................17

      B.      Diligent Misconstrues the Relevance of the Testimony of Drivers it Selected and Deposed. ......................................................................18

      C.      A Three-Year Statute of Limitations Applies because Diligent Willfully Violated the FLSA. ...........................................................19

      D.      Liquidated Damages Are Mandatory because Diligent has No Good Faith Defense. ..................................................................................23

      E.      The Secretary's Tolling Agreement with Diligent is Valid.............24

      F.      Diligent's Efforts to Deceive Drivers Regarding Their Employment Status Warrant Extending Their Liability to the Start of the Secretary's Investigative Period. .....................................................27

i

G.   Injunctive Relief is Appropriate Based on the Plain Text of the FLSA. ...........................................................................................28

**IV.   CONCLUSION** ....................................................................................**29**

## I.      **INTRODUCTION**

The undisputed material facts of this case demonstrate that drivers who work for Defendant Arizona Logistics, Inc., d/b/a Diligent Delivery Systems ("Diligent") are Diligent's employees under the Fair Labor Standards Act ("FLSA").  Accordingly, the Court should deny Diligent's motion and grant the Secretary's Motion for Partial Summary Judgment.  In order to argue that its drivers are independent contractors rather than employees entitled to protection under the FLSA, Diligent relies almost exclusively on the language of its self-drafted contracts and the labels that Diligent itself gave to its delivery drivers ("Drivers").  However, the representations in Defendant's independent contractor agreements ("IC Agreements") and other onboarding documents, which Diligent and its counsel drafted to serve Diligent's interests, are not determinative here where Drivers' working conditions vastly differed from those outlined in Defendants' documents.  Indeed, the picture Diligent paints based on its self-drafted "Owner Operator Agreement" not only contradicts the evidence that Plaintiff presents in the Secretary's Motion for Partial Summary Judgment, but also conflicts with Diligent's own website and how it markets services to potential clients.

Diligent bases its entire Motion for Summary Judgment on terms in Diligent's IC Agreements, each of which are negated by the undisputed facts in this record regarding Drivers' actual on-the-ground working conditions.  *See generally* Secretary's Statement of Undisputed Facts in Support of Motion for Partial Summary Judgment (ECF No. 204).[1]  These undisputed material facts both dispute Defendants' factual claims—requiring dismissal of Defendants' summary judgment motion—and  establish that Drivers are employees under the FLSA, requiring summary judgment in the Secretary's favor.

---

[1] The Secretary hereby incorporates by reference the facts included in the Secretary's Statement of Undisputed Facts in Support of Motion for Partial Summary Judgment. *See* ECF No. 204 ("SUF").

1

## II.   FACTS[2]

Diligent markets itself to customers as a business that "provid[es] professional shipping and delivery services" (ASUF 100) that is "dedicated to partnering with [its] customers to achieve their delivery goals by providing…[t]he highest level of dependable and reliable transportation services." ASUF 101.  Diligent advertises its drivers as follows: "[t]he team members that successfully complete each delivery are Delivery Service Professionals" whom "Diligent empowers…to be 'Customer Service Ambassadors.'"  ASUF 102.

Diligent also advertises the financial benefits of outsourcing delivery programs to Diligent, stating that by eliminating "operating costs, monthly vehicle payments, fuel prices, expense of workers' wages, and day-to-day maintenance costs" that clients can "save as much as 32% of [their] transportation costs."  ASUF 103.  On its website, Diligent includes a live "cost calculator" allowing potential customers to estimate how much they will save based on: number of drivers employed, regular hourly rate and overtime rate, regular hours and overtime hours worked, number of vehicles maintained, price of gas, and miles driven per day.  ASUF 104.  According to Diligent's cost calculator, the total yearly cost of maintaining a single employee driver and vehicle is $65,612.42.[3]

## III.   ARGUMENT

### A.   Drivers Are Employees Based on the Undisputed Material Facts.

The Ninth Circuit looks to "[e]conomic realities, not contractual labels, [to] determine employment status [under] the FLSA."  *Real v. Driscoll Strawberry Assocs.,*

---

[2] The following facts supplement those included in the Secretary's SUF.  *See* Secretary's Consolidated Separate Statement of Additional Undisputed Facts ("ASUF").

[3] ASUF 105. (The Secretary inputted the following values in Diligent's cost calculator: $11 per hour regular rate, 54.5 hours per week, 160 miles per day, Diligent's default vehicle costs). The annual pay of a Diligent Driver at the hourly rate supported by the factual record in this case ($0.44) for the 54.5 weekly hours Parts Authority Drivers worked (SUF 127, 150) is $1,247 per year.  ASUF 106.

*Inc.*, 603 F.2d 748, 755 (9th Cir.1979).  Despite the label Diligent provides to its Drivers, they are not entrepreneurs running their own businesses: they depend on Diligent to pay them set wages; they serve Diligent's clients; they rely on Defendants to provide them deliveries each workday; and they are subject to written and verbal rules and commands issued by both Diligent and its clients.  SUF 26-38, 41-48.  Together, Diligent and its clients determine Driver's pay, how many hours Drivers work each week, which hours they work each day and where, the specific routes they drive, and the order in which they make their deliveries.  SUF 26-38, 41-48, 55, 125-129.  Indeed, Diligent, in concert with its clients, controls every significant aspect of its Drivers' work.  *See* Pl. Mot. at 6-21.  Here, the undisputed *material* facts the Secretary introduced with his Motion for Summary Judgment, incorporated here, show sufficient control over Drivers' work to find summary judgment in favor of the Secretary; however, at a minimum the Secretary has sufficiently disputed the facts Diligent introduced to prevent summary judgment in its favor.

Diligent argues that its Drivers are independent contractors based on a set of hypothetical facts that do not reflect Drivers' realities while working for Diligent.  Diligent relies almost exclusively on the terms of its "IC Agreement" as the "factual" basis for its claims.  Def. Mot. at 14.  As the Secretary explained in his Motion for Partial Summary Judgment ("MSJ"), the label that Defendants chose to give to Drivers is irrelevant here because Drivers' actual working conditions bore no resemblance to the working conditions described in Diligent's IC Agreement (*i.e.*, "Owner Operator Agreement") or the other documents Diligent drafted and provided to its Drivers. *See* Pl. Mot. at 6-21.

Diligent agrees that controlling Ninth Circuit precedent provides that employment status is illuminated by the consideration of the economic realities of Drivers' working conditions through the lens of the six *Driscoll* factors.  *Cf.* Pl. Mot. at 5-13, Def. Mot. at 13-18.  When applied to the accurate reality of Drivers' working conditions—as opposed to the hypothetical working conditions described in Diligent's IC Agreement—the six factors inescapably point to Drivers being Diligent's employees under the FLSA.  *Real v.*

*Driscoll Strawberry Assocs., Inc.*, 603 F.2d at 754; *Donavan v. Sureway Cleaners*, 656 F.2d 1368, 1370 (9th Cir. 1981) (*citing Driscoll*, 603 F.2d at 754).[4]

### 1.  Contrary to Diligent's assertions, Drivers do not control how they perform their work.

As the Secretary has detailed in his MSJ (Pl. Mot. at 6:10-9:3), Diligent controls the manner in which Drivers' perform their work.  Among other actions detailed in the Secretary's MSJ, Diligent does this through a variety of strict and enforced rules and schedules, detailed policies directing how Drivers must perform their work, monitoring and hands-on supervision depicted in tens of thousands of text communications, and penalties for failure to comply with schedule demands or violations of Diligent's required non-compete agreement.  Pl. Mot. at 6-9; SUF 25, 32-57; ASUF 107 (Diligent operations manager to Driver: "If u can cover ur spot after ur appt it will keep you from being charged for today . . . .").  Although the written agreement that Diligent required Drivers to sign asserts that, "Drivers had sole control over providing delivery services for Diligent's clients,"[5] the record here shows that Drivers have no control over how they provide delivery services to Diligent's clients.[6]  *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947) ("Where the work done, in its essence, follows the usual path of an employee, putting on an 'independent contractor' label does not take the worker from the protection of the Act.").

As the Secretary explained in his MSJ, Diligent exercised significant control over almost every aspect of Drivers' work.  *See infra*; Pl. Mot. at 6:10-9:3.  Diligent's reliance on the contract language does not support the facts that Diligent seeks to establish in

---

[4] In conducting this analysis, courts must consider the totality of the circumstances between the individual and the employer, evaluating "the circumstances of the whole activity."  *Sureway*, 656 F.2d at 1370.  No one factor identified by the Ninth Circuit in *Driscoll* is determinative. *Id.*

[5] Def. Mot. at 14:5-6.

[6] ASUF 108.

support of its motion. Here, while the IC Agreement may state that Drivers had the right to "'control and determine all matters related to the performance of an engagement' including 'the time of performance or the time or hours during which an opportunity is to be performed,'" Diligent's own records and testimony show they do not. Pl. Mot. at 6-10, 15-19; ASUF 109 (former Diligent operations manager Caccavella testified, Drivers would "text [him] in the morning because they were set in stone to work the six days . . . .").[7] The IC Agreement states that Drivers can negotiate pay but Diligent admits they have no ability to negotiate their pay rate. SUF 27; ASUF 112 (Driver Leonard Peralta stated: "I was not allowed to negotiate the pay rate, and I tried… [Diligent manager] told me the pay rate was already established and he could not offer a higher rate."). The IC Agreement states that Drivers will not receive any training or instruction but Diligent admits it does provide training, markets "well trained labor"[8] to clients, and testified that there was no need for prior experience precisely because it "could always train [Drivers]." SUF 58-59. The IC Agreement states Drivers will determine the time or hours they work, when in fact Diligent admits it enforces strict schedules to satisfy its clients' needs. SUF 32-34, 36-38. For example, Drivers placed with Diligent's client Napa were held to minute-by-minute schedules, with dedicated times for each arrival and departure along the route, allowing only five minutes for unloading between stops. ASUF 114. The IC Agreement states that Drivers select their delivery routes when in reality Diligent managers directed Drivers to follow client route instructions, which some clients tracked via GPS. SUF 47; ASUF 115 (Driver Leonard Peralta stated he could not negotiate driving routes or area and that his routes were tracked via GPS and Drivers could be fired for not following GPS instructions). Diligent's largest client Parts Authority ("PA") required

---

[7] ASUF 110-111 (Driver Earl Mines had set weekly schedule, checked in with Diligent each morning, and was reprimanded for missing shifts for doctor appointments; Driver Leonard Peralta stated: "Diligent did not want to hear any excuses for not showing up to work other than being admitted to the hospital. A lot of time if you missed a few days of work, they let you go.").

[8] ASUF 113.

Drivers performing "hotshot" deliveries to complete deliveries in the order it dictated, thereby determining Driver routes. SUF 157. PA's shuttle and return routes were even more prescribed, following "a set schedule, set route" that required Drivers to be at particular locations at particular times. ASUF 116. Tellingly, Diligent Drivers performed the same work alongside PA's directly-employed drivers according to the same set of delivery procedures and schedules including non-delivery work such as sweeping and mopping PA floors, cleaning the break room, bank runs, and pulling parts for PA dispatchers. SUF 123, 173-178; ASUF 213, 214, 267. The IC Agreement further states that Drivers may perform work for other clients, when in reality Diligent requires Drivers to be available to perform work for Diligent customers full time. For PA this was six days per week for a total of 54.5 hours, leaving no time for work outside the scheduled hours. Further, Drivers could not provide service to non-Diligent clients or run personal errands like picking up their kids from school during the scheduled hours that Diligent and its clients determined. SUF 17, 40; ASUF 117 (email from Diligent general manager Robert Williams to Diligent COO Carter acknowledging termination of Driver for picking up her child from school during shift for PA). Even more tellingly, Diligent disciplined Drivers when they did provide services to others or otherwise deviated from clients' control as the IC Agreement purported to permit. SUF 40 ASUF 117.

Further, contrary to the IC Agreement's representation that Drivers could "from time to time at such times as Operator shall choose and elect to perform delivery services…,"[9] Diligent required that its Drivers seek permission to take days off, or even specific hours off during the day. SUF 32-33. That Drivers have no freedom to elect when to provide service is clear in the voluminous text communications between Drivers and Diligent's operations manager (*e.g.*, Driver: "Susan I'm going to take the day off tomorrow;" Diligent manager: "Nope I can't cover U tomorrow." ASUF 107. Not only

---

[9] ECF No. 206-2, an example of Diligent's contract with Drivers, at AZL024220.

6

did Diligent lead Drivers to believe they must get permission to take time off, Diligent routinely denied such requests.[10]  Nor could Drivers decline to work, as Diligent claims, without consequence (*e.g.*, Driver: "I'm not available today," Diligent manager: "Need to cover ur spot or u won't have one anymore"; Diligent manager: "if you are not back asap I will be terminating the contract for failure to provide service.").  ASUF 107.

Additionally, while Diligent highlights the IC Agreement language that mirrors the legal test for independent contractor status, other provisions in its IC Agreements, which Diligent does not discuss, are indicative of employee status and contradict the terms on which Diligent bases its argument.  Indeed, the IC Agreement itself contains terms aimed at maintaining control over Drivers, including a number of penalties and contractual provisions restricting Drivers' ability to work for others.  For example, the IC Agreement permitted Diligent to impose penalties on Drivers for failing to provide service, terminating the relationship without the Diligent-mandated notice or within 90 days of hire, and independently providing service to Diligent clients both during and after their tenure.  By permitting penalties for such actions, the IC Agreement itself undermines Diligent's broad reliance on that document as evidence that it allowed its Drivers to elect freely when they could perform delivery services.  SUF 18-19, 70, 73-75, 103.

Regardless of what the IC Agreement says,[11] Drivers have to comply with both Diligent's rules and the rules set by Diligent's clients—which Diligent enforced—that dictated nearly every aspect of how Drivers performed their work.  *See* Pl. Mot. at 1-15.  Diligent, both independently and in concert with its clients, controls: Drivers' schedules, Drivers' pay, how many hours Drivers work each week, which hours they work each day and where, the specific routes they drive, and the order in which they make their deliveries.  *See, e.g.*, SUF 27, 32, 36-37, 55, 157.  Diligent disciplines Drivers who do not comply

[10] ASUF 107 (Driver: "Susie I need to trade my car in tomorrow for a new one. Can you cover me tomorrow?  It won't pass emissions and today is the last day for my tags to be legal;" Diligent manager: "Nope I cannot u need to make other arrangements . . . .").
[11] ECF No. 206-2, an example of Diligent's contract with Drivers, at AZL024221, ¶ 3(b).

7

with Diligent's or its clients' mandates.  *See, e.g.*, SUF 65-68, 164-165.  Indeed, Diligent even reprimanded a Driver for selling burritos out of his car during the delivery day.  SUF 40.

Further, Diligent and its clients track Drivers as they perform their work (*e.g.*, telling them "I need to know where you're at, at all times" (SUF 52)), communicate with Drivers on a regular basis and, in some instances, use GPS to track Drivers' daily movements (*see, e.g.*, SUF 47).  Diligent marketed same-day tracking of its "hot shot" deliveries as a service available to its clients.[12]  Indicative of the level of supervision and control Drivers experienced, a Driver was reprimanded when her required GPS revealed that she stopped at a gas station to take a five-minute bathroom break during her route.  SUF 55.

Diligent managers exercised frequent and regular oversight over Drivers throughout the work day, for example by compelling Drivers to take deliveries past their scheduled end times and reprimanding them for carrying passengers, having messy vehicles, or selling food, pursuant to customer complaints.  SUF 39, ASUF 117 (Ex. 74, AZL-042410 (email from Diligent general manager Williams to Diligent COO Carter re: *inter alia* replacing Driver that picked up her child during shift)); SUF 48, SUF 40.

Diligent relies primarily on distinguishable, out-of-circuit decisions to support its argument that Drivers, rather than Diligent, sufficiently control how they perform the work.  First, the Fifth Circuit's decision in *Herman v. Express Sixty-Minutes Delivery Service* is inconsistent with *Real* and was decided on very different facts than this case.[13]  In *Herman*, unlike here, drivers were not subject to a non-compete agreement, could set their own hours and days of work, and could reject deliveries without retalia-

---

[12] ASUF 118.

[13] Notably, the *Herman* court found that both the "relative investment" and "skill and initiative" factors weighed in favor of drivers' status as employees, and held three out five factors was sufficient to find drivers were independent contractors. *Herman v. Express Sixty-Minutes Delivery Serv.*, 161 F.3d 299, 304-305 (5th Cir. 1998).

tion. *Herman*, 161 F.3d at 303. The lack of a covenant-not-to-compete played an important role in the decision and was expressly referenced by the *Herman* court both in analyzing control and in analyzing the permanence of the relationship. *Id*. at 303, 305. Significantly here, Diligent requires its Drivers to sign a non-competition agreement that prevents them from offering their delivery services directly to any Diligent client or becoming employees of those clients while driving for Diligent and for one year after Driver termination. SUF 76-77.[14]

Second, *Roslov v. DirecTV Inc.* (a district court case from Arkansas) is unpersuasive not only because Diligent is not in an analogous role to defendant DirecTV with respect to Drivers,[15] but because the putative employees in *Roslov* could *inter alia*: refuse work at the end of the day without consequences, complete installation orders "in any order," did not enter into any indefinite agreements to work for DirecTV, were not guaranteed a particular income in a given week and could earn more by taking on additional orders, and more generally admitted that their work entailed "highly technical duties." 218 F. Supp. 3d at 974, 977. *Cf.* SUF 39 (Drivers cannot decline deliveries late in the day), 160 (Drivers generally cannot refuse to take deliveries), 55 and 157 (Drivers do not decide order of delivery), 15 (Drivers sign one-year contracts that automatically renew) 182-183 (Drivers require no special skill or initiative) and Def. Mot. at 17 (Diligent concedes Drivers "do not possess special skills"). Finally, in *Moba v. Total*

---

[14] Moreover, Diligent's requirement that Drivers commit to six-day-a-week schedules of 54.5 weekly hours precludes most other employment. *See Acosta v. Senvoy, LLC*, 2018 WL 3722210, at *8 (D. Or. July 31, 2018) ("[W]orking for [the defendant] on shifts of 10 or more hours a day would make working for another delivery service impractical at best"); ASUF 208 (Caccavella Tr. 101:4-19 ("If they wanted the position, they would have to sign that they were willing to work six days.")).

[15] In *DirecTV*, the court analyzed DirecTV as a potential joint employer because there was no direct relationship or agreement between drivers and DirecTV. 218 F. Supp. 3d 965, 972, 973-975 (E.D. Ark. 2016). Here, Diligent's direct relationship with its Drivers is undisputed.

9

*Transp.*, the freight truck drivers were free to make their own schedule, could decline delivery requests, were free to decide how to make the delivery, invested in freight trucks rather than using personal vehicles, and attended truck driving school in order to become a truck driver.  16 F. Supp. 3d 1257, 1264-66 (W.D. Wash. 2014).  Further, in *Moba* there was no evidence that Drivers' actual working conditions diverged from their contract terms.[16]  Those are fundamentally different from the facts of this case.  Here, the Secretary has introduced overwhelming evidence contradicting the validity and veracity of the work conditions Diligent "memorialized" into the IC Agreements that Diligent drafted and required Drivers to sign as a condition of employment.[17]

> 2.   Diligent's argument that its Drivers have opportunity for profit or loss based on managerial skill is meritless.

Diligent has designed its business such that Drivers' potential for profit is constrained to well below the minimum wage.  SUF 26-31, 139-150.  Diligent excludes Drivers entirely from negotiating all work terms that drive their pay, including: the flat rate Diligent charges to clients, work schedule, the miles associated with Driver routes, and its own profit margin—all of which Diligent determines directly with the client and expressly prohibits Drivers from altering through separate negotiations with the client. SUF 26-28, 114, 116; ASUF 245-246; *see Slayman v. FedEx Ground Package Sys., Inc.*, 765 F.3d 1033, 1043 (9th Cir. 2014) (finding employment relationship when employers, as opposed to workers, negotiate directly with customers); *Flores v. Velocity Express,*

---

[16] Moreover, the case is not instructive because the plaintiffs in *Moba* made no substantive arguments opposing summary judgement but rather requested more time for fact discovery for necessary depositions that plaintiff's counsel failed to timely take.  The court declined to extend the discovery deadline because counsel failed to diligently pursue discovery.  *Moba*, 16 F. Supp. 3d at 1262-63.

[17] *Browning v. Ceva Freight* is also distinguishable.  Among other things, Ceva drivers could turn down work, had no set work hours, and drove cargo trucks with large loads, which was found to require skill.  885 F. Supp. 2d 590, 601-2, 608-9 (E.D.N.Y 2012). *Cf.* Def. Mot. at 17 (conceding Drivers did not possess special skill).

*LLC*, 250 F. Supp. 3d 468, 472 (N.D. Cal. 2017).  Thus, all the variables that meaningfully impact Driver pay are fixed and set by Diligent before Drivers are even hired.

Diligent knows that the potential for profit is non-existent based on its own calculation of costs associated with Drivers' services.  On its website, Diligent calculates monthly vehicle costs for a driver driving 150 daily miles as follows:

| Vehicle Cost Results | |
| --- | --- |
| Original Cost (Cash) or Loan Payment | $504.00 |
| Licenses, Title, Fees & Permits (State and/or Federal) | $18.00 |
| Taxes (State, Country, School, VIP – Where Applicable) | $90.00 |
| Gas Oil & Grease (Based on 16.67 Gallons Per Day) | $685.72 |
| Insurance (Liability, Collision, Cargo, Fire, Theft & Legal) | $190.00 |
| Actions Not Indemnified by Insurance | $90.00 |
| Normal maintenance (Service, Parts, Tires, Etc. ) | $45.00 |
| Washing & Exterior Maintenance | $25.00 |
| Communication Devices | $45.00 |
| Monthly Average Expense Per Vehicle | $1,692.72 |
| Total Monthly Vehicle Expense | $1,692.72 |

ASUF 119.  Based on these expenses, the *maximum* amount that a Driver could earn on the most common monthly rate that Diligent negotiated with its largest client PA ($3,100 for 26 driving days) after Diligent took its standard cut ($800) is $605.28 per month ($3,100 - $800 - $1,692.72 - $2.00 = $605.28), or $2.56 per hour, well below $7.25 per hour for the required 54.5 weekly hours. SUF 127, 141, 150; ASUF 120.  Thus, here, the opportunity for "profit" or loss is a matter of just how far below minimum wage a driver's pay would fall—including actual instances of *negative* wages (SUF 193, 195, Exs. N and P to Espinoza Decl. in Support of the Secretary's Motion for Partial Summary Judgment (ECF No. 208) showing negative wage computation), meaning that Drivers actually paid to work for some weeks.[18]

---

[18] While Diligent's own public documents depict Drivers' substandard wages, the undisputed facts in the record establish that Drivers' actual wages are lower at $0.44 per hour, SUF 150. For example, per Diligent's "cost calculator" vehicle expenses are typically $0.44 per mile. However, the IRS mileage reimbursement rate for business used by the Secretary in his computations approximated $0.55 during the relevant period. SUF 149.

11

Diligent points to three examples to argue that its Drivers have an opportunity for profit or loss based on managerial skill.  Def. Mot. at 15:25-16:3.  None of these have merit because the maximum "profit" established under the client contract always falls below minimum wage.  First, Drivers cannot increase their profit by purchasing certain (larger) vehicles required to perform "higher-paying delivery services," as Diligent claims, because these purportedly higher paying routes require driving more miles, and higher gas consumption, increasing Drivers' costs such that there is no additional profit. *Flores*, 250 F. Supp. 3d at 487 ("a worker's ability to simply work more is irrelevant" because "[m]ore work may lead to more revenue, but not necessarily more profit.") (quoting *Collinge v. IntelliQuick Delivery, Inc.*, No. 2:12-CV-00824 JWS, 2015 WL 1299369, at *5 (D. Ariz. Mar. 23, 2015)).  Second, Diligent introduces no evidence that a more-fuel efficient vehicle would reduce total costs considering that such vehicles are often more expensive.  Even if Drivers could reduce costs a negligible amount, decisions such as choosing a more fuel-efficient car are not evidence of "managerial skill."  *Id*. ("[A]lthough selecting a fuel-efficient vehicle will likely reduce a driver's costs over the long run, there is little 'managerial skill' involved in that decision") (quoting *Collinge*, 2015 WL 1299369, at *5).  Third, Drivers cannot increase profits by hiring helpers, as Diligent claims, because they would only be dividing an illegal rate that can never reach minimum wage.

Diligent further restricted Drivers' profitability through the non-compete agreement that it required Drivers to sign prohibiting them from independently contracting with any Diligent clients both while driving for Diligent and for a year after termination, stifling any potential profits Drivers might make through a self-negotiated contract. SUF 76-78; *see Hughes v. Family Life Care, Inc.*, 117 F. Supp. 3d 1365, 1371-72 (N.D. Fla. 2015) (finding employer's non-compete and anti-solicitation contract clauses "constrained" employee's "capacity to realize profit," which "points toward employee status" under the FLSA).

12

### 3.    The investment factor weighs in favor of employee status.

This Court has ruled in this case that it is appropriate to assess the workers' investments relative to the employer's investment.  ECF No. 99 (8/8/2018 Order).  The Court found that the proper investment assessment should include "'the total capital investment necessary to operate [a] delivery business, including the cost of acquiring and maintain[ing] warehouse space, office space, dispatchers, computers, and the... software used to coordinate deliveries.'"  ECF No. 99 (8/8/2018 Order) (citing *Flores*, 250 F. Supp. 3d at 48 (quoting *Collinge*, 2015 WL 1299369, at *5)).  Here, Diligent and its clients—not Drivers—invested in the greatest expenses associated with their delivery business including, among other things: warehouse space, office space, goods for delivery, a dispatching system, mechanisms to coordinate deliveries, a financial processing system, and staff to oversee operations.[19]  SUF 1-9, 123.  These investments generated hundreds of millions of dollars in annual revenue for Diligent.  SUF 2.  Indeed, according to Diligent's own advertising soliciting Drivers, Driver's investment is as small as "the gas money it takes to work till payday." ASUF 121.

Further, costs that are rightfully borne by the employer cannot constitute Driver investment.  Diligent attempts to characterize its delivery costs—such as vehicle and fuel costs—as the entrepreneurial investment in Drivers' independent businesses.  Here, tellingly, Diligent touts "[o]ur founders understood that 'outsourcing' the delivery of parts and supplies to automotive dealerships, distributors, and wholesalers was both cost-effective and hassle-free."[20]  However, the fact that Diligent requires its Drivers to

---

[19] Even *Herman*, on which Diligent purportedly relied in developing its business, found that relative investment weighed in favor of employee status where defendant, in operating its courier delivery service, invested in: office space, payroll, radio adds, radios, four vehicles, fax machine, and a computer system, while drivers bore the costs of vehicles. *Herman*, 161 F.3d at 303-304.

[20] ASUF 103.

bear a necessary cost of the very service it sells to customers is not evidence of independent contractor status as these Drivers are not actually investing in *their own* independent business.  The logical and undesirable outcome of Diligent's position is to reward employers for improperly classifying workers and unlawfully shifting core business costs.  This is further illustrated by Diligent reimbursing the Drivers it reclassified as employees $0.44 per mile for their vehicle expense. SUF 180.  While arguing in its motion that the same vehicles are a business investment for the Drivers.

With respect to Driver helpers, Diligent again misrepresents the facts in the record, falsely claiming that Drivers had "sole discretion" to hire subcontractors and determine their compensation.  Def. Mot. 16:27.  To the contrary, the undisputed facts establish that: (1) Driver helpers are subject to Diligent and its clients' approval; (2) Diligent vets helpers; (3) Diligent drafts agreements for those helpers; (4) Diligent requires helpers to submit to Diligent the same documentation it requires from Drivers; and (5) Diligent can terminate Drivers' helpers.  SUF 60-63; *Slayman*, 765 F.3d at 1045-46 ("[C]hoice of helper was subject to the approval of the employer.") (internal citations and quotations omitted); *see Flores*, 250 F. Supp. 3d at 489 ("[A] worker's ability to hire helpers is 'illusory' for purposes of the FLSA if helpers are also subject to the control of the alleged employer.") (quoting *Scantland v. Jeffrey Knight, Inc.*, 721 F.3d 1308, 1317 (11th Cir. 2013)).  Further, as discussed above in Section III.A(2), the pay margin Diligent set in concert with its clients was so low that there was no opportunity for profit sharing between Driver and a helper, only further division of an already substandard wage.

Importantly, a portion of Drivers that Diligent calls "subcontractors" were not actually Driver subcontractors at all, but rather Diligent Drivers who Diligent directed to work under another Driver for Diligent's own purposes and convenience, such as circumventing eligibility requirements such as age, (ASUF 122), or to facilitate Diligent's payment process (ASUF 123).  Driver Eric Cutler testified that he contracted with Diligent merely to give a friend "a job to go do" and "made enough to buy lunch … at

14

McDonald's" from the arrangement. ASUF 124. Thus, for these "subcontractors" Drivers themselves do not profit or benefit from the arrangement. ASUF 125.

Finally, the record here is clear that although Diligent's contract technically permits Drivers to hire helpers, few actually do so. SUF 64. The discrete examples on which Diligent relies in its motion are Drivers who Diligent itself selected knowing, based on its records, these specific Drivers were among the small minority, approximately 5% of Drivers, who had helpers. SUF 64; ASUF 126, Diligent's response to Secretary's third set of interrogatories, No. 12 (identifying ten then-current Drivers who Diligent believed had helpers in June 2018). These examples are sharply disputed by the entirety of the rest of the record.

### 4. Diligent concedes that driving is not a special skill, as courts have repeatedly held.

Diligent admits that driving for Diligent does not require a special skill and that this factor weighs in favor of Drivers' employee status.[21] Def. Mot. at 17:10. As Diligent admits, it does not require Drivers to possess any particular education, training, or special license. *Id.* However, in marketing its services, Diligent does promise its clients "well trained labor to ensure that your packages arrive safely, on time, every time,"[22] representing to customers that it does in fact train Drivers, contrary to its IC Agreement.

### 5. Diligent's permanency argument is meritless.

Driving for Diligent does not represent a discrete, finite task or engagement. Rather, Drivers' work for Diligent is ongoing and for an indefinite period, as evidenced by Diligent's mandatory one-year contract term, which renews automatically. SUF 15. Contrary to Diligent's representations, Drivers cannot simply end the relationship when they

---

[21] *See Alexander v. FedEx Ground Package Sys., Inc.*, 765 F.3d 981, 995 (9th Cir. 2014); *Ruiz v. Affinity Logistics Corp.*, 754 F.3d 1093, 1104 (9th Cir. 2014); *see also Flores*, 250 F. Supp. 3d at 490; *Campos v. Zopounidis*, No. 3:09-CV-1138 VLB, 2011 WL 2971298, at *7 (D. Conn. July 20, 2011)
[22] ASUF 113.

15

please because Diligent explicitly penalizes them for doing so.  For example, Drivers cannot cancel their engagement with Diligent in the first 90 days of employment without paying a $75 fee—an amount that would take Drivers approximately 170 hours of work to earn at their $0.44 per hour rate after accounting for gas, vehicle costs, and Diligent's profit.  SUF 70; ASUF 127.  Drivers also cannot quit with less than seven-days' notice without Diligent taking $75 from their last paycheck.  SUF 69-70.

Further undermining Diligent's argument is the non-competition agreement it requires its Drivers to sign, which prevents them from offering their delivery services to any Diligent client, or becoming employees of those clients (to prevent Drivers from "stealing a spot") while working for Diligent and for a year after leaving.[23]  SUF 74, 76-78.  Diligent subjects Drivers who violate the non-compete to a $500 penalty and threatens lawsuits. SUF 25, 74.[24]

The ongoing nature of Drivers' relationship is exemplified by the fact that Drivers could, and did, work for Diligent for years.  Some Drivers on Exhibit A to the Secretary's First Amended Complaint drove for Diligent for as many as 6 years.  SUF 16; ASUF 225 (Driver Earl Mines worked for Diligent and PA for almost two years), 226 (Driver Leon-

---

[23] Courts have routinely found non-compete clauses as evidence of employee status.  *See, e.g.*, *Swinney v. AMcomm Telecommunc'ns, Inc.*, 30 F. Supp. 3d 629, 634 (E.D. Mich. 2014) (noting "independent contractor agreement contains a non-compete agreement, which in and of itself weighs in favor of viewing Plaintiffs as employees"); *Powers v. Emcon Assocs., Inc.*, No. 14-CV-03006-KMT, 2017 WL 4075766, at *6 (D. Colo. Sept. 14, 2017) (recognizing a non-compete clause is indicia of employee status under the FLSA); *Pizzarelli v. Cadillac Lounge, LLC*, No. CV 15-254 WES, 2018 WL 2971114, at *4 (D.R.I. Apr. 13, 2018) (same); *Hughes*, 117 F. Supp. 3d at 1371-72 (same).  Even in *Herman*—the purported basis of Diligent's model—the court relies on the fact that "Drivers are able to work for other courier delivery companies, and the 'Independent Contractor Agreement' does not contain a covenant-not-to-compete" to find that permanency weighs in defendant's favor.  *Herman*, 161 F.3d at 305.

[24] Diligent also imposes a $1,500 fee on clients who hire on Diligent Drivers directly, further underscoring Drivers' inability to leave their employment relationship with Diligent.  SUF 75.

ard Peralta worked for Diligent and PA for almost seven years).  Additionally, while Diligent argues that Drivers "had the right to accept or decline 'a client-engagement opportunity'" the undisputed facts prove this is false. *See* Section III.A.1 *infra*.

6. <u>Diligent is a delivery business and Drivers provide its core service.</u>

Diligent cannot credibly claim that its delivery drivers are not integrated into its delivery business.  Diligent's own manager admitted Diligent is "a delivery business. Without drivers, they might as well shut the doors."  SUF 10.  Contrary to Diligent's claim that Diligent is a referral service whose "business operations effectively terminate when it connects a client with an IC Driver," Defendant CEO Larry Browne admits that Diligent is a delivery service and for purposes of Diligent's business, transportation and logistics are "kind of all the same." ASUF 287; SUF 1, 10.  Defendant Browne also admits that Drivers are in the same transportation and logistics business as Diligent: "[t]hey're driving for the company."  ASUF 286; SUF 10.

In claiming Diligent's involvement is limited to connecting Drivers with Diligent clients (with whom Diligent has pre-negotiated a contract and all material aspects of Drivers' working conditions (SUF 26, 140), Diligent misrepresents the facts of this case.  It is exceeding clear based on the undisputed facts—including Diligent's operation managers' testimony and tens of thousands of text messages exchanged between Drivers and Diligent managers sent after the time Diligent "connects" clients and Drivers—that Diligent was not a referral service but exerted significant, sustained control over Diligent Drivers who provided *Diligent's* delivery services to *Diligent's* clients.  *See, e.g.*, SUF 50 (Diligent produced 75,554 messages that former Diligent operations manager Gudgeon exchanged during her tenure, the majority of which were with Drivers).

In addition to the body of evidence the Secretary submitted in support of his MSJ, Diligent's own public marketing materials clearly illustrate that Drivers are the core of its business.  Indeed, Diligent sells "professional shipping and delivery services"[25] that its

---

[25] ASUF 100.

17

Driver "team members" actually provide.  Diligent advertises that it is "dedicated to part-nering with [its] customers to achieve their delivery goals by providing . . . [t]he highest level of dependable and reliable transportation services."[26]  Diligent relies on its "team members" to "successfully complete each delivery."[27]  To serve its clients' needs, "Dili-gent empowers these Delivery Service Professionals to be 'Customer Service Ambassa-dors.'"[28]  Accordingly, Diligent's argument that delivery drivers are not integrated into the delivery services it sells to customers is entirely meritless.

### B.   Diligent Misconstrues the Relevance of the Testimony of Drivers it Selected and Deposed.

Diligent claims that the six Drivers it selected and deposed during discovery are not representative of Drivers' experience at Diligent.[29]  In so far as, Diligent selected and deposed Drivers who had helpers they are not representative of the typical Diligent Driver because only a small percentage had helpers.  Further, these Drivers were not chosen by the Secretary.  Rather, to support his motion, the Secretary primarily relies on testimony of Diligent representatives, clients and the over 100,000 pages of Diligent's and PA's own documents produced in discovery.[30]  In support of this Opposition, the Secretary also introduces declarations from three Diligent Drivers as an example that is representative

---

[26] ASUF 101.

[27] ASUF 102.

[28] ASUF 102.

[29] Confusingly, Diligent both argues that the testimony of Drivers it opted to depose is unrepresentative of Drivers' experience at Diligent while also relying on this same testi-mony to argue the Court should find summary judgment in its favor.

[30] The Secretary is not bound by the requirement of Federal Rule of Civil Procedure 23, which is designed to preserve the due process rights of individual litigants in private lawsuits. *See Taylor v. Sturgell*, 553 U.S. 880, 892, 900-01 (2008) (FRCP 23 imple-ments procedural safeguards relating to the limitations on representation of nonparties); *see also Gen. Tel. Co. of the Nw. v. Equal Employment Opportunity Comm'n*, 446 U.S. 318, 324 (1980) (Rule 23 does not apply to statutorily-authorized government enforce-ment actions); *Donovan v. Univ. of Texas at El Paso*, 643 F.2d 1201, 1208 (5th Cir. 1981) (extending the Supreme Court's holding in *General Telephone Company of the Northwest* to FLSA enforcement actions brought by the Secretary).

of Driver experience at Diligent and PA.  *See* Ex. 106, Mines Decl.; Ex. 107, Peralta Decl.; Ex. 105, Butler Decl.  The undisputed material facts in Diligent's documents and testimony establish that Drivers are not small business owners, but FLSA employees subject to Diligent's control.

### C.    A Three-Year Statute of Limitations Applies because Diligent Willfully Violated the FLSA.

As discussed fully in the Secretary's Motion for Partial Summary Judgment, willful violations of the FLSA are subject to a three-year, rather than a two-year, statute of limitations.  A violation is willful if the employer "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA]."  *McLaughlin v. Richland Shoe Co.*, 486 U.S.  128, 133 (1988).  An employer acts knowingly when it has knowledge of the FLSA's requirements and fails to comply.  *See Moreno v. United States*, 88 Fed. Cl. 266, 277 (2009).  Further, an employer need not act knowingly to willfully violate the FLSA, rather under a lower standard, an employer's reckless disregard for the matter of whether its conduct was prohibited by the FLSA is sufficient to find an employer acted willfully.  *Flores v. City of San Gabriel*, 824 F.3d 890, 906 (9th Cir. 2016).  Evidence that an employer "attempt[ed] to evade compliance" with the FLSA obviously establishes a willful violation.  *Alvarez v. IBP, Inc.*, 339 F.3d 894, 908-09 (9th Cir. 2003).

Diligent bases its argument that it did not act willfully solely on the fact that it sought legal advice on how to develop an independent contractor model that "wouldn't get [Diligent] in trouble."  SUF 88.  This argument, even if true, does not provide Diligent with a defense to willfulness.  First, Diligent ignores the significant fact that in 2000, an independent law firm—rather than Diligent's long-time counsel—concluded that Diligent misclassified Drivers.  SUF 79.  In the 2000 opinion letter that concluded Drivers were

likely employees,[31] Morgan Lewis counseled that its "advice is global – the relationship with drivers needs to be restructured" by, among other things, eliminating uniforms, control over training and staffing, and providing drivers with more autonomy.  SUF 80.  In 2004, Diligent's counsel wrote an opinion letter on the general independent contractor model, which pre-dated Arizona Logistics's incorporation.  SUF 87.  Since 2004, Diligent has not obtained another opinion letter.  *Id.*  The opinion Diligent's counsel provided is premised on the understanding that: Drivers are not required to check in before starting work; are able to negotiate their rates of pay; do not have set hours; are not subject to Diligent enforcing client rules and imposing penalties upon them for failing to provide service.  SUF 90.  None of the facts—upon which the validity of Diligent's counsel's opinion depends—are true.  SUF 90.  Indeed, Diligent's counsel conceded that Diligent's actual business practice show some level of control over Drivers and run contrary to the facts Diligent represented, upon which he and his law partner relied in 2004.  SUF 91-92.

Diligent claims that, on advice of counsel, it designed its model based on the Fifth Circuit's *Herman* decision.  However, Diligent's reliance on this out-of-circuit case in

---

[31] Morgan Lewis concluded that the Diligent-type IC model would result in courts finding employee status.  Specifically, Morgan Lewis advised:

> "we think that a strong case exists that the NLRB and/or the federal courts would classify the DSI dedicated drivers as employees rather than independent contractors. While the independent contractor agreement in the Manual satisfactorily attempts to confer independent contractor status on Drivers, the Manual's marketing and business practice materials undermine that status significantly.  For example, the agreement refers to driver autonomy, but other sections of the Manual make it clear that DSI is heavily involved in route selection and the actual way in which deliveries are accomplished. In addition, the agreement refers to the contractor controlling his/her time, but other sections of the Manual establish that DSI controls a driver's time Monday-Friday (around 30 hours per day). While the existence of an independent contractor agreement is one factor in your favor, numerous courts have determined that the existence of the agreement itself is not dispositive for purposes of classifying workers as independent contractors."  SUF 79, 80, Ex. 21.

1   classifying Drivers as independent contractors is also irrelevant because, again, Drivers'
2   working conditions bear no resemblance to Diligent's documents, which it purportedly
3   based on *Herman*.  Thus, the fact that Diligent sought legal advice on how to avoid FLSA
4   violations is irrelevant here because Defendant did not follow the legal advice upon which
5   it now tries to rely.  Indeed, to the contrary, the fact that Diligent sought legal counsel
6   regarding a business model that it then disregarded only underlines that Diligent's viola-
7   tions are willful as these steps make plain that Defendant *knowingly* disregarded legal
8   advice regarding its Drivers' employee status.

9         Diligent's claim that it relied on arbitration decisions from the past two years find-
10  ing that Drivers were independent contractors is also baseless.  First, such reliance on
11  prior administrative decisions, some of which included findings of both employee and
12  contractor status (ASUF 128), is insufficient to demonstrate it took affirmative steps to
13  ensure compliance with the FLSA.  *Flores*, 250 F. Supp. 3d at 495 (granting delivery
14  drivers' summary judgment motion on issue of willfulness where defendant "point[ed] to
15  decisions in which courts and agencies found that their drivers were properly classified
16  as independent contractors" because this, alone, was insufficient to show affirmative steps
17  to comply with FLSA); *Collinge*, 2018 WL 1088811, at *19 (delivery company's reliance
18  on IRS opinion letter premised on a mischaracterization of delivery company's relation-
19  ship with drivers does not defeat finding of willfulness).  Second, Diligent cites arbitration
20  decisions from 2018 to 2020, over a decade after Diligent began operating its current
21  model.  SUF 5.  Third, one of Diligent's included arbitration decisions, in which Diligent
22  was not named as a defendant, found that Driver was, in fact, an employee of PA.  ECF
23  No. 200-35, Declaration of Maurice Bresenhan, Exhibit II at PDF p. 22 to 29 of 62.  In
24  that case, the arbitrator found that Driver was an employee of PA under the FLSA because
25  of PA's control over Driver's schedule and work, including the lack of ability to take
26  breaks, in addition to other economic reality factors.  *Id*. at PDF pp. 24-25.
27
28

Finally, Diligent cannot credibly argue it did not act willfully when the very service Diligent is selling, at its core, is avoidance and/or circumvention of the FLSA. Diligent tells potential clients:

> "Between operating costs, monthly vehicle payments, fuel prices, expense of workers' wages, and day-to-day maintenance costs, maintaining your own in house delivery fleet takes a huge chunk of your profit margin. By outsourcing your delivery program to Diligent, you reduce the risk and liability of operating a fleet of drivers and vehicles, and you can save as much as 32% of your transportation costs."[32]

Indeed, Diligent's website touts that, by using Diligent's "dedicated fleet management" clients will "save as much as 32% of your transportation expense" by eliminating: monthly vehicle payments/lifecycle costs; maintenance/replacement/repair costs; insurance premiums, accident claims and payouts; driver safety training expenses; driver absentees and turnovers; overtime pay; vacation time/home time; worker's compensation; unemployment wages; employee benefits on full time driving job; and payroll & taxes.[33]

It is clear that Diligent not only knew the profitability of circumventing the FLSA and shifting costs onto Drivers, but also knew how much driving for Diligent costs its Drivers. Diligent's website includes a live "cost-calculator" that computes exactly how much a client is saving per driver, accounting for:

> number of drivers; hourly rate; the overtime rate; regular hours worked; overtime hours worked; average itemized vehicle costs including the price of gas, daily miles driven, and insurance; payroll taxes and additional expenses associated with directly employing drivers.

ASUF 104. Based on Diligent's own cost calculator, the annual cost of employing a single driver at an hourly rate of $11 to work 54.5 hours per week while driving 160 miles per day is $65,612.42. ASUF 105. Thus, not only did Diligent know that its actual business practices did not reflect those considered by Diligent's attorney, Diligent also knew

---

[32] ASUF 103.
[33] ASUF 129.

that it paid Drivers substandard wages based on its own, publicly-available cost compu-

tations.

**D.    Liquidated Damages Are Mandatory because Diligent has No Good Faith Defense.**

An employer that violates the FLSA's minimum wage or overtime provisions, "*shall* be liable to the employee or employees affected in the amount of their . . . unpaid overtime compensation, and in an additional equal amount as liquidated damages." 29 U.S.C. § 216 (emphasis added).  FLSA liquidated damages are not penalties exacted by law, but serve instead to compensate employees for the delay in receiving the wages they are owed.  *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 583 (1942), *superseded by statute on other grounds as stated in Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 128 n.22 (1985).  "'[D]ouble damages [are] the norm and single damages the exception.'"  *Alvarez*, 339 F.3d at 910 (quoting *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 141 (2d Cir. 1999)).[34]  Liquidated damages in a FLSA minimum wage or overtime case "are 'mandatory' unless the employer can overcome the 'difficult' burden of proving both subjective 'good faith' and objectively 'reasonable grounds' for believing that it was not violating the FLSA."  *Haro v. City of Los Angeles*, 745 F.3d 1249, 1259 (9th Cir. 2014) (quoting *Alvarez v. IBP, Inc.*, 339 F.3d 894, 909-10 (9th Cir. 2003), *aff'd*, 546 U.S. 21 (2005)).[35]  Here, Diligent cannot meet this difficult burden.  As discussed in Section C above and in the Secretary's Motion for Partial Summary Judgment, Diligent cannot rely on advice it did not follow, which was based on a business model Diligent did not use and law that does not apply.

---

[34] A finding of willfulness is inconsistent with good faith.  *Empl'r Sols.  Staffing Grp., LLC*, 951 F.3d 1097, 1102 (9th Cir. 1097) (quoting *Chao v. A-One Med. Servs., Inc.*, 346 F.3d 908, 920 (9th Cir. 2003)).

[35] *Baker v. D.A.R.A. II, Inc.*, No. CV-06-2887-PHX-LOA, 2008 WL 191995 (D. Ariz. Jan. 22, 2008); *Nellis v. G.R. Herberger Revocable Tr.*, 360 F. Supp. 2d 1033 (D. Ariz. 2005).

E.      **The Secretary's Tolling Agreement with Diligent is Valid.**

Defendant and Diligent's CEO Browne signed two tolling agreements during the Department's investigation of Diligent.  Diligent now claims the agreements are not valid because they were not counter-signed by the Department.  Def. Mot. at 25.  Tolling is warranted here because: (1) the parties' two tolling agreements are effective, and (2) Diligent waived its statute of limitations defense by signing the parties' two successive tolling agreements.

The Secretary fully performed his obligations under the tolling agreements by not bringing suit during the covered period despite not counter-signing the agreements. *See* ECF No. 1 (initial complaint filed on December 21, 2016).  The Secretary did not bring suit for the entire period of Tolling Agreement I, which was fully performed when it expired on April 14, 2016.  The Secretary again fully performed under Tolling Agreement II, as he refrained from filing suit until the time that Diligent revoked the agreement.  Diligent signed the tolling agreement, received the benefit of the tolling agreement and now seeks to escape significant liability on a technicality.  Diligent's form-over-substance argument is meritless and the Court should not grant Diligent a windfall after it has already received the benefit of the bargain.

The two tolling agreements Browne signed on behalf of Diligent are valid because the parties' actions demonstrated mutual assent to the terms.  In *Harris v. Bruister*, a case with almost identical facts, the district court held that two tolling agreements unsigned by the Department of Labor involving the investigation of ERISA violations were valid notwithstanding the missing signatures because the parties' actions demonstrated mutual assent to the terms.  2013 WL 6805155, at *7 (S.D. Miss. Dec. 20, 2013).  The court found mutual assent because the Secretary "never sued until notice was given under the terms of the tolling agreements" and the defendants extended the first tolling agreement when they signed the second tolling agreement.  *Id*.  Diligent's reliance on *United States v. Spector*, involving a criminal defendant, is misplaced.  The *Spector* court invalidated the tolling agreement to safeguard the process of *criminal* plea

24

bargaining.  *See* 55 F.3d 22, 26 (1st Cir. 1995).  In particular, the First Circuit recognized that the criminal plea bargaining process requires meticulous contracts that create certainty regarding respective rights and obligations.  *Id*.  With these important interests in mind, the court strictly held the government to the literal language of the written agreement.  *Id*.  Unlike the defendant in *Spector*, Diligent is not a criminal defendant negotiating a plea deal and was not disadvantaged by the missing signatures.

The Department of Labor and Diligent likewise demonstrated mutual assent to the parties' two Tolling Agreements.  The Tolling Agreements were a product of the parties' negotiation.  During the course of the investigation, the Department's Wage and Hour Division ("WHD") sought certain records from Diligent to be produced by December 3, 2015.  ASUF 130.  Diligent requested an extension of this deadline and asked the Department to withhold a determination until January 4, 2016.  ASUF 131.  In response, on December 18, 2015, WHD sent Diligent a proposed tolling agreement (Tolling Agreement I).  ASUF 132.  WHD and Diligent's counsel then discussed their disagreement regarding Larry Browne's inclusion in his individual capacity in Tolling Agreement I.  ASUF 133.  Thereafter, Browne signed and returned the agreement after his counsel edited the agreement.  ASUF 134.  The Department accepted the agreement signed by Browne and placed it in the file but inadvertently did not counter sign it. ASUF 135.  The Department never conveyed any objection to Diligent's edits to Tolling Agreement I.  ASUF 136.  Accordingly, Diligent had no reason to believe the Department did not assent to the agreement.  Then, in August 2016, Diligent sent a letter to WHD regarding an ongoing document production dispute and sought to revoke the Tolling Agreements.  ASUF 137.  Until Diligent stated its intention to revoke the Tolling Agreements, the parties performed their obligations pursuant to the Tolling Agreements: the Department never sued Diligent during the covered period, and Diligent continued to produce documents to the Department.  ASUF 138.

Similar to the defendants in *Bruister*, Diligent's assent to tolling of the FLSA's statute of limitations during WHD's investigation is further demonstrated by its signing

Tolling Agreement II after signing Tolling Agreement I, after discussion with WHD. ASUF 139.  Although Diligent eventually attempted to revoke its signatures on August 1, 2016, as stated above, Tolling Agreement I was fully performed by this time as the Secretary refrained from bringing suit during the covered period.  Diligent likewise complied with the agreement by continuing to engage with the Department's investigation and providing documents and information.  The Parties agreed to Tolling Agreement II, which Browne signed on March 30, 2016.  Moreover, by attempting to revoke its assent to the Tolling Agreements, Diligent necessarily acknowledged that it had agreed with and had been performing its obligations under the terms of the Tolling Agreements up until August 1, 2016.  Upon receipt of this attempted revocation, the Department significantly increased the speed of its investigation.  ASUF 140.  Tellingly, Browne testified that he instructed his counsel to revoke the tolling agreements in August 2016 not because he did not receive a fully executed agreement from the Department but because he simply "changed [his] mind."  ASUF 141.

In addition, through its pre-litigation conduct, Diligent waived its statute of limitations defense for the period covered by the Tolling Agreements.  In *Spector,* the court suggested that an implicit agreement short of a valid contract may be sufficient to waive a statute of limitations defense.  *Spector*, 55 F.3d at 26 (citing *United States v. Doyle*, 348 F.2d 715, 718-19 (2d Cir. 1965)).  Likewise, the court in *Bruister* noted that, even if a tolling agreement is invalid as a contract, if signed by the defendant, the agreement can waive a statute of limitations defense.  *Bruister,* 2013 WL 6805155 at *8. In this Circuit, a waiver of the statute of limitations is effective if the waiver is accomplished "knowingly" and "voluntarily."  *United States v. Caldwell*, 859 F.2d 805, 806 (9th Cir. 1988).  Additionally, while signatures are not dispositive proof of whether waivers are made knowingly and voluntarily, a defendant's signature offers "strong proof" of a waiver's validity. *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).  Here, the case is stronger because Browne acknowledged his signatures on the two agreements in his deposition testimony (ASUF 134), he was a sophisticated party represented by

counsel throughout the parties' negotiations (ASUF 142), and because he simply "changed his mind" on the tolling agreement when he instructed his counsel to revoke the agreements.  ASUF 141.  Even if this Court finds that the tolling agreements are invalid as contracts, Diligent knowingly and voluntarily waived its right to raise a statute of limitations defense for the period covered by the Tolling Agreements by signing those agreements.  Finally, if the Court finds one or both Tolling Agreements valid or that Diligent waived its defense, the entire period for which the Secretary is seeking backwages, April 13, 2012 through the date of judgment, would be within the statute of limitations.  As a result, the Court does not need to decide the issue of equitable tolling discussed in the next section.

**F.     Diligent's Efforts to Deceive Drivers Regarding Their Employment Status Warrant Extending Their Liability to the Start of the Secretary's Investigative Period.**

Through deliberate and affirmative acts, Defendants deceived Drivers into believing that they were not employees entitled to protection under the FLSA.  Here, the record is replete with examples of the many ways that Diligent repeatedly recited its mantra to its Drivers that they were independent contractors, not employees, starting with the IC Agreement that Diligent required Drivers to sign as a condition of employment.  Diligent then repeatedly told its Drivers that they were not employees entitled to minimum wage and overtime, but instead are independent contractors, while also proceeding to dictate all aspects of their work.  Diligent's actions must be viewed for what they are: direct and deliberate interference with the Secretary's enforcement of the FLSA.  The Secretary depends on employees coming forward to achieve his mission from Congress to enforce the FLSA—and Drivers, like all employees, are intimidated, discouraged, and restrained from communicating with the Secretary when they do not even know they are employees with the accompanying right to communicate with the Secretary.  Further, Diligent's deliberate creation of documents, starting with the IC

27

Agreements, which attempt to memorialize working terms and conditions which Diligent knew were false—further interfered with the Secretary's enforcement.  These deliberate acts Diligent took to evade law enforcement require tolling of the statute of limitations under long-settled precedent.  *See Kasten v. Saint-Gobain Perf. Plastics Corp.*, 563 U.S. 1, 11-12 (2011) (noting that FLSA enforcement depends on information and complaints received from employees seeking to vindicate their rights); *Donovan v.* Crisostomo, 689 F.2d 869, 875 (9th Cir. 1982); *see also Stoll v. Runyon*, 165 F.3d 1238, 1242 (9th Cir. 1999) (wrongful conduct by a defendant that interferes with a plaintiff's ability to bring a cause of action warrant tolling the statute of limitations); *Yu G. Ke v. Saigon Grill, Inc.*, 595 F. Supp. 2d 240, 260 (S.D.N.Y. 2008) (granting equitable tolling because of "defendants' concealment of plaintiffs' rights" under the FLSA by failing to post a notice of their rights; citing three cases).

Diligent has put forth no evidence to establish that Drivers were not deterred from contacting the Secretary to complain about their working conditions because Diligent led them to believe they had no right to do so.  However, Driver declarations provided by the Secretary show that Diligent did, in fact, prevent Drivers from complaining about their working conditions.   ASUF 257, 258, 273.  For example, Driver Derrick Butler states that, because Diligent told him he was an independent contractor "I believed I was not entitled to overtime or minimum wage" and "[i]f I knew it was possible that I could get paid minimum wage or over time or get reimbursements for my expenses I would have asked for help and called the labor department." ASUF 273 (Butler Decl. ¶ 4).  Driver Leonard Peralta similarly stated that he would have complained had Defendants not misled him about his eligibility for the FLSA's protections.  ASUF 257.  Accordingly, the Court should not grant Diligent summary judgment on equitable tolling.

**G.      Injunctive Relief is Appropriate Based on the Plain Text of the FLSA.**

The plain language of the FLSA entitles the Secretary to injunctive relief for

violations of the FLSA.  29 U.S.C. § 217.  Contrary to Diligent's assertions, Drivers are employees entitled to FLSA protection and the Secretary is therefore entitled to injunctive relief for the alleged violations in this case.[36]

## IV.  <u>CONCLUSION</u>

The undisputed material facts of this case show Drivers are not independent contractors but employees entitled to protection of the FLSA.  Accordingly, the Court should deny Defendant Diligent's Motion for Summary Judgment and grant the Secretary's Motion.  At the minimum, the Secretary has sufficiently disputed the facts introduced by Diligent to prevent summary judgment in its favor.

Respectfully submitted,

Dated: August 25, 2020          JANET M. HEROLD
                                Regional Solicitor
                                ANDREW J. SCHULTZ
                                Counsel
                                BORIS ORLOV
                                Senior Trial Attorney
                                PAIGE B. PULLEY
                                EDUARD MELESHINSKY
                                Trial Attorneys

                                /s/ Hailey McAllister

---

[36] Diligent moves for Summary Judgment on all claims alleged in the Secretary's First Amended Complaint, which includes a claim under the FLSA's anti-retaliation provision, Section 15(a)(3), (*see* ECF No. 142 at 8 (paragraph 27)) which provides that "it shall be unlawful for any person . . . to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding." 29 U.S.C. § 215(a)(3).  While Diligent includes no facts whatsoever with respect to this claim in its Motion, the Secretary provides evidence that Diligent has, in fact, violated Section 15(a)(3). ASUF 273 (Driver Derrick Butler states Diligent terminated his co-worker after he joined a wage lawsuit against Diligent; Butler subsequently did seek to join the lawsuit for fear of termination). Therefore, Diligent's motion for summary judgment on the retaliation claim should be denied.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HAILEY McALLISTER
Trial Attorney